1                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF NEW YORK**
2


3
     UNITED STATES OF AMERICA,        )
4                                     ) Case No. 1:15-CR-00033A
                                      )
5                    Plaintiff,       )
                                      )
6    vs.                              ) April 24th, 2018
                                      )
7    AARON HICKS,                     )
                                      )
8                    Defendant.       )

9


10        **TRANSCRIPT OF JEROME GRANT'S JURY TRIAL TESTIMONY**
           **BEFORE THE HONORABLE RICHARD J. ARCARA**
11             **SENIOR UNITED STATES DISTRICT JUDGE**


12


13   <u>APPEARANCES</u>:

14   For the Plaintiff:   JAMES P. KENNEDY, JR.
                          ACTING UNITED STATES ATTORNEY
15                        BY:  WEI XIANG, ESQ.
                               PAUL PARISI, ESQ.
16                        ASSISTANT UNITED STATES ATTORNEYS
                          138 Delaware Avenue
17                        Buffalo, NY 14202

18   For the Defendant    ROBERT ROSS FOGG, ESQ.
                          69 Delaware Avenue, Suite 600
19                        Buffalo, NY 14202

20   Court Reporter:      MEGAN E. PELKA, RPR
                          Robert H. Jackson Courthouse
21                        2 Niagara Square
                          Buffalo, NY 14202
22


23


24


25

1                              **I N D E X**

2     WITNESSES                                              PAGE

3     GOVERNMENT

4     JEROME GRANT
          Direct Examination by Mr. Xiang                  2
5         Cross-examination by Mr. Fogg                    37
          Redirect Examination by Mr. Xiang              104
6         Recross-examination by Mr. Fogg                110

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (The jury entered the room at 10:00 a.m.)

2          THE CLERK:  All rise.  Criminal action 2015-33A.

3  United States v. Aaron Hicks, jury trial.  Counsel, please

4  state your name and the party you represent for the record.

5          MR. PARISI:  Good morning.  Paul Parisi and Wei Xiang

6  for the United States.

7          MR. FOGG:  Good morning, Your Honor, ladies and

8  gentlemen.  Robert Ross Fogg for Aaron Hicks, who is present

9  in court.

10          THE COURT:  Good morning, everyone.

11  (An off-the-record discussion was held.)

12          THE COURT:  Okay, folks.  We're ready to continue.

13          MR. XIANG:  Your Honor, the government calls Jerome

14  Grant, witness number 34.

15          THE CLERK:  Please state your full name and spell

16  your last name for the record.

17          THE WITNESS:  Jerome Nathan Grant, G-R-A-N-T.

18  (The witness was sworn at 10:02 a.m.)

19

20                      DIRECT EXAMINATION

21

22  BY MR. XIANG:

23  Q.  Mr. Grant, how old are you?

24  A.  Thirty-seven.

25  Q.  Where are you from?

GRANT  --  BY MR. XIANG  --  4/24/18

3

1    A.   Buffalo.

2    Q.   Were you born here?

3    A.   Yeah.

4    Q.   Are you currently in jail?

5    A.   Yeah.

6    Q.   Pull the mic closer to you, please.

7    A.   Yes.

8    Q.   Since when have you been in jail on this stint?

9    A.   July 24th, 2014.

10   Q.   So, for almost the past four years?

11   A.   Yes.

12   Q.   Had you ever been incarcerated before 2014, before July

13   of 2014?

14   A.   Yes.

15   Q.   What years?

16   A.   2003, 2004, 2006.  2006 to 2011, I got out on pre-release

17   and then, went back from 2011 to -- March 2011 to October

18   2012.

19   Q.   All right.  When you say pre-release, you were on --

20   A.   Technically, I was still incarcerated, but I was in a

21   halfway house.

22   Q.   And just to clarify, what time period was this that you

23   were at the halfway house?

24   A.   From August of 2011, August 15th, 2011 until March 2012.

25   I took too long to get back to work and they sent me back to

GRANT  --  BY MR. XIANG  --  4/24/18

4

1  Albion and I got on parole October 9th, 2012.

2  Q.  When you were released on -- to the halfway house, the

3  pre-release you're talking about August 15th, 2011, what

4  facility were you released from?

5  A.  SCI Albion.

6  Q.  And what state is that in?

7  A.  Pennsylvania.

8  Q.  SCI, being State Correctional Institution?

9  A.  Yeah.

10  Q.  And how long had you been in custody in the

11  Pennsylvania -- Commonwealth of Pennsylvania Department of

12  Corrections before this halfway house release on August 15,

13  2011?  How long before that?

14  A.  2004 to 2006.  I got paroled in 2006 from SCI Houtzdale.

15  Q.  And then when did you go back in?

16  A.  July 2006.

17  Q.  And when did you get released from that stint?

18  A.  Well, I got released from federal jail September 2010,

19  but I had a warrant for Pennsylvania for parole violation, so

20  they came and got me and took me to SCI Albion.  Then I got

21  released on pre-release August 15th, 2011.

22  Q.  Both the Pennsylvania -- well, what was the -- the

23  underlying conviction for which you served time in

24  Pennsylvania?

25  A.  Possession of marijuana.

1   Q.  And then, the federal sentence?

2   A.  Possession of a firearm.  Criminal in possession of a

3   firearm.

4   Q.  When you were in Pennsylvania prison, did you have access

5   to telephone contact with people on the outside?

6   A.  Yes.

7   Q.  How were you able to do that?

8   A.  Get a phone list, fill it out, put the numbers on there.

9   Don't nobody else have a number, they approve it for you and

10  you call them.

11  Q.  The phone list, who did you submit that to?

12  A.  The counselor on the unit.  The unit counselor.

13  Q.  At the prison?

14  A.  Yes.

15  Q.  Did you give them, the Pennsylvania facility, a list of

16  people for your phone list?

17  A.  Yes, I did.

18  Q.  Who was at the top of your list?

19  A.  Aaron Hicks.

20  Q.  Is the Aaron Hicks that you're talking about, is he in

21  the courtroom with us today?

22  A.  Yes.

23  Q.  Can you identify him by a unique article of clothing he's

24  wearing?

25  A.  A blue jacket, suit jacket and glasses.

1    MR. XIANG:  The record will reflect the witness has

2  identified the defendant.  Can you stop swinging?  It's

3  squeaking.

4  BY MR. XIANG:

5  Q.  Why did you put Aaron Hicks on the top of your telephone

6  list?

7  A.  At that time, he was somebody that I was talking to

8  pretty much the most.  So, when I filled out the list, that

9  was the first person to pop up in my mind.

10  Q.  How did you know him?

11  A.  From Schuele Street, around that area.

12  Q.  Since when?

13  A.  Since about -- I want to say about maybe 2000, early

14  2000, late 90's, early 2000's.

15  Q.  How old would that have made you at the time?

16  A.  Like probably 2000, I was 19, about to be 20.  About 20,

17  21, around that area.

18  Q.  And what street -- on what street were you living at that

19  time?

20  A.  I was staying on Schuele.

21  Q.  And where was Aaron Hicks?

22  A.  He was staying on Northland.

23  Q.  How did you first meet him?

24  A.  Just seen him around over there in the neighborhood.

25  Q.  Did you go to school with him?

GRANT  --  BY MR. XIANG  --  4/24/18                          7

1   A.  No.

2   Q.  In terms of age, are you older, younger?

3   A.  Older.

4   Q.  How did your relationship with him develop from the early

5   2000's?

6   A.  When I first got released from Houtzdale -- excuse me.

7   When I first got released from Houtzdale, I was in the

8   halfway house in Pennsylvania.  I think it was called Gateway

9   and --

10  Q.  What year is this?

11  A.  This was 2006.  Then, I talked to Stacks.

12  Q.  Who is Stacks?

13  A.  Antwon Steward.  And he told me that Boogy was going to

14  Edinboro down there.

15  Q.  Who is Boogy?

16  A.  Aaron Hicks.

17  Q.  How did you know Stacks or Antwon Steward?

18  A.  I have known him for a while, from around the Schuele

19  area.

20  Q.  In 2006, after you learned that Boogy was going to school

21  in Edinboro, what happened next?

22  A.  I called him.  He came down.  I was in Erie.  He came

23  down to pick me up from the halfway house.

24  Q.  Erie, Pennsylvania?

25  A.  Yeah.  Then, we went back out to his school.  Stayed out

1    there for a little while 'til it was time for me to go back

2    to the halfway house.  And then I went back to the halfway

3    house and that's when we started hanging around each other.

4    Q.  What did you guys do together?

5    A.  Well, at that time, we really wasn't doing too much, a

6    little bit of weed.

7    Q.  What do you mean a little bit of weed?

8    A.  Like, nickle bags.

9    Q.  Using?

10   A.  Selling.  I couldn't smoke at that time because I was in

11   the halfway house and they was giving me urines.  So, I would

12   just sell.

13   Q.  What do you mean by we?

14   A.  Well, I got the weed from him.

15   Q.  Where were you selling?

16   A.  In Erie, Pennsylvania, to various people.

17   Q.  How much were you getting from Boogy?

18   A.  At that time, it was probably like an ounce, two ounces.

19   Q.  So, how many -- you said nickel bags?

20   A.  Yeah.

21   Q.  Give us an idea of quantity-wise, price-ise, what that

22   is?

23   A.  You take an ounce, you probably make maybe 20 nickle bags

24   out of it, if I'm not mistaken.

25   Q.  A nickel bag; what's a nickle bag?

1  A.  It's a $5 bag of weed.

2  Q.  You say you would get an ounce or so from Boogy every

3  time?

4  A.  Yeah.  At that time, yes.

5  Q.  And how much was an ounce?

6  A.  At that time, it was kind of cheap, it was $50, $75 an

7  ounce.

8  Q.  How often were you doing this with Boogy?  And I'll ask

9  you again; we're talking about 2006?

10 A.  I don't know.  Just pretty much if I needed it or if I

11 knew somebody who needed it, I would call.  So, whenever I

12 needed it or somebody else needed it.

13 Q.  Was there anyone else -- you mentioned Stacks earlier.

14 Was there anyone else you knew from Schuele involved in your

15 drug dealing with Hicks in the Edinboro/Erie area at this

16 time?

17 A.  Barkley was going there, too.

18 Q.  Who?

19 A.  Barkley, Anthony.  I think his name is Anthony Barkley.

20 Q.  What was he doing?

21 A.  He was selling weed.

22 Q.  Where was he from?

23 A.  Schuele.

24 Q.  Did you know him before?

25 A.  Yeah.

1   Q.   I think earlier you said that in 2006 you went back to

2   prison?

3   A.   Yeah.

4   Q.   When -- and when you went back in, in 2006, when was the

5   next time you got out?

6   A.   2011.

7   Q.   And you said from -- is that the August 15, 2011?

8   A.   Yes.  That's when I was on pre-release -- or post-

9   release.  It's called -- it's actually called -- they have

10  pre-release if it's before your sentence; post-release if

11  it's after your sentence.

12  Q.   What you got out August 15, 2011, how did you get to the

13  halfway house?

14  A.   Boogy took me.

15  Q.   Where was this halfway house?

16  A.   On West 2nd Street in Erie.

17  Q.   Erie, Pennsylvania?

18  A.   Yes.

19  Q.   How long were you at this halfway house?

20  A.   Seven months before I went back to jail for taking too

21  long to get home from work.

22  Q.   During this seven-month period, starting August 15th,

23  2011, did you continue to sell drugs in the Erie area?

24  A.   Yeah.

25  Q.   What?

GRANT  --  BY MR. XIANG  --  4/24/18
                                                              11

1   A.   Marijuana, cocaine.

2   Q.   How did you get it?

3   A.   From Boogy.

4   Q.   How?

5   A.   He would come up there and see me.  One time, I went to

6   Buffalo to get some weed from him.

7   Q.   Was there anyone else from the Schuele area who was also

8   involved in your drug dealing in Erie during this period?

9   A.   Yeah.  It was Hottie.

10  Q.   How did you know Hottie?

11  A.   I really met him when I first came home, because he

12  wasn't around before then.  But when I first came home, I

13  been --

14  Q.   When you first came home was when?

15  A.   Well, 2011.  That was when I first met him.

16  Q.   How did you get to meet Hottie?

17  A.   I met him through -- well, Boogy didn't introduce us.  He

18  was there when we like, met face to face, but he told me that

19  that was his peoples.

20  Q.   Where did you meet Hottie?

21  A.   First time I met him was at a Walmart.  He had came up

22  and brought me some CDs.

23  Q.   And what city was this?

24  A.   This was in Erie, Pennsylvania.

25  Q.   When you say that he went -- he came up or you went up,

1   Buffalo is north of Erie, correct?

2   A.  Yeah.

3   Q.  But are you referring to you met him in Pennsylvania?

4   A.  Yeah.  I met him at a Walmart in Pennsylvania.

5   Q.  Why did you meet Hottie then?

6   A.  Well, at that time, he was -- he had some CDs for me to

7   pass around Erie.

8   Q.  What kind of CDs?

9   A.  Rap CDs.

10  Q.  What relation did the rap CDs have with Hottie?

11  A.  Well, he was Black.

12  Q.  Who is Black?

13  A.  Sirius Black, Sandy Jones.

14  Q.  Did you know who Sirius Black or Sandy Jones was?

15  A.  Yeah.

16  Q.  Before Hottie passed you these CDs?

17  A.  Yes.

18  Q.  How did you know Sirius Black?

19  A.  From Schuele Street.

20  Q.  What time period?  As in, when did you first meet him?

21  A.  About late 90's, early 2000's.

22  Q.  And how did you meet Sirius Black?

23  A.  Being in the neighborhood.  At that time, he was selling

24  weed.

25  Q.  When Hottie gave you the Sirius Black CDs, did you ever

1   view any music videos with -- of Sirius Black?

2   A.  Yes.

3   Q.  When you were at the halfway house in Erie, Pennsylvania,

4   from August 2011 to March of 2012, were you invited to be in

5   a music video with Sirius Black?

6   A.  Yes.

7   Q.  Who invited you?

8   A.  Boogy.

9   Q.  How?

10  A.  Phone.  I was talking to him on the phone.  He was

11  telling me that they was bringing Cheddar DVD down to Buffalo

12  and see if I can come to the video shoot.  And the reason why

13  he was asking is because I guess he wanted me to get fitted

14  for a tux.

15  Q.  How did you know he wanted to get you fitted for a tux?

16  A.  Because that's what he told me.

17  Q.  Were you able --

18  A.  If I can come.

19  Q.  Were you able to attend?

20  A.  No.

21  Q.  Why not?

22  A.  Because by me being on pre-release, I was technically

23  still in jail, so I wasn't allowed to leave the state.

24  Q.  You just said pre-release?

25  A.  Well, post-release.  It's the same.

1   Q.   The particular video that you were supposed to -- that

2   you were invited to be in with the tux, did you learn about

3   the finished video?

4   A.   Yes, I did.

5   Q.   How did you learn about the finished video?

6   A.   Boogy told me that it was on YouTube.  He called me and

7   told me it was on YouTube, or maybe I called him.  We was

8   talking on the phone.

9   Q.   Did you see the video afterwards after he told you about

10  it?

