```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
 2

 3   _____
     UNITED STATES OF AMERICA,
 4                                            Case No. 1:15-cr-33
                  Plaintiff,                             (RJA)
 5
     vs.                                      October 5, 2017
 6
     AARON HICKS,
 7
                  Defendant.
 8   _____


 9        TRANSCRIPT EXCERPT - TESTIMONY OF JAMES KASKA
             BEFORE THE HONORABLE RICHARD J. ARCARA
10                UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:         JAMES P. KENNEDY, JR.
12                        ACTING UNITED STATES ATTORNEY
                          BY: WEI XIANG, ESQ. and
13                            PAUL C. PARISI, ESQ.
                          Assistant United States Attorneys
14                        Federal Centre
                          138 Delaware Avenue
15                        Buffalo, New York 14202
                          For the Plaintiff
16
                          LAW OFFICES OF ROBERT ROSS FOGG
17                        BY: ROBERT ROSS FOGG, ESQ., LL.M.
                          69 Delaware Avenue
18                        Suite 600
                          Buffalo, New York 14202
19                        For the Defendant

20   PRESENT:             CATHLEEN M. TURTON, Paralegal
                          KEITH E. BENDER, Special Agent, FBI
21
     DEPUTY CLERK:        SANDRA D. WILSON
22
     COURT REPORTER:      ANN M. SAWYER, RPR, CRR, NYRCR, NYACR
23                          Notary Public
                          Robert H. Jackson Courthouse
24                        2 Niagara Square
                          Buffalo, New York 14202
25                        Ann_Sawyer@nywd.uscourts.gov
```

1         (Excerpt commenced at 10:48 a.m.)

2         MR. PARISI:  The government calls James Kaska,

3   witness 27.

4

5   **J A M E S   K A S K A**, having been duly called and sworn,

6   testified as follows:

7         **DIRECT EXAMINATION BY MR. PARISI:**

8   Q.   Good morning, Detective Kaska.

9   A.   Good morning.

10  Q.   Where do you work?

11  A.   Buffalo Police Department.

12  Q.   What are you currently doing for the Buffalo Police

13  Department?

14  A.   I'm a homicide detective.

15  Q.   How long have you been doing that?

16  A.   Almost 30 years.

17  Q.   How long have you been a detective?

18  A.   Just about seven years.

19  Q.   And how long with the Buffalo Police Department total?

20  A.   21 years.

21  Q.   The rest of your time was as a patrol officer?

22  A.   Yes.

23  Q.   I'd like to take you back to 2014, October 31st, 2014.

24  Were you working as a detective for the City of Buffalo

25  Police Department?

1  A.  Yes.
2  Q.  Where were you assigned?
3  A.  The FBI Safe Streets Task Force.
4  Q.  What was your role with the Safe Streets Task Force?
5  A.  Basically I was a go-between between the FBI and the
6  Buffalo Police Department.  A lot of things overlap between
7  the City of Buffalo and some of the cases that the FBI ran.
8  We investigated gangs, guns, drugs, violent crimes.
9  Q.  So you were kind of assigned to both BPD and the FBI at
10 that time?
11 A.  Correct.
12 Q.  On that date, October 31st, 2014, did you become involved
13 at the end of an investigation of a search warrant at 82
14 Girard?
15 A.  Yes.
16 Q.  How did you get involved?
17 A.  While I was on the task force, there was a case that we
18 were working on which involved a number of individuals.  One
19 of the individuals that day, our Buffalo Police narcotics
20 team did a search warrant at a residence and made contact
21 with that person and made an arrest.
22 Q.  Were you part of that search warrant process?
23 A.  No, I wasn't.
24 Q.  Did you get involved after the search warrant execution
25 had occurred?

1  A. Yes.

2  Q. Did you -- well, first, did you effectuate a federal

3  arrest of a person on that day?

4  A. Yes. Well, yes.

5  Q. Was he taken into federal custody?

6  A. Yes.

7  Q. And who was that person?

8  A. Roderick Arrington.

9  Q. Did you also receive certain evidence from members of the

10 Buffalo Police Department narcotics unit?

11 A. Yes.

12 Q. What was the purpose in sending the evidence to the FBI?

13 A. Because at that point, it was determined that the charges

14 would be filed in federal court instead of state.

15 Q. I'm going to hand you certain items. You'll see 40 D --

16 I'm sorry, 40 E and F in front of you. And I'm also going to

17 hand you 40 A and 40 D.

18         MR. FOGG: That was D or --

19         MR. PARISI: 40 D. I'm sorry 40 A, 40 D, 40 E and

20 40 F.

21 BY MR. PARISI:

22 Q. Let's just start with 40 A. Did you receive what's

23 inside the packaging of 40 A on October 31st, 2014?