11  A.   Yes.

12  Q.   And is Hottie in that video?

13  A.   Yes.

14  Q.   Do you remember the scene or a scene where he's in?

15  A.   Yeah.  I remember a scene where he's in.

16  Q.   When?

17  A.   He was sitting at the table.  He had an unlit cigar in

18  his mouth and he was talking.

19  Q.   Did you recognize anyone else in that video?

20  A.   Yeah.

21          MR. XIANG:  Can we pull up 24 -- what's in evidence

22  as Government Exhibit 24H, please?

23  BY MR. XIANG:

24  Q.   Mr. Grant, do you see what's on the screen as

25  Exhibit 24H?

GRANT  --  BY MR. XIANG  --  4/24/18
15

1   A.  Yes.

2   Q.  Is this still a lot of the video that we've been talking

3   about?

4   A.  Yes.

5   Q.  Do you recognize any persons shown in this still shot?

6   A.  Yes.  Yeah.

7   Q.  Why don't we start on the right-hand side?  Fair to say

8   that there's four people seated and then a number of people

9   standing in the back?

10  A.  Yes.

11  Q.  All right.  Let's start on the right-hand side with the

12  back row.  The first person on the right, do you recognize

13  that person?

14  A.  That's standing?

15  Q.  Yes.

16  A.  Holding the drink?  What are you talking about?

17  Q.  Just to be clear, on the back row.  The first person on

18  the right.

19  A.  Oh, yeah, yeah.  That's Dre.

20  Q.  How did you know him?

21  A.  From the Schuele Avenue.

22  Q.  What was your relationship to him?

23  A.  He was all right, cordial.

24  Q.  Let's move one over.  Second person on the right, back

25  row?

1  A.  Yeah, I know him.

2  Q.  Who is that?

3  A.  Torrance.

4  Q.  Do you know him by -- is that a first name, last name,

5  nickname?

6  A.  First name is Letorrance, last name Travis.

7  Q.  How did you know him?

8  A.  Well, I knew him before Schuele area.  His mom was one of

9  my teachers at the school, so I knew them by the Schuele

10  Avenue.  His grandmother stayed on Stevens.

11  Q.  Moving one left, still on the back row.

12  A.  The girl?

13  Q.  Yes.

14  A.  No, I'm not familiar with her.

15  Q.  Moving one over from her?

16  A.  That's Tory, Torrance's older brother.

17  Q.  Do you know Tory's full name?

18  A.  I think it's Shawntorrian Travis.

19  Q.  Moving one over from Tory?

20  A.  That's Mike.  Mikey Bird.

21  Q.  How did you know Mikey Bird?

22  A.  From the Schuele area.

23  Q.  Do you remember one over, the one in the White Sox hat?

24  A.  I can't really see his face, to be honest with you.

25  Q.  One over from the White Sox hat, individual holding up

1    the bottle with the gold chain?

2    A.   That's DJ Shay.

3    Q.   How did you know him?

4    A.   From being in the studio, his studio.

5    Q.   Do you see the person one over from him, the person on

6    the left-most side?

7    A.   Yeah.  It look like it could be Joe.

8    Q.   But you can't see his face?

9    A.   No, I can't see his whole face, but just from -- like,

10   what I assume he would look like.

11   Q.   I'm not asking you to assume anything.

12   A.   All right.

13   Q.   So, now let's go to the seated row.  Again, on the right-

14   hand side.  Starting on the right.

15   A.   Ra Ra.

16   Q.   Who?

17   A.   Ra Ra.

18   Q.   Do you know his -- is that a first name, last name,

19   nickname?

20   A.   No.  That's his nickname.  His first name is Roderick.

21   His last name is Arrington.

22   Q.   How did you know Roderick Arrington?

23   A.   I went to school with him and from around Schuele area.

24   Q.   Moving one left from Roderick Arrington?

25   A.   Boogy.

1   Q.   One left from Boogy?

2   A.   Black.

3   Q.   Do you remember from the video, at least one left from

4   Black, who has his head down?

5   A.   That's Breeze.

6   Q.   Who?

7   A.   OP, Breeze.

8   Q.   How did you know OP/Breeze?

9   A.   Schuele Street.

10  Q.   Do you remember the layout of the rest of this table?  I

11  mean, who was seated to OP's right?  Who is off the screen on

12  the left-hand side?

13  A.   I'm thinking.  If I can remember correctly, it would be

14  Brill and Dan, maybe Hottie.

15  Q.   Was there any video that you were present for?

16  A.   Yeah.

17  Q.   Which one or which ones?

18  A.   The All White video.

19  Q.   When was that?

20  A.   That was in 2013.

21  Q.   2013?

22  A.   Yeah.

23  Q.   Now, you had previously said that you went back to

24  Pennsylvania's prison in March of 2012?

25  A.   Yes.

1   Q.  So, when did you get released, after March of 2012?

2   A.  I got released to the halfway house.  They paroled me to

3   the halfway house on October 9th, 2012.  And then, I maxed

4   out from the halfway house, January 18th, 2013.

5   Q.  Can you explain what it meant for you to have maxed out

6   from the halfway house?

7   A.  I was finished with my Pennsylvania state sentence.

8   Q.  So, in January of 2013, were you under any criminal

9   sentence?  Let me rephrase.  By February of 2013, were you

10  under any criminal sentence?

11  A.  I was on probation for my previous federal charge that I

12  had.

13  Q.  Did that mean that you were in or out of custody?

14  A.  Well, I was out of custody, but I had to just report to

15  probation.

16  Q.  Is it -- after you were released or you maxed out of your

17  Pennsylvania sentence, in January of 2013, where did you go?

18  A.  Came back to Buffalo.

19  Q.  The All White video that you mentioned being produced in

20  2013, where was that?

21  A.  It was in Buffalo.

22  Q.  And how is it that you were present for its making?

23  A.  Because I was in Buffalo.

24  Q.  How did you know that it was being made?

25  A.  Oh, because Boogy had told me that they were about to do

1    a video.  I was hanging around pretty much almost every day

2    around this time.

3    Q.  Do you know how the All White video was funded?

4    A.  Yeah, we had some marijuana that came in.

5    Q.  How do you know that?

6    A.  Because I was there.

7    Q.  Explain what you meant by you had marijuana come in?

8    A.  I think it was 33 pounds, if I'm not mistaken.  And

9    picked it up from one of his relative's houses and we took it

10   to Brill house and we broke it down.  It was all in like,

11   little bags.  And like, you had to open the bags up and break

12   the weed down because it was compressed.

13   Q.  Start from the beginning.  How did you learn that there

14   was a shipment coming in?

15   A.  I was with Boogy.  He told me.

16   Q.  You said that it was brought to Brill's house?

17   A.  Yes.  We picked it up and then took it to Brill's house.

18   Q.  Who is we?  When you say we picked up?

19   A.  It was me, Boogy and Black was with us.

20   Q.  And where did you say you went to pick this up?

21   A.  It was one of his relative's houses, off like Camp

22   Street.

23   Q.  Whose relative?

24   A.  Boogy's.

25   Q.  When was the first time you saw the package?

GRANT  --  BY MR. XIANG  --  4/24/18

1   A.  When the UPS man dropped it off.

2   Q.  And give us an idea of what you saw, the package, before

3   it was opened.

4   A.  It was in a brown box.  The UPS man dropped it off.

5   Boogy got out the -- we was in a truck, I think at the time.

6   Boogy got out of the truck, he grabbed it, put it in the

7   truck and we pulled of.

8   Q.  Why were you there?

9   A.  Because I was with him all the time at that time.

10  Q.  Was Brill with you when you picked it up?

11  A.  No.  No.

12  Q.  And you know why it was taken to Brill's house to be

13  broken down?

14  A.  I really don't know.  Nobody said why we was taking it

15  over or nothing.  Just that's where we went to.  So, that's

16  when I got out of the car.

17  Q.  Can you explain what it means or what you meant by

18  breaking it down?

19  A.  It comes in, it's compressed.  You got to break it down,

20  take it out of its form and then, put it into pounds and

21  then, put them in a ziplock bag.

22  Q.  What do you mean that it came compressed?

23  A.  Like, it would be -- sometimes it would be -- sometimes

24  it come in big -- it would be like, a -- just a big,

25  compressed like, bale.  Sometimes, it would come and it would

                                                                        22

1   be compressed, but they would be about this big (indicating).

2   You got to take it, it's wrapped up.  You got to take it from

3   out of its wrapper and break it down.

4   Q.  And what do you mean by putting it in pounds?

5   A.  Weigh it up to a pound, then put it in a Ziplock bag

6   because you sell it in pounds, you sell it by the pound.

7   Q.  Is that a common denomination for sale, pounds for

8   marijuana?

9   A.  Yeah.

10  Q.  And so, what happened to this parcel that you're talking

11  about that you took to Brill's house?

12  A.  It got broke down and it got sold.

13  Q.  Who broke it down?

14  A.  Boogy was breaking it down.  I'm not sure if I touched

15  that one, but I know Boogy was breaking it down.

16  Q.  How do you know it got sold?

17  A.  Because I was there when they got it and I was there when

18  it was gone.

19  Q.  What did that have to do with the All White video that we

20  were talking about?

21  A.  Well, it was pretty much dependent on that, on the weed

22  making it through, because nobody had no money at that time

23  to finance the videos.  So, the weed, like if it would have

24  never gotten through, then we wouldn't have been able to do

25  the video.

23

1   Q.  The Brill that you're talking about, how did you know

2   Brill?

3   A.  I met him before.  I met him like, in the early 2000's,

4   briefly, but I really wasn't hanging around him then.  A

5   couple times I'd be around with Boogy.  And when I came home,

6   Boogy had introduced me to him.

7   Q.  When you first met Brill in the early 2000's, where did

8   you meet him?

9   A.  I met him -- at that time, I met him, he was coming

10  around Schuele neighborhood with Black Wheeze.  Black Wheeze

11  was on Lombard around that time.  So, I guess that's where he

12  was dealing on Lombard.  So, he would come around Schuele

13  from time to time, Brill would be with him.

14  Q.  You said that you didn't know him too well in the

15  beginning?

16  A.  No.  Just seeing him in passing.  I knew Black Wheeze.  I

17  didn't really know Brill.

18  Q.  Was there a time when you got to know Brill better?

19  A.  Yeah.  I got to know Brill better.

20  Q.  When?

21  A.  When I came home in 2013.

22  Q.  And how did you get to know him better then?

23  A.  From Boogy.

24  Q.  How?

25  A.  They was always together.

1    Q.  Doing what?

2    A.  Well, at that time, they really wasn't doing too much;

3    still getting some weed sent there.

4         MR. XIANG:  Can we pull up what's in evidence as

5    Government Exhibit 24B?

6    BY MR. XIANG:

7    Q.  Do you recognize what's on here?

8    A.  Yeah.

9    Q.  And how do you recognize it?

10   A.  That's the cover of the CD that I was passing out in

11   Erie.

12   Q.  The one that you had said Hottie gave you?

13   A.  Yeah.

14   Q.  Do you recognize any of the -- well, first, fair to say

15   that there are eight people or eight faces shown on here?

16   A.  Yeah.

17   Q.  Do you recognize any of them?

18   A.  Yeah.

19   Q.  How many?

20   A.  All of them.

21   Q.  Let's do what we did with the other one.  Start on the

22   right-hand side and go left.

23   A.  The -- the dark-skinned, bald-headed man, that's Black

24   dad.

25   Q.  That's whose dad?

1    A.   Sirius Black dad.

2    Q.   One over on?

3    A.   Torrance.

4    Q.   One over?

5    A.   Boogy.

6    Q.   One over?

7    A.   That's Cheese little brother, Wheeze.

8    Q.   One over?

9    A.   Black.

10   Q.   One over?

11   A.   Cheese.

12   Q.   One over?

13   A.   Brill.

14   Q.   And then the last person on the --

15   A.   Ra Ra.

16   Q.   Just let the question be finished.  The last person on

17   the left side?

18   A.   That's Ra Ra.

19   Q.   The All White video, did you ever learn why it was made?

20   A.   Yeah.  We had went to see --

21   Q.   Wait, wait, wait.  Just yes or no.  Did you ever learn --

22   A.   Yes.

23   Q.   How did you learn it?

24   A.   Well, we had went to see Black when he was in jail.

25   Q.   Who is we?

1    A.  Me and Boogy.

2    Q.  Okay.

3    A.  We went to see him.  He was like, saying some of the rap,

4    some of the songs that he had.  Then, we talking about pretty

5    much the situation that was revolving around Torrance.

6    Q.  Explain for us what that was about.

7    A.  He --

8    Q.  And by that, I mean what you, Boogy and Sirius Black were

9    discussing about Torrance.

10   A.  Just about how he was cooperating with the Feds.

11   Q.  When was that?

12   A.  That was in 2013.

13   Q.  And the cooperation -- or the perceived cooperation with

14   the Feds, when was that from?

15   A.  2011.

16   Q.  To be clear, were you in Buffalo for any arrest of

17   Letorrance Travis in 2011?

18   A.  No.

19   Q.  Where were you at the time?

20   A.  I was in Erie, Pennsylvania.

21   Q.  And what did you, Boogy and Sirius Black talk about in

22   2013, about Torrance cooperating?

23   A.  The -- well, at the jail, when we went to see him, he was

24   saying like, how he ain't messing with him.  Torrance, he

25   about to mess up his rap name.  And that's why he was making

27

1    some of the songs.

2    Q.   What does that have to do with All White?

3    A.   All White, that's like a formal -- it's like a slang word

4    for -- to represent cocaine.

5    Q.   And what did it have to do with Letorrance Travis?

6    A.   Well, of course it was All White.  That's -- well,

7    Torrance was selling cocaine, but that phrase wasn't

8    necessarily directed towards him.  Telling other niggas that

9    was bitch nigga shit was more of the phrase that was directed

10   towards him.

11   Q.   So, you're saying that there were lines in the song about

12   Letorrance?

13   A.   Yes.

14   Q.   What lines?

15   A.   Telling on niggas, that's bitch nigga shit.  That was

16   directed towards Torrance.

17   Q.   Was cooperating or providing information to the

18   government encouraged?

19   A.   Pardon?

20   Q.   Where you're from?

21   A.   No.

22   Q.   Were you present for picking up any other marijuana boxes

23   with Boogy?

24   A.   Yes.

25   Q.   How many?

28

1   A.   A few times, couple times, various times.

2   Q.   And what time period are we talking about?

3   A.   2013, 2014.

4   Q.   Was there anybody else present during those times that

5   you were?

6   A.   Yeah.  It was me and Black a couple times.

7   Q.   And Black, you're referring to whom?

8   A.   Sirius Black.  He was present one time when we picked it

9   up.  Then, he was present at the other time when we took it

10  down to Girard Street.

11  Q.   Girard?

12  A.   Yeah.

13  Q.   Who else was at Girard, if anybody?

14  A.   Ra Ra had came over there.  That was his mother house.

15  Q.   Why were you and Sirius Black with Boogy for picking up

16  these other parcels?

17  A.   He told us that he had it coming in.  We went with him

18  and got it, took it over there.

19  Q.   Did you have anything to do with the marijuana that he

20  received?

21  A.   Yeah.  I was -- sometimes, I would pick it up.  I would

22  be by myself and pick it up and take it to him or I would

23  sell some of it.

24  Q.   The time that you were talking about with Sirius Black,

25  how much did you, Boogy and Black pick up then?