24 A. Yes.

25 Q. Was there certain paperwork that was filled out that

1    transferred -- showed the transfer of evidence from Buffalo
2    Police Department custody to your custody?
3    A.  Yes, there's a Buffalo Police Department form in evidence
4    control form, I believe it's a P 27.
5    Q.  And was Government Exhibit 40 A, is that in the same
6    condition as it was when you had received it from the
7    narcotics detective until the time -- well, was it -- is it
8    in the same condition as when you received it from the
9    narcotics detective, what's inside of the packaging?
10   A.  Yes, other than the large -- the large plastic bag, the
11   two smaller bags.
12   Q.  So it wasn't in the large bag when you --
13   A.  Correct.
14   Q.  Now, 40 D, do you see what's inside of 40 D?
15   A.  Yes.
16   Q.  And what was inside of 40 -- I'm sorry, first of all,
17   what's inside of 40 A?  I don't think I asked you that.
18   A.  Some packaging material and a scale, I believe.
19   Q.  40 D, did you receive 40 D from the same narcotics
20   detectives?
21   A.  Yes.
22   Q.  What did -- what is inside 40 D?  How many packages?
23   A.  Two.
24   Q.  Again, was that -- what did you receive that day?
25   A.  The two smaller bags that are inside the larger bag were

1 separated.

2 Q. And were they in the same condition as they exist in

3 those packages as when you received them on that day?

4 A. It appears so, yes.

5 Q. Those are the same packages they were in?

6 A. Yes.

7 Q. Now, I'd like to go to 40 E. Do you recognize what's

8 inside 40 E?

9 A. Yes.

10 Q. And what is that?

11 A. It's a semiautomatic handgun.

12 Q. And is that related to what you received from narcotic

13 detectives on October 31st, 2014?

14 A. Yes.

15 Q. Is that in the same condition as it was when you received

16 it from them?

17 A. It appears so. There's also a spent shell casing that

18 the lab fired, test fires with. That was a -- not part of

19 what I received, but the casing is part of the packet now.

20 Q. And 40 F, I believe, is the last one in front of you. Do

21 you recognize what's in 40 F?

22 A. Yes.

23 Q. Is what's in 40 F?

24 A. It looks to be the magazine for semiautomatic handgun and

25 a separate bag of live ammunition.

1  Q. Was that what was received from the narcotics detective
2  and you took into your custody on October 31st, 2014?
3  A. Yes.
4  Q. Does it appear to be in the same condition?
5  A. Yes.
6  Q. With respect to 40 A, 40 D, 40 E and 40 F, what did you
7  then do with them?
8  A. I took all those items I received from the narcotics unit
9  and I transferred them over to Special Agent Laurie Holmes
10 from the FBI.
11 Q. In the time that these were in your custody and your
12 control, did you ever tamper with any 40 A, 40 D, 40 E or
13 40 F?
14 A. No.
15          MR. PARISI: The government would offer 40 A, 40 D
16 and 40 F in evidence. I believe 40 E is already admitted.
17          MR. FOGG: No objection, Judge.
18          THE COURT: All right. They'll be received.
19          **The following were received in Evidence:**
20          **GOVERNMENT EXHIBIT 40 A**
21          **GOVERNMENT EXHIBIT 40 D**
22          **GOVERNMENT EXHIBIT 40 F**
23          MR. PARISI: No further questions for the witness.
24          MR. FOGG: May I?
25

1        **CROSS-EXAMINATION BY MR. FOGG:**

2  Q.  You said -- Investigator Kaska, is that what it is?

3  A.  Detective.

4  Q.  Detective?  Sorry.

5      Detective, you are with what division?

6  A.  Currently I'm with the homicide unit.

7  Q.  Where?

8  A.  Buffalo Police Department.

9  Q.  Buffalo Police Department.  You were -- you were

10 testifying on -- on -- on direct, and the question was

11 basically how did you or your office get involved.  And you

12 had mentioned about information that you received prior to a

13 warrant.  What information this was?

14 A.  Regarding this case?

15 Q.  Or being just explained, yes, please.

16 A.  The information was actually some of it I'd heard over

17 the Buffalo Police radio that the narcotics unit was doing a

18 search warrant at an address on Girard, which was an address

19 of interest to our case at the task force at the time.

20 Q.  What case was that?

21 A.  It was the case involving members of a Schuele Street

22 gang.