1  A.  At that time, it was 40 pounds.

2  Q.  And what did you all do with the 40 pounds?

3  A.  Took it to Girard to Ra Ra's mother house and broke it

4  down.

5  Q.  Was Ra Ra's mother there?

6  A.  No, she wasn't there.

7  Q.  So, who else was there?

8  A.  Me, Black and Ra Ra.

9  Q.  You, Black, Ra Ra.  Anyone else?

10  A.  Oh, Boogy.

11  Q.  And what did the four of you -- each of the four of you

12  do when -- with those 40 pounds?

13  A.  I was breaking it down.  Boogy was putting it in pounds,

14  weighing it up in pounds and putting it in a bag.  Black and

15  Ra Ra really wasn't doing too much.

16  Q.  Did you ever know of an individual by the name of Matt?

17  A.  Yeah.  I heard of him.  I did.  I never met him, though,

18  but I heard of him.

19  Q.  Did you ever talk to him?

20  A.  Yeah.  I talked to him before.

21  Q.  How?

22  A.  I was locked up one time and he was with Boogy and I had

23  called Boogy.

24  Q.  What time period of your incarceration are we talking

25  about here?

                                                                        30

1   A.  This was when I was in FCI Petersburg, so that had to be

2   like, 2009, I want to say it was, maybe 2009, 2010, around

3   that time, before I got released from FCI Petersburg.

4   Q.  How is it that you were on the phone with Boogy and got

5   introduced to Matt?

6   A.  Because I had called him.  And Matt is from Cleveland.

7   And so, Stacks and all them, they from Cleveland, so he

8   was -- asked me did I know him, because he my cousin.

9   Q.  Who was asking you?

10  A.  Boogy.

11  Q.  Did you -- well, I think you answered that.  So, but you

12  said that you never met Matt in person?

13  A.  No, I never met him in person.

14  Q.  Did you ever learn of what happened to Matt?

15  A.  Yes, I did.

16  Q.  After you came home, did -- to Buffalo, did Boogy ever

17  talk to you about Matt?

18  A.  Yeah.

19  Q.  Under what circumstances?

20  A.  I had -- I was at -- he picked me up from --

21  Q.  Who is he?

22  A.  Boogy.  Boogy picked me up from the -- downtown mall.  We

23  went to his girlfriend house in the Town Gardens and he was

24  just pretty much like, filling me in on things that was

25  happening since I was gone, because that was like, one of the

1   main times that we got a chance to really sit down and talk.

2   And he was telling me about how I would have liked him.  How

3   he, you know, he got on his nerves sometimes, but he had love

4   for him.

5   Q.  He had what?

6   A.  He had love for him.

7   Q.  Did Boogy say anything to you about Matt's death?

8   A.  Yeah.  He said that it hurt him.  And he was talking

9   about how Matt's uncle asked him and welcomed him into the

10  church, about how it was really hurting him and he couldn't

11  let it go.

12  Q.  Were you in Buffalo on August 26th, 2012?

13  A.  No.

14  Q.  Where were you then?

15  A.  August 26th, 2012, I was in SCI Albion.

16  Q.  What about four days later, on August 30th, 2012?

17  A.  No, I wasn't there.

18  Q.  Still in prison?

19  A.  Yeah.

20  Q.  Did Ra Ra ever -- Roderick Arrington ever show you

21  anything regarding August 30th, 2012?

22  A.  Yes.

23  Q.  What?

24  A.  He showed me a letter from Dame.

25  Q.  Where were you and Ra Ra when Ra Ra showed you this

1  letter?

2  A.  The Erie County Holding Center.

3  Q.  And around when was that?

4  A.  That was in -- I want to say maybe like, the early part

5  of 2015.  Yeah, it was about the early part of 2015.  I want

6  to say like, around January 2015.

7  Q.  Explain for us how it is that you saw Ra Ra at the

8  holding center at that time.

9  A.  I was in Allegany County on this charge I'm on now.  And

10  I had a city case in Buffalo that I had to go to court for.

11  So that they do it -- the sheriffs from Buffalo come and take

12  me to the holding center.  So, when they took me to the

13  holding center, I went to the -- they moved me to the block

14  that Roderick was on.

15  Q.  Explain for us the layout of the block where Ra Ra was on

16  at this time.

17  A.  It's just like, a big room with a bunch of cells on the

18  side, a shower, a TV area, a microwave area, CO's desk.

19  Q.  Did inmates in this block have their own sleeping

20  quarters?

21  A.  Yes.

22  Q.  Like, individual beds?

23  A.  Yes.  They're all single cells, all individual rooms.

24  All single cells.

25  Q.  By single cell, you mean there's only one person who is

1    in the cell?

2    A.   Yes.

3    Q.   Or one person who is assigned to a cell?

4    A.   Yes.

5    Q.   So, explain for us how Ra Ra showed you a letter from

6    Dame.

7    A.   When I came up, he was playing chess.  I said, what's up?

8    And he asked me what I was doing there.  When I told him I

9    had a city case that I had to go to court for, because I had

10   to go to court the next day for it, Dame, he got to asking me

11   about were you guys questioning me about him.

12   Q.   Were the Feds asking you about Arrington?

13   A.   Yeah.  Somebody had -- I think somebody had told him that

14   he was on our criminal compliant.  So, he was -- kept asking

15   me about that.  Did you guys -- did the Feds say anything

16   about me?  I pretty much telling him, no and he kept asking

17   me and I kept telling him no.

18   Q.   You told him that we hadn't -- that the Feds were not

19   asking about Ra Ra?

20   A.   Yeah.  That he wasn't on --

21   Q.   Was that true?

22   A.   No.

23   Q.   Why did you lie to Ra Ra?

24   A.   Because if I would have told him that you was asking

25   about me and that I was cooperating, it would have been a

34

1    different situation.

2    Q.  Like what?

3    A.  It would turn around, pretty sure.

4    Q.  So, after you told him no, what happened next?

5    A.  He got to telling me about how Dame not telling on him.

6    And then that's when I asked him if Dame not telling on you

7    about what.  And he said, Dame about shooting Shooter.  And

8    then, he took me to his cell because at that time, we was at

9    my cell and he took me to his cell and he showed me the

10   letter.

11   Q.  Did you read the letter?

12   A.  Yeah.  I read it.

13   Q.  I'm handing to you what's in evidence as Government

14   Exhibit 41 and 41A.  Do you recognize those two exhibits?

15   A.  Yes.

16   Q.  How do you recognize them?

17   A.  Well, I recognize the letter from -- this is the letter

18   that I read from Dame -- or that he told me it was from Dame.

19   Q.  That Ra Ra showed to you?

20   A.  Yeah.

21   Q.  And what, if any, reaction did Ra Ra have to that letter?

22   A.  He seemed like he was relieved that Dame -- he was

23   convinced that Dame wasn't telling on him.

24   Q.  Do you see where Ra Ra had the letter stored?

25   A.  He just had it in an envelope.  I didn't see exactly

1    what -- I mean, I think he pulled it out of the envelope,

2    because his back was towards me when he was pulling it out.

3    Q.  What I was referring to was in the cell itself?

4    A.  Oh, yeah.  He was in his cell.  He had like, a desk and

5    he had like, some mail and it was like, a little cubby hole.

6    He had mail sitting down there and that's what he reached and

7    grabbed it from.

8    Q.  Was he showing it to everybody on the block that you saw?

9    A.  Not that I seen, no.

10   Q.  What happened after you read the letter in Ra Ra's cell?

11   A.  I gave it back to him.

12   Q.  Did you do anything with your knowledge of the letter?

13   A.  Yeah.  I wrote a letter to George Burgasser.

14   Q.  Who is that?

15   A.  He was the prosecutor on the case that I was on.

16   Q.  You told the prosecutor on your case about Ra Ra's

17   letter?

18   A.  Yes.

19   Q.  You mentioned your current charge a little bit.

20   You're currently convicted on a 2014 cocaine charge here in

21   Federal Court?

22   A.  Yes.

23   Q.  And after your arrest, continuing to today, are you

24   cooperating with the investigation and prosecution of

25   criminal conduct?

1   A.  Yes.

2   Q.  Have you already been sentenced?

3   A.  Yes.

4   Q.  To what?

5   A.  188 months.

6   Q.  In years' terms, what is that?

7   A.  Fifteen and a half.

8   Q.  By whom?

9   A.  By the Judge.  You're talking about who sentenced me?

10  Q.  Correct.

11  A.  The Judge.

12  Q.  And who is that?

13  A.  Judge Arcara.

14  Q.  Are you hoping for a sentencing reduction?

15  A.  Yes.

16  Q.  Did you receive -- as far as you knew, any credit at the

17  time of your sentence?

18  A.  No.

19  Q.  Let me rephrase.  Did you receive any credit at the time

20  of your sentence?

21  A.  For cooperating?

22  Q.  Correct.

23  A.  No.  I got 188 months.  That was my low end of my

24  sentencing guidelines.

25  Q.  In terms of any sentencing reduction, had anyone made any

1    promises to you about a specific reduction or a specific

2    sentence?

3    A.   No.

4    Q.   Who makes the final determination?

5    A.   The Judge.

6    Q.   Judge Arcara?

7    A.   Yes.

8            MR. XIANG:  No other questions, Judge.

9

10                     CROSS-EXAMINATION

11

12   BY MR. FOGG:

13   Q.   Mr. Grant, you had testified that you wrote George

14   Burgasser a letter.

15   A.   Yes.

16   Q.   In fact, you wrote George Burgasser several letters,

17   right?

18   A.   Yes.

19   Q.   How many letters, all together, would you say?

20   A.   I don't know a specific number.

21   Q.   Well, the one letter, did you -- do you recall writing a

22   letter to George Burgasser, I guess that would be 12/12/2016

23   and that would be a Christmas card?

24   A.   Where -- do you know where it was sent from?

25   Q.   Do you recall?

                                                                    38

1    A.  It's possible.

2    Q.  Let me show you what's been marked as Government's

3    Exhibit -- well, excuse me -- Defendant's Exhibit 9 for

4    identification.  Look through that.

5    A.  Oh, yeah.  All right.

6    Q.  Do you recognize that?

7    A.  Yes, sir.

8    Q.  And that's your Christmas card, right?

9    A.  Well, they was giving them away in Allegany County, so --

10   Q.  That's a Christmas card you prepared, right?

11   A.  Well, prepared?  Did I prepare?  What do you mean?

12   Q.  Did you sent this Christmas card to Mr. Burgasser?

13   A.  Oh, yeah.

14   Q.  Yeah.  Okay.  And that consists of the card, what's

15   inside the card, correct?

16   A.  Yes.

17   Q.  And then, there was a letter attached, right?

18   A.  Yes.

19   Q.  And then, of course, the envelope, right?

20   A.  Yes.

21   Q.  And the back of the envelope, right?

22   A.  Yes.

23   Q.  Okay.  And does Government -- excuse me.  Does Defense 9

24   fairly and accurately represent what you sent?

25   A.  Pardon me?

                                                              39

1  Q.  Does it -- is it accurate?  Does this represent what you

2  sent?

3  A.  Oh, yes.

4  Q.  It does?

5          MR. FOGG:  Defendant moves Defendant's 9 into

6  evidence, Judge.

7          MR. XIANG:  Objection.  Hearsay.

8          THE COURT:  Ladies and gentlemen, would you step in

9  the jury room?

10  (The jury left the room at 10:52 a.m.)

11          THE COURT:  Marshal, would you have the witness step

12  out of the courtroom for a minute?

13  (The witness left the stand at 10:53 a.m.)

14          THE COURT:  What's the objection?

15          MR. XIANG:  Hearsay objection.  There's no purpose to

16  the exhibit, other than the statements that are contained

17  therein, which are statements -- out-of-court statements.  And

18  unless there was some -- I don't hear any impeachment.  I

19  don't hear anything that would say that it's not for the truth

20  of any matter asserted, which would make it hearsay.

21          THE COURT:  Mr. Fogg?

22          MR. FOGG:  Judge, this is some documents -- he had

23  mentioned that he wrote George Burgasser.  There are several

24  letters that I have that basically state certain things.  And

25  what he says to George Burgasser --

40

```
1              THE COURT:  So what?
2              MR. FOGG:  It established a relationship with George
3   Burgasser and the office and also his attempts to curry favor
4   and also to somehow work out deals.
5              THE COURT:  I'm not sure I fully understand the
6   relevance of this.
7              MR. FOGG:  Well --
8              THE COURT:  I want you to give me some authority on
9   this.  We'll take a 10-minute recess.  I want some authority
10  on this.
11             MR. FOGG:  Your Honor, I don't have access to --
12             THE COURT:  It's not my problem.
13  (Brief recess)
14             THE CLERK:  All rise.  You may be seated.
15             THE COURT:  Now, as I see it, there's like 29 letters
16  here?  Where is Mr. Fogg?
17             MR. FOGG:  Yeah, Judge.
18             THE COURT:  What do you intend to use in the
19  29 letters?
20             MR. FOGG:  I'm probably not going to be using all
21  these letters, Judge.
22             THE COURT:  Well, I want to know which ones you
23  intend to use.  What is -- the purpose of it is.  I had no
24  notice on any of this and I'm trying to make a fair decision
25  here, on evidentiary grounds, of whether any of this is
```

 1   admissible or not admissible and I am not shooting from the

 2   hip.

 3            MR. FOGG:  I understand, Judge.

 4            THE COURT:  So -- and the government should have been

 5   aware of these letters and briefed these points, as well as

 6   the defense.

 7            MR. XIANG:  Judge, we got the binder yesterday.

 8            MR. FOGG:  Judge, the -- some of the letters are

 9   actually handed in the last trial.  They were actually in the

10   last trial.  A lot of these letters were.

11            THE COURT:  Well, I don't know which ones were.  I

12   don't remember which ones were and which ones were not and

13   there's 29 letters here.  And I don't know what these letters

14   say.  I never read these letters.  And they're not that easy

15   to read right now.  So, I don't know what you want to do about

16   this.

17            MR. FOGG:  Well --

18            THE COURT:  You can do this, you can call him as your

19   own witness, if you want, But I'm not -- but I got 29 letters

20   here.  I don't know which ones you want to use, which ones --

21   how you identify them, which ones may be hearsay.  Which ones

22   may be -- I saw two letters here that may have to raise

23   concern of mine as to whether or not it may be a privileged

24   communication between you and your client, in that quick 15

25   minutes that I had a recess.  So, I don't know what's in here.

1           MR. FOGG:  Which one was that?

2           THE COURT:  Well, I don't remember exactly which one,

3  but I was looking at them.  I said, listen, some of this stuff

4  may be confidential communication you had with Mr. Hicks.  I

5  don't know.

6           MR. FOGG:  Well, this --

7           THE COURT:  I think you got to step back here a

8  little bit --

9           MR. FOGG:  Okay.

10          THE COURT:  -- and figure out where you want to go

11  with these things.  I think you can take a look at these

12  things.  I don't know how long you're going to be on cross-

13  examination, but it may be a point that -- we'll break at

14  lunch time and you want to take a look at these things more

15  precisely, tell the government exactly which ones you intend

16  to use.  I want to know what the purpose of it is and I want

17  to hear some argument on these things.  You gave this to the

18  government yesterday?

19          MR. FOGG:  I -- they've had most of them.  They've

20  had quite a few from the last trial.