23 Q.  Please go ahead.

24 A.  That's it.

25 Q.  What was -- what were you interested in when you say the

1  Schuele Street gang?  What was it in particular that you were
2  interested in?
3  A.  Well, the case revolved around -- the task force is in a
4  violent crime task force.  The purpose of the task force is
5  to investigate gangs, drugs, guns, violence in the City of
6  Buffalo and elsewhere.  I say city because I'm a Buffalo --
7  Q.  You're in Buffalo?
8  A.  -- detective, yes.
9  Q.  So, that address prompts you to be concerned; is that
10 what it was?
11 A.  No.
12 Q.  The individual?
13 A.  No.
14 Q.  Please explain.
15 A.  Concerned about what?
16 Q.  Well, you had said that this was a case of interest.
17 A.  Um-hum.
18 Q.  So what about it that sparked the interest?
19 A.  An investigation was already underway into the person
20 who -- where the search warrant was conducted, so that was
21 the interest.
22 Q.  So the interest -- I asked was it the address or the
23 person.  It's actually the person and possibly the address?
24 A.  Correct, both.
25 Q.  All right.  And you said no before.  Was that because you

1  didn't want to say?  Or you were confused with my question?

2  A.  I said no to what?

3  Q.  When I asked --

4  A.  I think the use of your word "concern," I wasn't

5  concerned about anything, actually.

6  Q.  Well, my word was "interest."  And what was your

7  interest?  Was it in the person or the place?  You said to no

8  to both.  Was that a mistake, or --

9          MR. PARISI:  Object to the mischaracterization of

10  the --

11         THE COURT:  Sustained.

12  BY MR. FOGG:

13  Q.  So your interest was -- and I don't mean to be

14  antagonistic, I'm just asking a question.  So your interest

15  was in the house and the individual, correct?

16  A.  Yes, for that day, yes.

17  Q.  For that day?  All right.

18  A.  On that particular call, yes.

19  Q.  All right.  Now, so I would say that your investigation

20  included other folks; am I right?

21  A.  Yes.

22  Q.  Did it include my client?

23  A.  Yes.

24  Q.  And you had information regarding my client on what?

25  A.  I honestly don't recall.  As I said, it's been some time

1 since I've been off the task force, I don't have access to a
2 lot of the paperwork that was generated.  The focus of the
3 investigation was drug dealing and violence and gangs.
4 Q.  All right.  So, in a big general sense, there is some
5 focus on that area; am I correct?
6 A.  Which area?
7 Q.  You said Schuele, didn't you?
8 A.  Yes, that's --
9 Q.  Or there's another area?
10 A.  I didn't know if you meant the area of the crimes, the
11 area of the house, or --
12 Q.  Oh, I see.  No, no.
13     What sparked your interest in that particular case was
14 that you were investigating several crimes in that area of
15 Schuele; is that what it is?
16 A.  That's fair.
17 Q.  Okay.  Well, while you're here, let me see if I can get
18 this straight.  This Schuele Street or Avenue, that's in a
19 neighborhood; am I right?
20 A.  Correct.
21 Q.  And that neighborhood is called Grider neighborhood;
22 isn't that what it's called?
23 A.  It could be.
24 Q.  Like Hamlin Park?  You're familiar with that, right?
25 A.  Sure.

1  Q. And you're familiar with Central Park, right?

2  A. Sure.

3  Q. And you're also familiar with, what, Fillmore/Leroy?  Is

4  that an area?

5  A. Fillmore/Leroy is in Central Park.

6  Q. Is it Leroy area?  You're familiar with that, right?

7  A. It's a street, yes.

8  Q. So, that whole area that encompasses, I guess, ECC as

9  well, it's got a term for that, and it's called -- do you

10  know if it's actually called Grider neighborhood?  The Grider

11  area?

12  A. ECC?

13  Q. No.  My -- my question was the area where the street

14  Schuele is located in Griley -- Grider and Moselle, that's a

15  neighborhood called Grider, are you familiar with that?

16  A. I can honestly say I haven't heard that.

17  Q. Okay.  All right.  So, now, let's go back to the

18  investigation.  As you sit here today, you don't have

19  specific information about my client, do you?

20  A. No.

21  Q. Aaron Hicks?

22  A. Correct.

23  Q. Aaron Hicks wasn't involved in whatever investigation the

24  City of Buffalo Police Department was conducting at 82

25  Girard; am I correct?

1   A.  On the day of the search warrant?  I think that's fair.

2   Q.  Okay.  So that would be a yes, correct?

3   A.  Yes.

4   Q.  And as you sit here today and give testimony to the jury,

5   you don't have information about my client specifically doing

6   something or having criminal activity with Mr. Arrington who

7   is located at 82 Girard; am I correct?

8   A.  I don't recall what each individual member of the group

9   we were investigating did or didn't do.  Like I said, I

10  haven't had that paperwork in three years or so.  Sometimes

11  names, sometimes people are involved through different

12  actions within the group or the gang.

13  Q.  So you have documentation of my client involved with some

14  sort of gang activity; is that what you're saying?

15  A.  I don't.

16  Q.  You don't.  So you have documentation of my client

17  somehow involved or associated with people who are committing

18  crimes for profit?

19  A.  I don't have that documentation.

20  Q.  You were called here specifically to testify in this

21  case; am I right?