21          THE COURT:  We didn't -- none of these -- were any of

22  these used in evidence at the last trial?  None of them were

23  in evidence at the last trial.

24          MR. XIANG:  No.

25          MR. FOGG:  They weren't in evidence, Judge, but they

1    were provided.

2            THE COURT:  How am I supposed to know?  I can't just

3    sit here and you know --

4            MR. FOGG:  Well, Jerome Grant didn't testify last

5    time.

6            THE COURT:  Pardon me?

7            MR. FOGG:  I'm sorry, Judge.

8            THE COURT:  Stay on one microphone.

9            MR. FOGG:  Jerome Grant didn't testify last time, so

10   there was no need to present them, but they were there and

11   ready to go.  At the last moment, only because my secretary's

12   husband died, I wasn't able to package it all and I was trying

13   to get it all together.  And I don't really mean for that to

14   be on the record, but we've had a little problem in the

15   office.

16           And this is something I let counsel know from the

17   very beginning, that I was trying to get some documents

18   together.  I'm not saying that they have any obligation to me.

19   I'm not saying that they had -- well, even consented, but I

20   did notify them I was having trouble getting some of the

21   documents together.  Now, Judge, this is --

22           THE COURT:  Well, I'll tell you what we'll do, we'll

23   just put this aside for now --

24           MR. FOGG:  This is a major part of the cross-exam,

25   Judge.  That's basically the letters.  And I know it's too

1   early for a lunch break, but it is the major part of the exam.

2   What I can do is go through each one and see -- definitely

3   pull up the ones we had before, because those are the ones we

4   should be using.  And anything extra, I'll notify both the

5   Court and counsel with regard to what's greater than it was

6   before.

7           But some of these things I wanted to step through,

8   they actually say quite a few things.  This gentleman actually

9   wrote me and you know, I'm not his attorney.  He wrote me a

10  letter.  He wrote Wei a letter.

11          THE COURT:  Well, what is the government's position

12  on this?

13          MR. XIANG:  Judge, regarding the timing, I mean, I

14  think there's -- if counsel wants to use them for impeachment,

15  there are ways to do that, but we --

16          THE COURT:  He can ask him questions about that to

17  refresh his memory without getting the letters in evidence.

18          MR. XIANG:  Right.  Same thing that was done with the

19  transcripts.  These are no different.  They're prior

20  statements made outside of the courtroom -- outside of here,

21  so, I don't know what --

22          MR. FOGG:  But they're not hearsay.  They can't be

23  considered hearsay.

24          THE COURT:  Well, then, what are they being offered

25  for?

1          MR. FOGG:  Well, it wouldn't be inadmissible, because

2     it's being offered for the truth of the matter asserted.  That

3     would be the wrong basis --

4          THE COURT:  I think it's being offered for the truth

5     of the matter asserted, that he wants to move from one prison

6     to another?

7          MR. FOGG:  Yes.

8          THE COURT:  I mean, what is it being offered for?

9          MR. FOGG:  Well, he's looking -- he's trying to curry

10    favor.  He's trying to bury his own dirt and actually increase

11    someone else's liability and get favors from the government.

12    Now, I'm not saying that the government actually did it, But

13    you can see the steps.  Burgasser is a very honorable man.

14    So, I'm not saying that the government is complicit in some

15    illegal activity.  I'm pretty sure they were stalwart, but the

16    fact is that this gentleman is trying to manipulate people.

17    He comes up with a plan.  It's all contrived.

18          THE COURT:  What's contrived?

19          MR. FOGG:  He's got a plan and the plan is to

20    manipulate, to keep sending letters and keep requesting this.

21    He wants to get out of jail.  He wants to get home.  And he's

22    trying his best to offer things so he can get things in

23    return.

24          THE COURT:  Well, if you want to ask him questions

25    about some of the information that's in these letters

1  without -- and you can use the letters to maybe refresh his

2  memory.  If it's proper cross-examination, we'll consider it.

3         But the letters themselves, right now, I'm not

4  inclined to allow them in, because I don't -- there's

5  29 letters here.  I haven't read them.  I have no idea what

6  these letters say and I'm not about to bring all these letters

7  in evidence and start reading them to the jury.  First of all,

8  they're very confusing.  We're going to have a like,

9  mini-trial here and I'm not going to do that.  So, think about

10 what you want to do before we go any further.  We'll take a

11 five-minute recess.

12        THE CLERK:  All rise.

13 (Brief recess)

14 (The jury entered the room at 11:27 a.m.)

15        THE CLERK:  All rise.  You may be seated.

16        THE COURT:  Ladies and gentlemen, in trials sometimes

17 issues come up and it takes time to try to resolve them.  It's

18 not the attorneys' fault.  It's basically mine, I guess, But I

19 don't like to have you just sitting around, waiting around.

20 So, what I'm going to do is -- I don't know what you want to

21 call it, breakfast, brunch or lunch.  I'm going to send you

22 out at 11:30.  I don't want you to sit there, waiting around.

23 So, let's see if we can try to start back about 1 o'clock,

24 Okay?  I'm sorry for the delay.  It happens in trials.

25        And certainly, I don't mean to ignore you at all.

1   Just sitting around, waiting around is kind of -- can be

2   irritating.  I know that when I'm on an airplane and there's a

3   delay and they don't tell you what's going on and you sit

4   there for a while and you get -- will someone tell me the

5   truth, what's really going on?  So, that's the truth.  I've

6   got to work out some issues.

7          So, see if we can come back here at 1 o'clock.  I

8   can't guarantee 1 o'clock, but we're going to try for it,

9   okay?  Thank you.  Enjoy your lunch, folks.

10  (The jury left the room at 11:30 a.m.)

11         THE COURT:  I have three other matters on at

12  1 o'clock.  I'm going to just put them off until later in the

13  day.  It's probably the government and the one public

14  defenders office and one private practice lawyer.  So, I'd

15  like you back here at quarter to one and see where we're going

16  to go from there.

17         MR. FOGG:  Thank you, Judge.

18         THE CLERK:  All rise.

19         THE COURT:  And the government, I want the

20  government's position a little bit more carefully articulated

21  to what it is as to what's in these letters.

22  (Lunch recess at 11:31 a.m.)

23  (The jury entered the room at 1:51 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Sorry for the delay, folks.  We're

1    trying.  I hope you enjoyed your lunch.  All right, Mr. Fogg.

2           MR. FOGG:  Thank you, Judge.

3    (An off-the-record discussion was held.)

4    BY MR. FOGG:

5    Q.  Mr. Grant, previously, I showed you a document that was

6    marked as Exhibit 8 -- excuse me -- as Exhibit 9 and that was

7    your card.  Do you recall that?

8    A.  Yes.

9    Q.  All right.  You'll have to excuse me.

10          MR. FOGG:  It's now marked as Exhibit 8, for the

11   record, Judge.  Defendant's Exhibit 8.

12   BY MR. FOGG:

13   Q.  And I'll show you what's been marked as Defense

14   Exhibit 8.  Now, that Exhibit 8 is the same exhibit that was

15   produced to you as Exhibit 9; am I correct?

16   A.  Yes.

17   Q.  All right.  You had a chance to look it over?

18   A.  Yes.

19   Q.  Now, when did you write that card?

20   A.  When did I write the card?

21   Q.  Mm-hmm.  Was that December 12th?

22   A.  I never wrote the card.  I sent the card.

23   Q.  Okay.  When did you send the card and write the letter?

24   A.  I don't know the exact date.

25   Q.  12/12/2016 sound familiar?

                                                                    49

1   A.   Yeah.  It was before Christmas.

2   Q.   Okay.  And at that time, you were looking to come home;

3   am I right?

4   A.   Is that what it says in the letter?

5   Q.   Sorry?

6   A.   Is that what it says in the letter?

7   Q.   Well, what you were looking to do was actually be

8   relocated from Youngstown, Ohio or at least being located in

9   Youngstown, Ohio, right?

10  A.   I was looking to be relocated somewhere.

11  Q.   Okay.  Where were you housed at that time?

12  A.   Allegany.

13  Q.   In Allegany.  And at that time, you just simply wrote

14  him -- and not your attorney -- but you wrote the prosecutor

15  to ask him to relocate you to Youngstown, correct?

16  A.   Be relocated somewhere, yeah.

17  Q.   Okay.  Do you recall where?

18  A.   I don't.

19  Q.   No?  All right.

20  A.   Be relocated numerous places.

21  Q.   I'll show you, again, Exhibit 8.  And you can turn to the

22  page with your letter on it.  And if you would read that to

23  yourself, the first one and two lines.  Do you see that?

24  A.   Oh, yeah.

25  Q.   Okay.  I'll take that back.  Does that refresh your

50

1   recollection?

2   A.  Yeah.

3   Q.  And you wished him a merry Christmas, too; am I right?

4   A.  Yeah, I think so.

5   Q.  Now, you also wrote a letter to -- I guess that would be

6   Judge -- excuse me -- you also wrote a letter to

7   Mr. Burgasser again and that would be 7/25/2006.  Do you

8   recall that?

9   A.  7/25/2006?

10  Q.  Excuse me.  2016.  Sorry about that.

11  A.  No.  You probably have to show me the letter.

12  Q.  Okay.

13  A.  I wrote a lot of letters.

14  Q.  I'll show you what's been marked as Defendant's 10.  Look

15  that over to yourself.  At the bottom of Defendant's 10,

16  that's your signature?

17  A.  Yeah.

18  Q.  Okay.  And it's dated 7/20/2016, right?

19  A.  There's a little tape in the way, but I see a 7.  I see a

20  2.  It looks like a 0.  I think that's the date.

21  Q.  20 slash and then a large 1 and a 6, right?

22  A.  That thing right there is in the way of those numbers.

23  It looks like a 2, though.

24  Q.  How about I give you the original?

25  A.  That will work.

GRANT  --  BY MR. FOGG  --  4/24/18

51

1   Q.  I'll show you what's been marked as also 10, but it's the

2   original in the plastic container.

3   A.  Oh, yeah.  That's the date.

4   Q.  Okay.

5   A.  Do you need this back?

6   Q.  Now, you were again asking Mr. Burgasser to move you; am

7   I correct?

8   A.  Yes.

9   Q.  All right.  And you were asking that -- you were

10  informing him that if you were to become a CI, you would have

11  to be moved; am I correct?  Let me take that from you.  You

12  shouldn't be reading it at this time.

13  A.  Oh, I shouldn't?

14  Q.  No.

15  A.  I'm not sure.

16  Q.  Oh, you're not sure?

17  A.  I needed it -- I need it.

18  Q.  Then, you can review it to -- Have you had an opportunity

19  to look it over?

20  A.  Yeah.

21  Q.  Okay.  Now, this was around July, there was some sort of

22  affidavit going around in the jail; am I correct?

23  A.  Well, I had asked for the affidavit before July.  I think

24  I was in Warsaw, Virginia when I had got the affidavit sent

25  to me.

GRANT  --  BY MR. FOGG  --  4/24/18

52

1   Q.  And that was an affidavit for, what, people, inmates to

2   sign, to say that there was no RICO conspiracy in this case;

3   am I right?

4   A.  Well, the one that I got was from -- well, it had

5   Roderick's name on it and Boogy's name on it, saying that we

6   never talked about things or nothing like that.

7   Q.  All right.  So, you've got something from Roderick

8   Arrington?

9   A.  Well, it was all in one letter.

10  Q.  All right.  So, you received the letter.  Do you know

11  where you got the letter from?

12  A.  Yeah.

13  Q.  Where did you get the affidavit from?

14  A.  Aaron.

15  Q.  How did you get the affidavit from Aaron?

16  A.  He mailed it to me.

17  Q.  And do you have that address?  Do you have that mail?

18  A.  No, I don't.

19  Q.  And when did he mail that?

20  A.  When I was in Warsaw, Virginia.

21  Q.  And it came from where?

22  A.  Niagara County.

23  Q.  And it had his name on it?

24  A.  Yeah.

25  Q.  So, you wrote to George to tell him that you didn't want

1   to sign the affidavit, correct?

2   A.   It's possible.  I didn't sign it, so --

3   Q.   And that's because you didn't want to lose your credit as

4   far as cooperation; am I correct?

5   A.   Well, the reason I couldn't -- didn't want to sign it is

6   because I didn't want to -- that would be lying and I would

7   perjure myself.

8   Q.   I understand, but you actually told them that you didn't

9   want to lose your credit with the U.S. Attorney's Office.  Do

10  you recall stating that?

11  A.   Is that in this letter?

12  Q.   If you would go up to at least fifth from the bottom.

13  A.   So, I can read it now?

14  Q.   You can.  To yourself, please.

15  A.   Fifth from the bottom.  Yeah, that's what it say.

16  Q.   Okay.  Now, in that letter, you were stating that you

17  wanted to go home to your kids; am I correct?

18  A.   I would have to read that.  What line is that?

19  Q.   Is that what you said?

20  A.   I don't remember, but if you said it's in here, can you

21  show me?

22  Q.   Now, you also wrote a letter to Mr. Burgasser.  And that

23  would have been 12 -- let's see, 12/24 -- let's see.  That

24  would be 12/19/2014, it looks like.  Do you recall writing

25  Mr. Burgasser then?

1  A.  It's possible.

2  Q.  All right.  And do you recall a letter where you were

3  asking for your release from custody, so that you can see

4  your kids?

5  A.  That's possible.

6  Q.  And that -- well, do you recall doing that?  Yes or no?

7  A.  You would have to show me a letter.

8  Q.  All right.  Now, you have what's been marked as

9  Defendant's 12.  Have you had an opportunity to read that?

10  A.  Yeah.

11  Q.  I'm sorry?

12  A.  Yes, I did.

13  Q.  Okay.  So, this letter was written on what date?

14  A.  12/19/2014.

15  Q.  2014.  And where were you there, at that time?  Where

16  were you housed in?

17  A.  I think Monroe County.  Yeah, Monroe County.

18  Q.  Monroe County?

19  A.  Yeah.

20  Q.  And you were writing this letter to express to

21  Mr. Burgasser that you wanted to go home to see your babies

22  and your girlfriend, right?

23  A.  Well, that was part of the reason.  I was expressing to

24  him why I wouldn't -- why I probably can't read this right

25  here because you said I ain't supposed to read it, read it to

1    myself, but I was expressing that I wouldn't lie to him.

2    Q.  And where did you express that in that letter?

3    A.  I didn't say it, but I said bullshit.

4    Q.  And where did you express that?

5    A.  You want me to read it?

6    Q.  No, I don't.

7    A.  On the same letter, 12/19/14.

8    Q.  You never stated that you wouldn't bullshit him -- you

9    weren't bullshitting him; am I right?  You were serious about

10   a plan?

11   A.  No.  I was serious about telling the truth.  I wasn't

12   going to lie or anything like that.  I mean, if I could read

13   it, I could read what it says.

14   Q.  And you were asking Mr. Burgasser to bring you home on

15   certain dates; am I correct?

16   A.  Bring me home?

17   Q.  Yeah.  On 12/24 and 12/06, those are important dates for

18   you, right?

19   A.  Am I asking him to bring me home in this letter?

20   Q.  Yes.

21   A.  12/24.

22   Q.  Sixth line down.  Not bring you home.  You wanted to come

23   into the office, is that what it was and speak to him?