22  A.  Correct.

23  Q.  United States v Aaron Hicks; am I right?

24  A.  Correct.

25  Q.  You don't have information regarding Mr. Hicks?

1   A.   I was called to testify regarding this evidence and what
2   was done with it.
3   Q.   Have you informed other agencies, especially the United
4   States Attorney's Office, that you had this interest in that
5   property and that person, 82 Girard and Roderick Arrington?
6   Did you let them know that?
7   A.   When?
8   Q.   Any time.
9   A.   I'd have to say the day of the search warrant on Girard,
10  a determination was made that the charges would be filed in
11  federal court instead of state court, so I assume the U.S.
12  Attorney's Office was well aware.
13  Q.   And, therefore, well aware of your information regarding
14  my client?
15  A.   What?
16  Q.   And, therefore, well aware of information about my client
17  from your agency or bureau or division?
18  A.   I'm -- I don't understand the question.
19  Q.   Well -- well, maybe I don't understand the answers, as
20  well.
21       You had stated that 82 Girard and the individual brought
22  concern, the case itself -- not concern, interest -- let me
23  correct myself -- interest, the cause of ongoing
24  investigations in that area of Schuele Street; am I right?
25  A.   The investigation was regarding people who hang around

1  and utilize the area of Schuele Street as, basically, their
2  area of operation, not that necessarily crimes were committed
3  right on Schuele Street.
4  Q.  Okay.  Now, the area of Schuele, it consists of many
5  streets, right?
6  A.  Yes.
7  Q.  And there are many homes there, right?
8  A.  Yes.
9  Q.  People live there, right?
10 A.  Yes.
11 Q.  And people would hang out there, right?
12 A.  Sure.
13 Q.  And people have friends and they'd have relatives hanging
14 out there, right?
15 A.  Sure.
16 Q.  Would that include all of them as, well?
17 A.  No.
18 Q.  So you had specific information about specific people,
19 correct?
20 A.  The task force did, yes.
21 Q.  The task force did.  But my client wasn't one of them?
22 A.  I don't know where Mr. Hicks falls in in that -- the
23 setting of that group on Schuele Street.
24 Q.  Well, neither do I.  And I'd like the jury to figure it
25 out, as well.  So if you had information --

1      THE COURT: Well that --
2      MR. FOGG: -- you would have brought it in.
3      THE COURT: -- that comment will be stricken from the
4  record. You -- the jury will ignore that last comment from
5  Mr. Fogg.
6      MR. FOGG: I apologize, Judge. I'll also withdraw
7  it.
8  BY MR. FOGG:
9  Q. You said you didn't know where he fell in. So is it
10 correct to say that you don't know that he's actually in?
11     THE COURT: Do you have any idea whether Mr. Hicks is
12 involved or not, sir?
13     THE WITNESS: I recall the name coming up during the
14 investigation. I don't know what roles may have been played.
15 It was, like I said, three years removed from that assignment.
16     THE COURT: Was that of your concern at all?
17     THE WITNESS: As in this particular time, it was.
18     THE COURT: Okay. Thank you.
19 BY MR. FOGG:
20 Q. Did you take any other steps after this regarding my
21 client, or maybe go back and check your files?
22 A. No.
23     MR. FOGG: Thank you.
24
25

1         **REDIRECT EXAMINATION BY MR. PARISI:**

2    Q.   Detective Kaska, were you the lead agent on the Schuele

3    Street investigation?

4    A.   I was not.

5    Q.   Were you actually -- within the Safe Streets Task Force,

6    how many agents were working around that time that you were

7    there?  Agents and task force officers.

8    A.   Probably in the neighborhood of 20 to 24 law enforcement

9    personnel.

10   Q.   And were you actually a task force officer that was

11   assigned primarily to the Schuele investigation?

12   A.   No.

13   Q.   Were you called in on October 31st, 2014 solely to

14   collect evidence?

15   A.   I was working in my role at the time, because it was a

16   Buffalo Police narcotics warrant -- search warrant, that

17   would be my role on the task force is to go between the two

18   departments.  That was my role that day.

19   Q.   So your role that day was just to take the person of

20   Roderick Arrington and collect the evidence?

21   A.   Correct.

22   Q.   Would you say you had minimal involvement in the Schuele

23   investigation prior to that?

24   A.   Yes.

25            MR. PARISI:  No further -- nothing further.

1        THE COURT:  All right.  Thank you, sir.

2        (Witness excused at 11:12 a.m.)

3        (Excerpt concluded at 11:12 a.m.)

4           *     *     *     *     *     *     *

7                       CERTIFICATION

9             I certify that the foregoing is a

10       correct transcription of the proceedings

11       recorded by me in this matter.

15                       s/ Ann M. Sawyer
                         Ann M. Sawyer, RPR, CRR, NYRCR, NYACR
16                       Official Reporter
                         U.S.D.C., W.D.N.Y.