24   A.  Oh, yeah, yeah, yeah.  I see it now.

25   Q.  I apologize.

                                                            56

1    A.   No problem.

2    Q.   Right.  So, you just wanted to offer your information to

3    him; is that what it was?

4    A.   Yeah.  I guess if that's what you want to say.

5    Q.   Now, you also wrote Mr. Burgasser on 10/22/2014.  Do you

6    recall that at all?

7    A.   Again, you got to show me the letter.

8    Q.   Showing you what's been marked as Defendant's 11.

9    A.   Okay.

10   Q.   What is the date on that?

11   A.   I don't see anything on this one.

12   Q.   Is that your letter?  Is that your handwriting?

13   A.   Yeah, that's my handwriting.

14   Q.   And that's your signature at the bottom?

15   A.   Yes.

16   Q.   And if you flip through the next two pages, you'll see an

17   envelope, right?

18   A.   Yeah.

19   Q.   And that's your writing?

20   A.   Yeah.  That's my handwriting.

21   Q.   And there's a postmark October 20th, 2014, correct?

22   A.   October 27th.

23   Q.   Postmark, the postal mark?

24   A.   Yeah.  It says received October 27th, 2014, U.S.

25   Attorneys Office.

1    Q.  That's received, true.  And the stamp shows October 20th,

2    correct?

3    A.  Oh, yeah.  Okay.

4    Q.  All right.  Now, in that letter you actually mentioned an

5    agent by first name Shawn, right?  You meant Sean Hill,

6    correct?

7    A.  Yeah, that was my -- the lawyer that I had at the time.

8    Q.  Sean Hill was a lawyer?

9    A.  Yeah, that's the one I was -- mentioned.

10   Q.  Okay.  And so, you were talking about your lawyer?

11   A.  I would have to read it to be sure.

12   Q.  Okay.  And you were asking Mr. Burgasser that -- what you

13   wanted to do is you wanted to give up some murders in

14   exchange for bail; am I correct?

15   A.  Yeah.

16   Q.  And you had stated to him that you felt the murder is

17   worth a signature bond; isn't that correct?

18   A.  Let's see.  Yeah.  I said -- yeah, that's what I said.

19   Q.  And you also told Mr. Burgasser one good deed deserves

20   another, sir; am I correct?

21   A.  Yeah, that's what it says.

22   Q.  All right.  Now, you wrote Mr. Burgasser again on

23   September 19th, 2016.  Do you recall that at all?

24   A.  Yeah.  I wrote a lot of letters.  You're going to need to

25   show me.

GRANT  --  BY MR. FOGG  --  4/24/18

58

1   Q.  I'll show you what's been marked as Defendant's 13.  Is

2   that your letter that you wrote?  Is that your handwriting?

3   A.  Yeah, looks like my handwriting.

4   Q.  And you wrote that letter; am I correct?

5   A.  Yeah.

6   Q.  And you wrote that letter to George?  It says, dear

7   George?

8   A.  Yeah.

9   Q.  Now, do you remember informing George that you needed a

10  root canal and you were hoping that he can get you out on

11  bail, correct?

12  A.  Yes, I do, actually.

13  Q.  And you actually proposed bail conditions to George; am I

14  right?

15  A.  Yeah.

16  Q.  Now, this George is George Burgasser, who is an Assistant

17  U.S. Attorney, just like the gentlemen behind me here for the

18  government, correct?

19  A.  Yeah.

20  Q.  Now, on 8/10/2015, you wrote George Burgasser a letter as

21  well.  Do you recall that or should I --

22  A.  Yeah.  You would be better off just showing me the

23  letters.

24  Q.  I'll show you what's marked as Defendant's 14.  Is that

25  your letter?

1  A.  Yes, it is.

2  Q.  Okay.  And that's the letter that you wrote to George --

3  or Mr. Burgasser -- excuse me; am I correct?

4  A.  Yes, sir.

5  Q.  All right.  And what's the date on that one?

6  A.  I don't see no date on this first page.  Well, it says

7  received May 8th, 2015 on the second page.  Is that the date

8  you're talking about?

9  Q.  That's when it was received.  And the date postmarked?

10  A.  Oh, May 5th, 2015.

11  Q.  May 5th, okay.  So, this is a May 5th letter; is that

12  what this is?

13  A.  Yeah.

14  Q.  And then do you recall writing to George and still

15  looking for some sort of decrease in your time; is that

16  correct?

17  A.  Well, I think this letter was concerning my relevant

18  conduct, as far as the phone conversations that -- that they

19  had that I heard and that they had, like in the criminal

20  complaints so --

21  Q.  So, this is a phone conversation as far as a wiretap; am

22  I correct?

23  A.  Correct.

24  Q.  All right.  So, they wiretapped your phone?

25  A.  Not my phone.

GRANT  --  BY MR. FOGG  --  4/24/18

60

1   Q.  Someone else's phone?

2   A.  Yes.

3   Q.  And in that wiretap of that other individual, it was a

4   co-defendant on your case?

5   A.  Yes.

6   Q.  All right.  And in that wiretap, there was discussions

7   about drug transactions?

8   A.  Yes.

9   Q.  And they actually had you on the wiretap; am I correct?

10  A.  Yes.

11  Q.  And you were discussing drug transactions with those --

12  with that person, right?

13  A.  Yes.

14  Q.  All right.  And you were trying to explain to George that

15  this should not have an effect on your relevant conduct; is

16  that what it is?

17  A.  No.  I think my relevant conduct -- well, I felt like it

18  was wrong at the time, based off of those phone

19  conversations.  So, I was trying to clear that up.

20  Q.  But you were also talking to George about -- to take you

21  off of probation for some reason.  Were you trying to work

22  out a deal with George to get you off of your violation of

23  probation?  First page.

24  A.  First page?

25  Q.  Bottom, lower half.

1    A.  I don't see nothing on the first page.  Oh, I think I was

2    talking about what you questioned about being on probation,

3    as far as the guidelines.  When you get guidelines -- and I'm

4    pretty sure you know how the guidelines work.  So, that's the

5    only thing I can see on the first page pertaining to

6    probation.

7    Q.  So, what you're trying to explain to George Burgasser is

8    the point system in which you would fall under; am I correct?

9    A.  As far -- from the way I see it, yeah.

10   Q.  Okay.  Now, you have also written, I guess, Judge

11   Skretny; is that correct?

12   A.  It's possible.

13   Q.  And what would be the purpose of writing Judge Skretny;

14   do you recall?

15   A.  Skretny was the Judge that I had on my first federal

16   charge.

17   Q.  And you wrote to him for what purpose?

18   A.  If I'm not mistaken, I'm pretty sure -- you got the

19   letter, just so I'm not mistaken.

20   Q.  Sure.

21   A.  All right.  I appreciate that.

22   Q.  I'll show you what's been marked Defendant's 9.  And

23   Defendant's 9 is a letter that you wrote.  That's your

24   handwriting; am I correct?

25   A.  Yes.

1   Q.  All right.  And it says, Dear Judge Skretny and

2   2/23/2015, correct, at the top?

3   A.  Yes.

4   Q.  Okay.  So, this is not to be confused with prior

5   testimony with regard to Exhibit 9, which has been changed.

6   So, this is your letter to Judge Skretny, correct?

7   A.  Yes.

8   Q.  Now, you were hoping that the Judge would plead you out

9   to time served; am I correct?  And you were trying to get a

10  bail on your other charge; isn't that correct?

11  A.  It's possible.  I haven't read that far yet, to tell you

12  if it's correct or not.  Yeah.  Yeah.  It was time served.

13  Yeah.

14  Q.  Time served on your probation and you were trying to get

15  bail on the other charge?

16  A.  Yes.

17  Q.  And that was the federal charge that you were on, right?

18  A.  Yes.

19  Q.  All right.  So, you were hoping, because they didn't

20  release you on your federal charge, you were hoping that if

21  you could negotiate with the Judge to get time served, they

22  would release you on your federal charge, correct?

23  A.  Well, I was hoping that if I could get time served from

24  him, that they wouldn't be able to use the fact that I was on

25  probation as a reason not to give me bail.

                                                                    63

1   Q.  And you were asking for, at least, maybe home confinement

2   or something like that; am I correct?

3   A.  Yes.

4   Q.  And you actually informed the Judge that the agents on

5   your case didn't mind you getting bail; am I correct?

6   A.  Yes, that's what it says.

7   Q.  And that was the Agent Vanessa M. Paris, right?

8   A.  Yes.

9   Q.  She's the agent that investigated your case?

10  A.  Yes.

11  Q.  And she's the agent that investigated this case -- well,

12  the case that you were indicted on, right?

13  A.  Yes.

14  Q.  Now, on January 31st, 2017, you wrote a letter to

15  Mr. Hicks; am I correct?

16  A.  Again, I wrote plenty of letters.  You going to have to

17  show me.  I've been in jail four years.  I ain't done nothing

18  but write letters.

19  Q.  I'll show you what's been marked as Defendant's 5.

20  A.  Okay.

21  Q.  Now, in that letter -- that is your letter that you

22  wrote, right?  That's your handwriting?

23  A.  Yeah.  It looks like it.

24  Q.  Okay.  Now, in the letter, you're explaining to Mr. Hicks

25  how you were going to discuss, with his attorney, how you

64

1   were going to help his attorney; am I right?

2   A.  I have to read this letter to be sure.  Yeah.  I know

3   this letter.

4   Q.  You remember?  Okay.  So, in that letter you were talking

5   about Bones.  Who's Bones?

6   A.  He's one of my co-defendants.

7   Q.  And what's his real name; do you know?

8   A.  Yeah.  Michael Robertson.

9   Q.  Michael Robertson?

10  A.  Yeah.

11  Q.  So, you were explaining to Mr. Hicks how Michael

12  Robertson was selling drugs; am I correct?

13  A.  Yes.

14  Q.  And you were explaining how Michael Robertson was getting

15  drugs from Spence; am I correct?

16  A.  No.  I don't think you correct with that one.  You going

17  to have to show me where it says that.

18  Q.  Well, if you look lower on the second page.

19  A.  I said Bones was getting drugs from Spence?

20  Q.  If you look at the second page.

21  A.  I'm on the second page.

22  Q.  All right.  Halfway down.

23  A.  Halfway down.

24  Q.  Things that you can say to your lawyer is what you said.

25  A.  Oh, okay.  I see what you're saying.  It's towards the

1  end, right?

2  Q.  Yes.

3  A.  All right.  Yeah.  I see that it did say that.

4  Q.  Right.  Okay.  And you wanted Mr. Hicks to let me know --

5  let his lawyer know; am I correct?

6  A.  Do you want me to -- how do you want me to answer this?

7  Q.  Well, is it correct that you wanted Hicks to inform me of

8  the information that you had, so it can help Mr. Hicks?

9  A.  Well, sort of, but it was a letter that I had received

10  from Mr. Hicks before.  This was me answering him.

11  Q.  Well, hold on a second.  Is that what you're saying in

12  that letter, though?

13  A.  No.  What I -- do you want to read what I said in the

14  letter?

15  Q.  No.  Did you advise him that you believed they were lying

16  on Mr. Hicks and that you wanted Mr. Hicks to have the

17  information from you?

18  A.  Well, I advised that if Spence was talking about drugs,

19  as far as he go, then I had no knowledge of it.  And as far

20  as I know Spence was lying but --

21  Q.  All right.  And you wanted to reach out and talk to his

22  lawyer, correct?

23  A.  Well, actually, that is what he wanted me to tell his

24  lawyer.

25  Q.  And this is a letter that you addressed to Mr. Hicks; am

GRANT  --  BY MR. FOGG  --  4/24/18

66

1    I right?

2    A.   I don't see --

3    Q.   That's the letter you sent to Mr. Hicks?

4    A.   Yeah.  Yeah.

5    Q.   And did you eventually write me?

6    A.   Yes.

7    Q.   And why did you reach out to me?

8    A.   Because he asked me to.

9    Q.   Now, you reached out to me and sent me a letter.  And you

10   knew that I was his attorney, correct?

11   A.   Correct.

12   Q.   And you stated that you were the driver for Michael

13   Robertson, correct?

14   A.   I would have to see the letter.

15   Q.   Were you the driver for Michael Robertson?

16   A.   I mean, I drove him places.

17   Q.   So, then that was a correct statement, right?

18   A.   Like, to an extent, yeah.

19   Q.   I'll show you what's been marked as Defendant's

20   Exhibit 6.  Now, that's a letter you wrote, correct?

21   A.   Yes.

22   Q.   And you wrote that to me; am I right?

23   A.   Yes.

24   Q.   And that's your signature, correct?

25   A.   Yes, it is.

1  Q.  And you were explaining how Michael Robertson was dealing

2  drugs, at least and he never bought it from Spence.  And you

3  were a driver for Michael Robertson, correct?

4  A.  Yeah.

5  Q.  Now, this is because -- that would -- Spence would be

6  who; Spencer Rogers?

7  A.  Yes.

8  Q.  Now, at that time, just as people were thinking that you

9  were a CI, people were also thinking that Spencer Rogers was

10  a CI, correct?

11  A.  Correct.

12  Q.  And that he was talking to the government, correct?

13  A.  Correct.

14  Q.  And what you were trying to do, is you were trying to at

15  least set the record straight; am I right?

16  A.  Pertaining to as far as I knew, from Spencer getting

17  drugs from Boogy, yes.

18  Q.  All right.  Now, you're saying that you were willing to

19  be a witness for Aaron; am I correct?

20  A.  Yes, I did.  Pertaining to that.

21  Q.  And that's -- excuse me?

22  A.  Pertaining to Spencer Rogers.

23  Q.  Now, you've written Aaron quite a few times; am I right?

24  A.  Yeah.  We write each other.  Well, we did.

25  Q.  How many times would Aaron write you?

1    A.  I can't keep count.  I don't know.  A lot, though.

2    Q.  Did you ever save the letters?

3    A.  Yes.  I saved some.

4    Q.  Did you provide the government with those letters?

5    A.  I gave them to my lawyer.

6    Q.  And did you instruct your lawyer to give it to the

7    government?

8          MR. XIANG:  Objection.  Privilege.  Not to be

9    asserted by the government, but by the witness.

10          THE COURT:  Overruled.  Go ahead.  You may answer the

11   question, sir.

12          THE WITNESS:  Can you repeat that for me?

13   BY MR. FOGG:

14   Q.  Did you advise your attorney to give it to the

15   government?

16   A.  I don't remember advising him to give it to them, but it

17   is a possibility.  I'm pretty sure that's why I sent it to

18   him.

19   Q.  I'm going to show you what's been marked -- well, you

20   wrote George Burgasser and you explained to George --

21   Mr. George Burgasser, the Assistant U.S. Attorney, you

22   explained your daughter's first birthday was January 30,

23   2015, correct?  Do you remember telling him that?

24   A.  Well, yeah.  At that time I thought that it --

25   Q.  Okay.

                                                                    69

1   A.  -- was my daughter.  But, yeah --

2   Q.  Okay.  All right.

3   A.  -- I remember saying that.

4   Q.  All right.  And you also explained that your grandmother

5   may pass that year; am I correct?

6   A.  You would have to show me where I said that at.

7   Q.  All right.  I'll show you Government's Exhibit 3506Y.

8   Now, this is a typed letter; am I correct?

9   A.  Mm-hmm.

10  Q.  All right.  So, where were you when you typed that

11  letter?

12  A.  I assume at Allegany County.  That's the only place I

13  remember having a typewriter.

14  Q.  Now, in this letter, you were explaining how your

15  grandmother was going to pass within the year and you're

16  explaining how your daughter was having a birthday and you

17  were asking Mr. Burgasser, again, if you could get out on

18  bail; am I correct?

19  A.  I don't see where it says my grandmother is going to pass

20  in a year.  Can you show me that?

21  Q.  Can you read one, two, three, four, fifth one down.

22  Fifth sentence down where it says, sir, my grandmother is.

23  A.  Not doing the best.  Want me to keep going?

24  Q.  No.  You don't -- just read it to yourself.

25  A.  Yeah.  I never said that she was going to pass in a year.

1    Q.  Well, you said she will not -- you know, you can't say if

2    she will make it past this year, Lord willing; am I right?

3    Do you remember that?

4    A.  Oh, yeah.  Okay.

5    Q.  All right.  And then you went on to say that she will not

6    be alive if I do some years, sir.  Do you remember that?

7    A.  Yes.

8    Q.  All right.  And you wrote Mr. Burgasser again?

9    A.  Yeah.

10   Q.  And that would be, what, December 10th, 2014?  Do you

11   recall that or should I show you?

12   A.  Yeah.  It probably would be better for you to show it to

13   me.

14   Q.  All right.  All right.  I'm going to show you what's been

15   marked as Government Exhibit 3506AA.  Do you remember writing

16   that letter?

17   A.  I don't really necessarily remember writing it, because I

18   didn't finish reading it yet, but it's my handwriting.

19   Q.  And do you remember telling Mr. Burgasser that you wanted

20   to go home and that you -- you had a plan that will work so

21   that you can get Mr. Hicks convicted?  Do you remember that?

22   A.  I don't see the plan part.

23   Q.  Take your time.

24   A.  I will.  You have to let me know where the plan part at.

25   Q.  Do you see it?

1   A.  I seen I had no plans on running.  I see I didn't have no

2   plans on harming anyone.  I see that.

3   Q.  Do you see where it says that you know that the U.S.

4   Attorneys are -- they want Hicks?

5          MR. XIANG:  Objection.  Speculation.

6   BY MR. FOGG:

7   Q.  Do you see that?

8   A.  Yeah.

9          THE COURT:  Overruled.

10  BY MR. FOGG:

11  Q.  Do you see it?

12  A.  Do I see that the U.S. Attorneys want Hicks?

13  Q.  Yeah.  I know you guys want Hicks, Aaron Hicks?

14  A.  Yes.  I see that.

15  Q.  All right.  And you were telling them that you -- you're

16  sure that you can be a big help; am I right?

17  A.  Yes.

18  Q.  All right.  And then you're advising them that you could

19  have been in the same line of business as they were, right?

20  A.  I think I remember something like that.  Pretty much

21  saying if I was -- chose a different path, I could have been.

22  Q.  And then later on, at the end, you were saying that you

23  have a plan that will work; am I right?

24  A.  Yeah.  I see that.

25  Q.  Okay.  Then you wished him happy holidays; am I correct?

1   A.  Yeah.

2   Q.  All right.  I'll take that back.

3   A.  Okay.

4   Q.  Now, as you stated, you wrote many letters, right?

5   A.  Yeah.

6   Q.  You wrote letters to the Judge Magistrate Scott for your

7   release; am I correct?

8   A.  Yeah.

9   Q.  Right.  And you wrote letters to Judge Magistrate Scott

10  with regard to complaints about your attorney, correct?

11  A.  Yes.

12  Q.  And you did that about three times, didn't you?

13  A.  Yes.

14  Q.  And that was after each time the Court admonished you and

15  told you not to write letters and you continued to do so,

16  correct?

17  A.  Yeah.  I didn't know who I was supposed to write to if it

18  wasn't the Courts.

19  Q.  But you were in court when the Judge told you not to

20  write him letters; am I correct?

21  A.  Yeah.  Yeah.  I was there.

22  Q.  But even though he told you not to write letters the

23  first time, you wrote him three -- two or three successive

24  times?

25  A.  Yeah.  I was having a lot of problems with my lawyer.

1    Q.  Okay.

2    A.  I didn't know who else to write.

3    Q.  Now, you have an arrest -- a criminal history, correct?

4    A.  Yeah.

5    Q.  And you had stated, on the record a couple times, as far

6    as your charges were, right?

7    A.  Right now?

8    Q.  Well, you had previously testified to your charges,

9    correct?

10   A.  Previously testified of my charges?

11   Q.  Yeah.

12   A.  Right now, you're talking about?  I had plenty of charges

13   before.

14   Q.  You had plenty of charges?

15   A.  Yes.  Before this one, I have.

16   Q.  All right.  And you went back as far as what, 2003?  Or

17   it goes further?

18   A.  First time I was arrested, I think I was like, 16.  I got

19   an ACD, so it goes further -- a little further than 2003.

20   Q.  When was that?

21   A.  That was '97.

22          MR. XIANG:  Objection.  Improper impeachment.

23          THE COURT:  Sustained.

24   BY MR. FOGG:

25   Q.  And you were arrested -- well, did you get a conviction

1    in 2003?

2    A.  2003, no.  I think I got convicted in 2004.

3    Q.  It was 2004.  And that was for an arrest in 2003?

4    A.  Yeah.  Which one?  I got arrested twice in 2003.

5    Q.  You tell me.  What happened in 2003?

6    A.  You want to know about them both?

7    Q.  Sure.

8    A.  All right.  The first one I was on Bissell Street.  I

9    got -- I had like, a half a gram of crack on me and a

10   firearm.

11   Q.  So, there was a firearm possession, right?

12   A.  Yes.

13   Q.  Okay.

14   A.  Then I got caught with -- I had 55 grams of weed on me in

15   Erie, Pennsylvania.

16   Q.  And those were in two different locations?

17   A.  Yes.

18   Q.  So, you had a firearms possession and you had a

19   controlled substance possession, right?

20   A.  Yes.

21   Q.  All right.  And you were convicted on both?

22   A.  Yes.

23   Q.  And one was up here in Buffalo and one was in Erie,

24   Pennsylvania?

25   A.  Yes.

1    Q.   Which one were you convicted on first?

2    A.   Buffalo.

3    Q.   In Buffalo.  And you received a sentence?

4    A.   Of eight months.

5    Q.   Eight months?

6    A.   One year.

7    Q.   One year.

8    A.   Yeah.

9    Q.   And were you transferred down to Erie?

10   A.   Yeah.  When I finished my county year, Erie, Pennsylvania

11   came and got me.

12   Q.   All right.  So, they were waiting for you to do that

13   year.  So, you were sitting in jail until you got to Erie,

14   Pennsylvania, right?

15   A.   Yeah.  They came and got me in like, two days or

16   something.

17   Q.   All right.  And that was on a criminal possession of a

18   controlled substance.  And you were convicted on that one?

19   A.   Yes.

20   Q.   And that was a felony conviction, correct?

21   A.   Well, it got dropped to a misdemeanor 1.

22   Q.   Okay.  And were you sentenced on that?

23   A.   Yes.

24   Q.   What was your sentence on that?

25   A.   One to four.

1   Q.   So, that was one to four years?

2   A.   Yes.

3   Q.   On a misdemeanor?

4   A.   Yeah.

5   Q.   And you did state time?

6   A.   Yeah.

7   Q.   And you got out on post-release supervision; is that what

8   it was?

9   A.   No.  At that time I got paroled in 2006 to a halfway

10  house.  I think it was Gateway, Erie, Pennsylvania.

11  Q.   Okay.  So, you got out early; is that what it is?

12  A.   No.  Actually, I got out late because by the time I

13  was -- I did 20 months instead of one year.

14  Q.   So, after you were doing your time, you were on post-

15  release supervision or parole; is that what is?

16  A.   Yeah.  One to four, you do a minimum of one year, that

17  you can get paroled, but I didn't get paroled until

18  20 months, based off of the time that I had in Buffalo,

19  county.  So, I already had my year in when I got sentenced,

20  so I had to go see the parole board.

21  Q.   So, parole is basically court supervision where you're

22  supervised after you do your time; am I right?

23  A.   Yeah.

24  Q.   Okay.  And that's sort of like post-release supervision

25  in Federal Court, where you're just supervised after you do

1  your time?

2  A.  No.  It's counted differently.

3  Q.  How so?

4  A.  Because parole like, you -- you have a sentence.  I had a

5  one to four.  After the four years, my time is up.

6  Corrections, you know, parole -- I mean, supervision, they

7  can reinstate you.  They can keep you a year, they can

8  reinstate you on three years probation.  They can't do that

9  on parole.

10  Q.  So, you're saying with federal post-release supervision,

11  you do your time and that's it or are you saying --

12  A.  No.  What I'm saying with federal post-supervisory --

13  supervised release, if you violate, you can do whatever you

14  fall at in the guidelines, but I think it's up to the Judge

15  to cancel your probation or extend it all over again.

16  Q.  Okay.  But at least with the state, or at least with

17  parole, time is the time and it can't end early; is that what

18  you're saying?

19  A.  I've never seen nobody get off it early.

20  Q.  I'm sorry?

21  A.  I ain't never seen nobody get off early.

22  Q.  Well, then, they don't extend it as much as, I guess, the

23  federal post-release; is that what it is?

24  A.  Well, yeah.  They extended mine.

25  Q.  And they extended it for how long?

1  A.  I was supposed to max out from parole in 2008, but they

2  extended it all the way back to 2013, based off of my arrests

3  in 2006.

4  Q.  All right.  So, now you got a rearrest in 2006?

5  A.  Yeah.

6  Q.  And that rearrest was for what?

7  A.  Felon in possession of a firearm.

8  Q.  And where was that?

9  A.  On Carl Street in Buffalo.

10  Q.  In Buffalo?

11  A.  Yes, sir.

12  Q.  And because of that, you violated the -- your --

13  A.  Parole.

14  Q.  Parole.  Which you were at Gateway at the time.  I guess

15  you were let out of Gateway?

16  A.  Yes.  I was finished with Gateway.

17  Q.  And then, you decided to possess a weapon.  And you also

18  were charged with drug charges then, too; am I correct?

19  A.  No.  You're not correct.

20  Q.  So, no drug charges at that time, just the weapon?

21  A.  Yeah, just the weapon.

22  Q.  They didn't dismiss the drug charge?

23  A.  No drug charge.

24  Q.  It was just the weapon?

25  A.  Yes.

1    Q.   And did you do time on that one?

2    A.   On the weapon charge?

3    Q.   Yeah.   2006.

4    A.   Yeah.

5    Q.   And that was in what year?

6    A.   What year did I do time?

7    Q.   Yeah.   When were you sentenced on that one?

8    A.   Well, I was sentenced in 2007, if I'm not mistaken, maybe

9    2008.

10   Q.   And you were sentenced to what?

11   A.   Fifty-seven months.

12   Q.   And that was 57 months federal time or is that --

13   A.   Federal.

14   Q.   Okay.  So, this was -- in 2006, this was a federal case;

15   am I right?

16   A.   Yeah.  It started off a city case, but I guess, due to

17   all the violence that was going to at that time --

18   Q.   They transferred it over?

19   A.   Yeah.

20   Q.   All right.  And this is the case that you were before

21   Judge Skretny on?

22   A.   Yes.

23   Q.   All right.  And that's when you wrote the letter to --

24   well, not when -- but that's the same Judge you wrote the

25   letter to; am I right?

1    A.   The letter talking about my probation situation?

2    Q.   Yes.

3    A.   Yeah.  Not at the same time, though, of course.

4    Q.   So, now, you were found to be a felon in possession of a

5    firearm; am I right?

6    A.   Yes.

7    Q.   Because you have a prior felony and you were possessing a

8    firearm, correct?

9    A.   Yes.

10   Q.   And that's how you were charged with federal charges,

11   correct?

12   A.   Yes.

13   Q.   All right.  You did -- you were sentenced to 57 months by

14   Judge Skretny, correct?

15   A.   Correct.

16   Q.   How much time on post-super -- excuse me -- post-release

17   supervision?

18   A.   Three years.

19   Q.   Hmm?

20   A.   Three years.

21   Q.   Three years.  And did you do all your time on the 57?

22   A.   Well, no.  I had good time.

23   Q.   Okay.  So, you got out a little earlier, right?

24   A.   Yeah.

25   Q.   And then, you were placed on post-release supervision for

81

1    three years, correct?

2    A.  Well, no.  Correct, to an extent.  But no, because when I

3    finished, Pennsylvania came and got me from Virginia and I

4    had to answer to my parole.

5    Q.  All right.  So, the 2006 criminal possession of a

6    weapon --

7    A.  Felon in possession.

8    Q.  It's a -- yes.  Felony possession violated the Erie,

9    Pennsylvania --

10   A.  Parole.

11   Q.  -- parole?

12   A.  Yes.

13   Q.  So, you did 57 months on federal time, correct?

14   A.  Correct.

15   Q.  And then, when you were about to be released, or

16   released, you were sent back to Erie, Pennsylvania?

17   A.  No.  I was sent back -- yeah, Albion.

18   Q.  So, you were sent back to Pennsylvania, though?

19   A.  Oh, yeah.

20   Q.  Right.  So, you were sent back to Pennsylvania to answer

21   for the VOP, right?

22   A.  Yes.

23   Q.  All right.  And you got sentenced on that?

24   A.  Yeah.  They gave me 18 months.

25   Q.  And did you get out early on 18 months?

                                                              82

1  A.  Yeah.  I got out, I want to say maybe seven months.  It

2  was I think, maybe nine.  One of the two.  I got out earlier,

3  though.

4  Q.  All right.  And what year that would be?

5  A.  That would be 2011.  That's when I got home.  Well,

6  technically, I wasn't released, because it was post-release.

7  I was still under the Department of Corrections custody, but

8  I was in a halfway house.

9  Q.  And what year was that?  Did you say 2011?

10  A.  Yes, sir.

11  Q.  So, 2011, were you on post-release still or that ended

12  that?

13  A.  No.  Post-release didn't start at that time because,

14  technically, I was still incarcerated.  You talking about as

15  far as the federal go, right?

16  Q.  Mm-hmm.

17  A.  Yeah.

18  Q.  So, now, with the federal case, 2006 criminal possession

19  of a weapon, the felony case, you pled guilty?  You entered a

20  plea; am I right?

21  A.  Of guilty?

22  Q.  Mm-hmm.

23  A.  Yeah.

24  Q.  And you actually had a plea agreement, correct?

25  A.  Yes.

1    Q.  All right.  Now, in that plea agreement, you agreed not

2    to violate the conditions of your post-release; am I right?

3    A.  I don't know.  You got a copy of my plea agreement?  I

4    don't want to answer a question that I am not 100 percent

5    sure.

6    Q.  Sure.  Sure.

7            MR. FOGG:  Can I have this marked?

8    BY MR. FOGG:

9    Q.  I'm going to show you what's been marked as Defendant's

10   Exhibit 15.  It's a pink label, but it's Defendant's 15.

11   A.  What page would it be that I agree not to -- what you

12   say?

13   Q.  May I?  Your plea agreement specifies that -- talks about

14   supervised release; am I correct?  Do you recall that at all?

15   A.  It's possible.

16   Q.  All right.  And do you recall that if you violate those

17   conditions, that you can be resentenced?  Do you recall that?

18   A.  I would need to --

19   Q.  All right.  Turn to page 2, paragraph 2.  Read it to

20   yourself.  Did you read that paragraph?

21   A.  Mm-hmm.

22   Q.  You're supposed to let me know.  So, you agree with that;

23   am I right?

24   A.  What was your question again?

25   Q.  So, in your plea agreement, you had agreed to -- that if

84

1    you violated your -- you wouldn't violate your supervised

2    release.  And if you did, you could be resentenced; am I

3    right?

4    A.  Well, it says to the defendant's understanding, so --

5    Q.  So, right?  That's correct?

6    A.  Yeah, I guess.

7    Q.  Okay.  And your plea agreement also spoke to you

8    cooperating with the government and providing truthful

9    information, right?

10   A.  Yes.

11   Q.  And helping in the prosecution of other people; am I

12   correct?

13   A.  I would need to see it again.

14   Q.  Start at page 10.

15   A.  Okay.  And where to stop?

16   Q.  That one paragraph will do it, the one section.

17   A.  Okay.

18   Q.  But you can go up to page -- I mean paragraph 25.

19   A.  It starts on page 10?  It's on 11, that's why I'm not

20   seeing it.

21   Q.  Yes.  Page 10, where the cooperation starts.

22   A.  Okay.  I got you.

23   Q.  Are you finished?

24   A.  All you wanted me to read was this right here, right?

25   Q.  Did you -- do you recall actually agreeing to provide

1  substantial assistance in the prosecution of others?  Do you

2  recall that?

3  A.  Yeah.  I can recall that.

4  Q.  Huh?

5  A.  Yes.

6  Q.  You do?  Now, 2011 is when you came out of Pennsylvania

7  off of time; am I correct?

8  A.  Well, 2011 is when I was released on post-release.  So,

9  technically, I was still doing time.

10  Q.  You were on post-release in 2011, right?

11  A.  Yes.

12  Q.  And your next arrest was?

13  A.  2014, if I'm not mistaken.  Oh, no.  No.  No.  No.  2013.

14  Q.  And that was for what?

15  A.  They said I had possession, but I never was charged with

16  that.

17  Q.  Right.  And then after that came?

18  A.  2014.

19  Q.  2014; am I correct?

20  A.  Yeah.

21  Q.  Now, the 2014 arrest, you were arrested.  Do you recall

22  the month?

23  A.  In 2014?

24  Q.  Mm-hmm.

25  A.  Hold up.  I think Buffalo times was in 2014.  I think one

GRANT  --  BY MR. FOGG  --  4/24/18

86

1   of them was April, I want to say maybe 24th.  And was that

2   April 24th, 2013 or '14?  I think it was '14, though.

3   Q.  So, May 2014?

4   A.  No.  I said April.

5   Q.  I'm sorry.  April?

6   A.  Yeah.  I said April.  The charges had gotten dismissed.

7   That was in April.

8   Q.  That was in April?

9   A.  Yes.

10  Q.  Okay.  And then, you were arrested in July, right, of

11  2014?

12  A.  I turned myself in in July.

13  Q.  All right.  You turned yourself in in July?

14  A.  Yeah.

15  Q.  And that was to federal agents?

16  A.  Well, not necessarily to the agent, but to the court

17  building.

18  Q.  To the court building?  All right.

19  A.  Yeah.

20  Q.  And that was July 24th, 2014?

21  A.  Yes, sir.

22  Q.  Now, before that, April 29th, 2014, you actually met with

23  federal agents, didn't you?

24  A.  April 29th, 2014?

25  Q.  Mm-hmm.

87

1    A.   You would have to show me that.

2    Q.   Well, do you recall being interviewed by the agents at

3    the Buffalo Central Booking Department?

4    A.   April 29th, 2014?

5    Q.   Well, excuse me.  That would probably be the 25th.

6    Sorry.  April 25th, 2014.

7    A.   And they interviewed me?

8    Q.   Yes.

9    A.   Can you show me that?

10   Q.   I'll show you what's been marked as Government

11   Exhibit 3506B.

12   A.   Yeah.  I think this might be the false document.  Oh, you

13   mean did they come and try to talk to me?

14   Q.   Where were you located at that time?

15   A.   I think it was in central booking, if I'm not mistaken.

16   Yeah, central booking.

17   Q.   And you were on some other arrest?

18   A.   That's the charge that got submitted.

19   Q.   So, while you were being held on that charge, they came

20   to visit you?

21   A.   Yeah.  That next morning, before I went to court,

22   actually I thought I had court, but when I got around the

23   corner, the lady was telling me that there was some people

24   that wanted to speak to me.  They asked to speak to me.  Once

25   he showed me his badge, that's when I said I had nothing to

1   say to them.

2   Q.  All right.  Now, that was the FBI, correct?

3   A.  Yeah.  FBI.

4   Q.  Sorry?

5   A.  Yeah.  He had a FBI badge.

6   Q.  Now, you also filed a petition in the Western District of

7   New York -- well, excuse me.  You were under supervision, am

8   I correct?  And they violated you in, what, April?  I mean --

9   excuse me -- in May 2014; is that what it was?

10  A.  You would have to show me.  It's possible.  What was the

11  violation for?

12  Q.  Well, 4/24, Buffalo Police pulled you over and found

13  criminal possession of drugs.

14  A.  Oh, yeah, that's --

15  Q.  4/24 they pulled you over and said you were tampering

16  with physical evidence, driving without a license, possession

17  of marijuana.  You tested positive for marijuana?

18  A.  Okay.

19  Q.  They actually issued a violation; am I right?

20  A.  Yeah, yeah, yeah.

21  Q.  All right.  And that was before Judge Skretny?

22  A.  Yes.

23  Q.  All right.  So, you were violated again before Judge

24  Skretny; am I right?

25  A.  That was the first time, if I am not mistaken.

1  Q.  Well, this is now, actually, May of 2005 -- I mean,

2  excuse me, 2014.

3  A.  So, you -- I'm confused.

4  Q.  Okay.  Well, you were arrested -- well, you were placed

5  on post-release supervision by Pennsylvania while you were

6  still on post-release supervision in the Federal Court; am I

7  right?  So, in 2006, you had three-years post-release

8  supervision, right?

9  A.  For who?

10  Q.  Was that for the federal court?

11  A.  No.

12  Q.  So, this new post-release supervision --

13  A.  New?  No.  It's probably old, 2006, 2014.  It's 2018

14  right now, right?

15  Q.  I'll show you what's been marked as Defendant's 16 for

16  identification.

17  A.  Okay.  And you said I violated my federal probation in

18  2006?

19  Q.  That's a violation petition, right?

20  A.  Yes, it is.

21  Q.  And that's with Judge Skretny?

22  A.  Yes, it is.

23  Q.  It's got the same docket on it as the original docket; am

24  I correct?

25  A.  Yes, it does.

1    Q.  Flip the page and it shows the conditions relating to

2    April 24th, right?

3    A.  Of 2014, right.

4    Q.  2014?

5    A.  Okay.

6    Q.  Correct?

7    A.  Yeah.

8    Q.  So, you were violated at that time?

9    A.  Yeah.  He sent -- my probation officer sent -- yeah, he

10   sent the violation paperwork to the Judge.  Yes, if I'm not

11   mistaken.

12   Q.  And that was on the federal case?

13   A.  Yes.

14   Q.  All right.

15   A.  But this was after 2006.  When you first was talking, you

16   mentioned 2006.

17   Q.  I'll show you again Defendant's 16.  And the date on that

18   filing is what day?

19   A.  This date right here (indicating)?

20   Q.  Yes.  What is the date?

21   A.  5/4/14.

22   Q.  And the date of the filing of the document is what date?

23   A.  5/5/14.

24   Q.  '14.  So, on 5/5 --

25   A.  I was done with Pennsylvania.

1    Q.  On 5/5/14, the Federal Court actually pled -- you were

2    done with Pennsylvania, right?

3    A.  Yes.

4    Q.  All right.  And the Federal Court placed a violation on

5    you, correct?

6    A.  Yes.  My probation officer did --

7    Q.  Your probation officer --

8    A.  -- advise the court.

9    Q.  Right.  And that's because you got rearrested, even

10   though those cases were dismissed, right?  Now, you were

11   placed in custody at that time?

12   A.  Yeah.

13   Q.  All right.

14   A.  On the 24th of April, yeah?

15   Q.  Right.  And did you get out of custody or your probation

16   officer filed it and you remained in custody, in federal

17   custody?

18   A.  No, I bailed out.

19   Q.  You bailed out?

20   A.  Yeah.

21   Q.  When your federal probation officer placed the violation

22   petition, were you placed in custody?

23   A.  No.

24   Q.  So, Judge Skretny allowed you to come in and out of

25   court; am I right?

1    A.  Yes.

2    Q.  All right.  And you had to make an appearance before the

3    Court, so they can see what happens in Buffalo City Court,

4    right?

5    A.  Yes.

6    Q.  To determine if they're going to consider it a violation;

7    am I right?

8    A.  Yes.

9    Q.  And that was May 5th, 2014, right?

10   A.  That's when the paper got put in, yes.

11   Q.  When the paperwork got in.  Now, it just turns out that

12   on July 24th is when you turned yourself in?

13   A.  Yeah.

14   Q.  And that's 2014, correct?

15   A.  Yes.

16   Q.  Now, you turned yourself in because you found that FBI

17   agents were actually inquiring about you and looking for you,

18   correct?

19   A.  Well, yeah, because they had my picture all over the

20   news.

21   Q.  Right.  Okay.  So, you decided just to walk on in; am I

22   right?

23   A.  Yeah, turn myself in, yeah.

24   Q.  All right.  Now -- and that would be on this case, but at

25   the time, your case number was a little different, 14-2082,

1  right?  Do you remember?

2  A.  You would have to show me the criminal complaint.

3  Q.  All right.  I'll show you what's been marked as

4  Defendant's 17.  Can you see that?

5  A.  Mm-hmm.

6  Q.  That's the cover sheet to the complaint you made; am I

7  right?

8  A.  Yes.

9  Q.  Okay.  And at the top, it has a docket number up there;

10  am I right?

11  A.  Yes.

12  Q.  And you recognize that docket number as 14-M-2082, right?

13  A.  I didn't memorize it by heart, but I am assuming.

14  Q.  But this is the case; am I right?  And --

15  A.  Yeah.  That's what my criminal complaint looked like.

16  But as far the numbers, I don't remember was that the exact

17  numbers or not.

18  Q.  All right.  And your -- a criminal complaint was filed

19  consisting of 17 co-defendants, right?

20  A.  Yeah.  I think it was 17.

21  Q.  And each one considered to be conspiring with each other,

22  correct?  So, you had 17 co-conspirators all together.  And

23  you were one of them, right?  So, that was 16 co-

24  conspirators, right?

25  A.  Yeah, plus me, which makes 17.

GRANT  --  BY MR. FOGG  --  4/24/18

94

1    Q.  Which makes 17.

2    A.  Yeah.

3    Q.  All right.  Now, the people that are on this, on the case

4    with you and that was July, you knew those people; am I

5    right?

6          THE COURT:  Would you mind telling me what the

7    relevance of this is?

8          MR. FOGG:  Judge, we're getting --

9          THE COURT:  I think we better get into a different

10   area.

11         MR. FOGG:  Well, this is the --

12         THE COURT:  I think we've heard enough.

13         MR. FOGG:  Yes, Judge.

14         THE COURT:  Go on to some other area.

15         MR. FOGG:  All right.

16   BY MR. FOGG:

17   Q.  Now, you had testified about dealing, what, 33 pounds of

18   marijuana?  When did that transpire?

19   A.  I didn't testify to dealing 33 pounds of marijuana.  Are

20   you talking today?

21   Q.  Yes.

22   A.  I never said that I dealt 33 pounds of marijuana.

23   Q.  Well, did you deal in marijuana?

24   A.  Yeah.

25   Q.  All right.  And when did you do that, in 2014?

1  A.  When didn't I.

2  Q.  I'm sorry?

3  A.  I said, when didn't I.

4  Q.  And where were you getting your marijuana from?

5  A.  Aaron.  Boogy.

6  Q.  All right.  And you believed that the people in the

7  neighborhood, or at least Aaron, had a Mexican connection?

8       MR. XIANG:  Objection to speculation and relevance.

9       THE COURT:  Sustained.

10  BY MR. FOGG:

11  Q.  Where did you believe Aaron was getting it from?

12       MR. XIANG:  Objection.  Relevance and speculation.

13       THE COURT:  Well, it's a perception of the witness.

14  If you know, sir.

15       MR. FOGG:  Well, I'll --

16       THE COURT:  It's all right.  He can answer it.

17       THE WITNESS:  Where I do believe that he was getting

18  it from?

19  BY MR. FOGG:

20  Q.  Mm-hmm.

21  A.  Texas.

22  Q.  Texas.  But you didn't know that?

23  A.  I mean, I did pick up a couple boxes before.

24  Q.  And you picked up a couple of boxes from where?

25  A.  Texas.

GRANT  --  BY MR. FOGG  --  4/24/18

96

1  Q.  You drove down to Texas and went down to Texas?

2  A.  No.  They were mailed.

3  Q.  How do you --

4  A.  You know, like the letters that I had, on the envelope,

5  my name was like, on the return address and where I was

6  sending the letter to.  Same thing with the UPS service.

7  Q.  And it was marijuana?

8  A.  Yeah.

9  Q.  You saw what was in the box?

10  A.  Yeah.

11  Q.  When did that happen?

12  A.  Couple times.

13  Q.  How many times is a couple?

14  A.  Well, all right.  Let me rephrase that, because I think a

15  couple is two.  Numerous times.

16  Q.  All right.  How many times?

17  A.  I don't know how many times, to be exact.

18  Q.  Okay.

19  A.  Whenever he called me.

20  Q.  All right.  So, what year?

21  A.  2013.  As far as me, per se, picking them up, 2013, 2014.

22  Q.  All right.  So, in two-years' time.  And do you know when

23  in 2013?

24  A.  No.

25  Q.  Do you know how many times in 2013?

1   A.   However many times he called me and told me he needed me.

2   Q.   So, you don't know?

3   A.   No.

4   Q.   And in 2014, do you know how many times in 2014?

5   A.   Like, you asking for an exact number?

6   Q.   I'm asking how many times.  You said numerous times.  How

7   many times in 2014?

8   A.   If I give you an exact number, it's a possibility that I

9   could be --

10  Q.   I'm not asking for possibility --

11          THE REPORTER:  Wait.  Wait.  One at a time.

12          MR. FOGG:  I'm sorry.

13  BY MR. FOGG:

14  Q.   I'm not asking for possibilities.  I just want to know,

15  do you know how many times in 2014?  Do you know?

16          THE COURT:  Approximately, sir.

17          THE WITNESS:  No.

18          THE COURT:  Approximately?

19          THE WITNESS:  Approximately, I don't have an

20  approximate.

21          THE COURT:  Would it be more than five?

22          THE WITNESS:  Yes.

23          THE COURT:  More than 10?

24          THE WITNESS:  I'd say about 10.  I'd say maybe 10 to

25  15, at the most.

98

1        THE COURT:  All right.

2   BY MR. FOGG:

3   Q.  All right.  And do you know what months they may have

4   been?

5   A.  No.

6   Q.  Summertime, wintertime?

7   A.  I mean, summertime, wintertime, spring.

8   Q.  Okay.  And do you know what houses they were delivered

9   at?

10  A.  Different houses.  One time, he got it sent to me.

11  Q.  And what address is that?

12  A.  The address that's in the criminal complaint, 2 West

13  Cleveland Drive.  Actually, two times.

14  Q.  And when was that?

15  A.  That was in 2014.

16  Q.  They were both in 2014?

17  A.  Yes.  A couple days apart from each other, actually.

18  Q.  Now, how do you know they were coming from Aaron or

19  purposed for Aaron?

20  A.  Because I took it to him.

21  Q.  All right.

22  A.  One time, he came to the house.  The second time, I took

23  it to him.

24  Q.  All right.  Have you ever dealt with Letorrance Travis?

25  A.  What do you mean?

1    Q.  Drug dealing?

2    A.  No.

3    Q.  Have you ever purchased from him?  Have you ever -- ever

4    sell to him?

5    A.  No.

6    Q.  You described this one particular time where there was

7    33 pounds.  You made reference to 33 pounds?

8    A.  Yes.

9    Q.  And where did that occur?

10   A.  I want to say it was at his grandfather's house, maybe on

11   Camp Street, one of them streets over there.  We picked it up

12   from there.  His aunt dropped -- she grabbed it -- she

13   dropped it on the floor.  He grabbed it, picked it up on the

14   concrete.  He grabbed it, picked it up, put it in the back of

15   the truck.  We took it to Brill house.

16   Q.  And who's Brill?

17   A.  I don't know his first name.

18   Q.  All right.  And was this in a vehicle?  Did he pick you

19   up in his vehicle or your vehicle?

20   A.  Did who pick me up?

21   Q.  Well, how did you get to the house to pick up the

22   package?

23   A.  How did I get to the house?

24   Q.  Yes.

25   A.  Boogy.  I didn't -- what is you saying?  Can you be a

1    little more -- so I can understand you?

2    Q.  Well, I'm asking --

3    A.  I don't want to answer it wrong.

4    Q.  No.  No.  I don't want you to answer it wrong.  You said

5    you picked up 33 pounds in a box, right?  It was at Camp?

6    A.  Well, I didn't pick him up.  I was there.

7    Q.  Okay.  And how did you get there?  Were you driven there?

8    Were you -- did you walk there?  How did you get to that

9    location to see that?  Does that make sense to you?

10   A.  Yes.  Boogy.  Boogy's.

11   Q.  And how did he get you there?

12   A.  He had a rental from somebody.

13   Q.  Somebody?

14   A.  Yeah, I don't know who, one of his girlfriends.

15   Q.  Now, the white video -- All White video, did you

16   participate in that?

17   A.  Yeah, I was there.

18   Q.  Okay.  Were you in the video itself?

19   A.  No.

20   Q.  All right.

21   A.  Well, there was two makes of it.  I might have been in

22   the second one.

23   Q.  Now, you went to -- you testified that you went to a

24   relative's house on Camp Street to deliver the 33 pounds?

25   A.  To deliver?

1  Q.  Well, to pick up the 33 pounds, right?

2  A.  You saying that I did it?  Because you just said that I

3  took it, but I got it.

4  Q.  Well, you said you went there; am I right?

5  A.  Oh, yeah.

6  Q.  Am I right?

7  A.  Yeah, you right.  I was there.

8  Q.  All right.  And you recall the address, right?

9  A.  No, I don't recall the address.

10  Q.  No?  Now, you testified at a prior proceeding on

11  September 18, 2017; do you recall?

12  A.  That's sounds about correct.  I'm not sure on the date,

13  but --

14  Q.  And at that time you swore, under oath, to tell the

15  truth, right?

16  A.  Mm-hmm.

17  Q.  And you did -- and to tell the whole truth, right?

18  A.  Mm-hmm.

19  Q.  And you did, didn't you?

20  A.  Yeah.

21  Q.  Do you recall being asked questions about the 33 pounds

22  then?

23  A.  No.  It was 40 pounds that time.

24  Q.  So, you recall it wasn't 33 pounds; it was 40 pounds?

25  A.  Two different incidents.

1   Q.  Two different incidents?

2   A.  Yeah.

3   Q.  But you didn't know where the 40 pounds was delivered; is

4   that what it is?

5   A.  I didn't know where it was delivered?

6   Q.  Right.

7   A.  Yeah, I knew where it was delivered.

8   Q.  Where was the 40 pounds delivered?

9   A.  On Girard Street.

10  Q.  On Girard?

11  A.  Yeah.

12  Q.  But it was not 33 pounds; am I right?

13  A.  At that time, no.

14          THE COURT:  This was a different time?

15          THE WITNESS:  Yes.

16          MR. FOGG:  A different time?

17          THE COURT:  One time it was 33 pounds.  One time it

18  was 40 pounds?

19          THE WITNESS:  The 33 pound was, I think that was

20  2013, if I am not mistaken.  The 40 was in 2014.

21          THE COURT:  We'll take a 15-minute recess, ladies and

22  gentlemen.  Court will be in recess.

23          THE CLERK:  All rise.

24  (The jury left the room at 3:19 p.m.)

25  (Brief recess)

1    (The jury entered the room at 3:36 p.m.)

2            THE CLERK:  All rise.  You may be seated.

3            THE COURT:  All right.

4    BY MR. FOGG:

5    Q.  Mr. Grant, do you recall also writing letters to George

6    Burgasser with regard to -- excuse me.  Have you also -- do

7    you recall writing a letter to Mr. Wei Xiang, here, on

8    September 15th, 2017?

9    A.  You have to show me the letter, man.

10   Q.  I'll show you what's been marked as Government's

11   Exhibit 3506DD.  Do you recognize that?

12   A.  Yeah.

13   Q.  You recognize that, right?

14   A.  Yeah.

15   Q.  And you were advising him -- or letting him know that

16   you're ready to get prepped for trial; am I right?

17   A.  What line is that?

18   Q.  Is that what you were doing on that date?  Do you recall

19   writing that letter?

20   A.  Yeah.  I recall writing the letter.

21   Q.  All right.  And the purpose to write him was to inform

22   him that you're ready to get prepped for trial?  Is that the

23   purpose?

24   A.  I think my purpose here was -- yeah.  I would think I was

25   being threatened.  So, I think that was my purpose for

1  writing him, but you can show me the line that you're talking

2  about?

3  Q.  Well, look at the bottom.

4  A.  Oh, okay.  Yeah.

5  Q.  Yeah?

6  A.  Yeah.

7         MR. FOGG:  No further questions.

8

9                    REDIRECT EXAMINATION

10

11  BY MR. XIANG:

12  Q.  Mr. Grant, let's start with where defense counsel left

13  off, the letter that you wrote to me.  What did you say your

14  purpose for writing that letter was?

15  A.  Well, my purpose was, I was being threatened.  I had

16  actually -- was told to check into the SHU, protective

17  custody.

18  Q.  In fact, lines 3 to 4 of that letter:  I was threatened

19  by a guy at the jail due to me cooperating against Roderick

20  Arrington.  Is that right?

21  A.  Yes.

22  Q.  What do you mean by the SHU, you just said?

23  A.  It's -- like I said, it's a segregated housing unit where

24  they put people for either administrative -- I was placed

25  under administrative -- due to me checking myself -- solitary

1  confinement.

2  Q.  Can you explain what checking yourself in means?

3  A.  It's like when you be threatened.  Somebody tell you get

4  out the compound.  You got to check yourself in for coop --

5  there's many people who check their selves as people who

6  cooperate.

7  Q.  What did you mean by the term compound you just used?

8  A.  Oh, that's what they call the jail, as a whole, the

9  different units.  There's a chow hall, the library, medical

10  units.  So, I'm assuming that that's why they call it a

11  compound.

12  Q.  Now, putting yourself in solitary confinement, what was

13  the purpose?

14  A.  Protection.  To be protected.

15  Q.  Defense counsel had asked you during cross-

16  examination -- actually, he started with a couple of letters

17  about you asking George Burgasser about being relocated.  Do

18  you recall that line of questioning?

19  A.  Yes.

20  Q.  Relocated from Allegany County?

21  A.  Yeah.

22  Q.  And relocated to Youngstown?

23  A.  Yeah.

24  Q.  And relocated -- or being housed at Monroe County.  Do

25  you remember there's a letter he asked you about that you

1   were housed at Monroe County?

2   A.  Yeah.

3   Q.  And you also mentioned in one of the letters you got it

4   at Warsaw, Virginia?

5   A.  Yes.

6   Q.  Can you just explain for the jury here, how is it that

7   you were at these county jails in the past four years?

8   A.  What do you mean?  Like, how was I -- like, why I was

9   getting moved?

10  Q.  Yes.

11  A.  Well, my cooperation.  I was being -- I was cooperating

12  and everybody knew about it.  So, they, you know, I was

13  getting threatened from time to time.

14  Q.  First off, is there a federal detention center here in

15  the Western District of New York?

16  A.  No, not in the Western District of New York, no.

17  Q.  So, are federal inmates located -- farmed out to local

18  facilities?

19  A.  Yes.

20  Q.  Including, you said, as far down south as Warsaw,

21  Virginia?

22  A.  Yes.

23  Q.  So, when you wrote to George Burgasser asking to be

24  relocated from Allegany County, that was Defendant's

25  Exhibit 8, being relocated in that letter, Defendant's

1  Exhibit 10, why were you asking to be relocated from where

2  you were housed?

3  A.  Because I was having problems there due to my

4  cooperation.

5  Q.  What kind of problems?

6  A.  People was threatening me.  Ra Ra, he was sending threats

7  to me through people.

8  Q.  Defense counsel also asked you about letters that you

9  wrote to the defendant while you were in jail.

10  A.  Yeah.

11  Q.  Do you remember that?

12  A.  Yeah.

13  Q.  I mean, him asking you those questions?

14  A.  Yeah.

15  Q.  Why were you exchanging letters with Aaron Hicks when you

16  were in jail?

17  A.  Well, I felt like that if I write him and maybe try to

18  persuade him that I am not going to cooperate with you guys,

19  I'm not going to follow complete all the way through with it,

20  that like, as far as all of the threats that I was getting

21  might cease.

22  Q.  Might cease?

23  A.  Yeah, stop.

24  Q.  Similar to when you told Roderick Arrington to his face

25  that you weren't -- that the government didn't ask about him?

1  A.  Yeah.

2  Q.  Defense counsel also asked you about writing to George

3  Burgasser, trying to get credit.  Do you remember he used

4  that term, to get credit?

5  A.  Yeah.  I remember that term.

6  Q.  Under the terms of your plea agreement, do you get credit

7  if you falsely accuse anyone of a crime?

8  A.  No.

9  Q.  Why not?

10  A.  That's perjury.  If you perjure, you get extra charges

11  against you.

12  Q.  Is it in your interest or against your interest to be

13  truthful in your testimony right now?

14  A.  In my interest.

15  Q.  Why is that?

16  A.  I won't -- would not get charged with perjury.

17  Q.  And then, defense counsel also asked you about -- well,

18  first off, let's clarify.  Am I George Burgasser?

19  A.  No.

20  Q.  Is my counsel here George Burgasser?

21  A.  No.

22  Q.  Is it a different United States Attorney than the two of

23  us who are here today?

24  A.  As far as George Burgasser?

25  Q.  Correct.

1    A.  Yeah.

2    Q.  And all of the -- what defense counsel went over, your

3    request for bail, for the root canal, whatnot, did the U.S.

4    Attorney's Office agree to any of it?

5    A.  No.

6    Q.  Defense counsel asked you about your 2006 firearm

7    possession.  Do you remember that line of questioning?

8    A.  Yeah.

9    Q.  You said it was on Carl Street?

10   A.  Yes.

11   Q.  Why did you have a gun on Carl Street in 2006?

12   A.  At that time, it was a lot of shooting going back and

13   forth.  Yeah, a lot going on.

14   Q.  Well, with you having a gun, what did that do for you?

15   A.  Got me arrested.

16   Q.  Well, if you weren't arrested, what was your purpose in

17   having the gun?

18   A.  To protect myself.

19   Q.  Is that a common tool of the trade in the drug trade?

20   A.  Yeah.

21   Q.  Then, defense counsel asked you about the 33 pounds of

22   marijuana with Brill.  Do you remember that line of

23   questioning?

24   A.  Yeah.

25   Q.  And he asked you how you got there or got to the Camp

1    Street --

2    A.  Yes.

3    Q.  -- address.  You said rental?

4    A.  Yeah.

5    Q.  Was using rentals common?

6    A.  Yeah.

7    Q.  Why?

8    A.  Keeps it -- keeps you off the radar.  Like, one minute,

9    people might hear you in this and then, you would switch to

10   something else.

11          THE COURT:  You say rental, you mean a rental car?

12          THE WITNESS:  Yeah.

13   BY MR. XIANG:

14   Q.  Was that also a common tactic in the drug trade?

15   A.  Yes.

16          MR. XIANG:  No other questions, Judge.

17          MR. FOGG:  Judge, may I ask three questions?

18          THE COURT:  All right.

19          MR. FOGG:  Thank you, Judge.  Maybe four.

20

21                    RECROSS-EXAMINATION

22

23   BY MR. FOGG:

24   Q.  Counsel for the government asked, is it in your best

25   interest to lie; am I right?  Do you remember that?

1    A.  In my best interest to lie?

2    Q.  Do you remember that?

3    A.  I was never asked if it --

4    Q.  Okay.

5    A.  -- was in my --

6    Q.  Okay.

7    A.  -- best interest to lie.

8    Q.  Right.

9    A.  I said tell the truth.

10   Q.  You're serving a sentence of 188 months?

11   A.  Correct.

12   Q.  And that's a little over 15 years, correct?

13   A.  Yes.

14   Q.  Will you get a reduction in sentencing if you cooperate

15   here today?

16   A.  If I'm truthful, I assume.

17   Q.  So, you're hopeful that this -- so, it is in your best

18   interest to actually talk -- to testify today, at least; am I

19   correct, because you're hoping to get a sentence reduction,

20   correct?

21   A.  I mean, like give me what you -- I need an example.

22   Q.  Your testimony here would help you get a reduction in

23   your sentence, correct?

24   A.  If I'm telling the truth.

25   Q.  Right.  When you were in the hold today, did you --

1  yesterday, did you refer to someone else, saying that you're

2  going to lie against Aaron in the hold?

3  A.  Hmm?

4  Q.  Did you say, in the hold yesterday, that you were looking

5  to come home a lot earlier than 15 years and you're going to

6  say whatever you have to say, to lie against Aaron today?

7  Did you say something like that in the hold?

8  A.  What?  No.  I was in the hold -- it was probably one

9  other person in the hold with me.  No.  So, if you have --

10  Q.  You didn't --

11  A.  -- somebody that heard that.

12  Q.  Did you say that; yes or no?

13  A.  No.

14        MR. FOGG:  No further questions, Judge.

15  (The witness was excused at 3:50 p.m.)

16

17

18

19

20

21

22

23

24

25

113

```
1                    *    *    *    *    *    *    *

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                             s/ Megan E. Pelka, RPR

10                            Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```