1

**UNITED STATES DISTRICT COURT**

2
**WESTERN DISTRICT OF NEW YORK**

3
VOL. IV

4
UNITED STATES OF AMERICA,            )
                                     ) Case No. 1:15-CR-00033
5                                    )           (RJA)(HBS)
                Plaintiff,           )
6                                    )
vs.                                  ) April 24th, 2018
7                                    )
AARON HICKS,                         )
8                                    )
                Defendant.           )
9


10
            **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
11      **BEFORE THE HONORABLE RICHARD J. ARCARA**
            **SENIOR UNITED STATES DISTRICT JUDGE**
12


13
APPEARANCES:

14
For the Plaintiff:    JAMES P. KENNEDY, JR.
15                          UNITED STATES ATTORNEY
                            BY:  PAUL PARISI, ESQ.
16                               WEI XIANG, ESQ.
                            ASSISTANT UNITED STATES ATTORNEYS
17                          138 Delaware Avenue
                            Buffalo, NY 14202
18
For the Defendant:    ROBERT ROSS FOGG, ESQ.
19                          69 Delaware Avenue, Suite 600
                            Buffalo, NY 14202
20
Court Reporter:       MEGAN E. PELKA, RPR
21                          Robert H. Jackson Courthouse
                            2 Niagara Square
22                          Buffalo, NY 14202

23

24

25

1                          **I N D E X**

2    WITNESSES                                        PAGE

3    GOVERNMENT

4    JEROME GRANT
         Direct Examination by Mr. Xiang            555
5        Cross-examination by Mr. Fogg              590
         Redirect Examination by Mr. Xiang          657
6        Recross-examination by Mr. Fogg            663
     JEREMY PETERSON
7        Direct Examination by Mr. Parisi           666

10:35AM

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:25AM | 1 | (The jury entered the room at 10:00 a.m.) |
| 10:01AM | 2 | THE CLERK:  All rise.  Criminal action 2015-33A. |
| 10:01AM | 3 | United States v. Aaron Hicks.  Jury trial.  Counsel, please |
| 10:01AM | 4 | state your name and the party you represent for the record. |
| 10:01AM | 5 | MR. PARISI:  Good morning.  Paul Parisi and Wei Xiang |
| 10:01AM | 6 | for the United States. |
| 10:01AM | 7 | MR. FOGG:  Good morning, Your Honor, ladies and |
| 10:01AM | 8 | gentlemen.  Robert Ross Fogg for Aaron Hicks, who is present |
| 10:01AM | 9 | in court. |
| 10:01AM | 10 | THE COURT:  Good morning, everyone. |
| 10:01AM | 11 | (An off-the-record discussion was held.) |
| 10:02AM | 12 | THE COURT:  Okay, folks.  We're ready to continue. |
| 10:02AM | 13 | MR. XIANG:  Your Honor, the government calls Jerome |
| 10:02AM | 14 | Grant, witness number 34. |
| 10:02AM | 15 | THE CLERK:  Please state your full name and spell |
| 10:02AM | 16 | your last name for the record. |
| 10:02AM | 17 | THE WITNESS:  Jerome Nathan Grant, G-R-A-N-T. |
| 10:02AM | 18 | (The witness was sworn at 10:02 a.m.) |
| 10:02AM | 19 | |
| 10:02AM | 20 | DIRECT EXAMINATION |
| 10:02AM | 21 | |
| 10:02AM | 22 | BY MR. XIANG: |
| 10:02AM | 23 | Q.  Mr. Grant, how old are you? |
| 10:02AM | 24 | A.  Thirty-seven. |
| 10:02AM | 25 | Q.  Where are you from? |

10:03AM    1    A.  Buffalo.

10:03AM    2    Q.  Were you born here?

10:03AM    3    A.  Yeah.

10:03AM    4    Q.  Are you currently in jail?

10:03AM    5    A.  Yeah.

10:03AM    6    Q.  Pull the mic closer to you, please.

10:03AM    7    A.  Yes.

10:03AM    8    Q.  Since when have you been in jail on this stint?

10:03AM    9    A.  July 24th, 2014.

10:03AM   10    Q.  So, for almost the past four years?

10:03AM   11    A.  Yes.

10:03AM   12    Q.  Had you ever been incarcerated before 2014, before July

10:03AM   13    of 2014?

10:03AM   14    A.  Yes.

10:03AM   15    Q.  What years?

10:03AM   16    A.  2003, 2004, 2006.  2006 to 2011, I got out on pre-release

10:03AM   17    and then, went back from 2011 to -- March 2011 to October

10:03AM   18    2012.

10:03AM   19    Q.  All right.  When you say pre-release, you were on --

10:04AM   20    A.  Technically, I was still incarcerated, but I was in a

10:04AM   21    halfway house.

10:04AM   22    Q.  And just to clarify, what time period was this that you

10:04AM   23    were at the halfway house?

10:04AM   24    A.  From August of 2011, August 15th, 2011 until March 2012.

10:04AM   25    I took too long to get back to work and they sent me back to

10:04AM  1    Albion and I got on parole October 9th, 2012.

10:04AM  2    Q.  When you were released on -- to the halfway house, the

10:04AM  3    pre-release you're talking about August 15th, 2011, what

10:04AM  4    facility were you released from?

10:04AM  5    A.  SCI Albion.

10:04AM  6    Q.  And what state is that in?

10:04AM  7    A.  Pennsylvania.

10:04AM  8    Q.  SCI, being State Correctional Institution?

10:04AM  9    A.  Yeah.

10:04AM  10   Q.  And how long had you been in custody in the

10:05AM  11   Pennsylvania -- Commonwealth of Pennsylvania Department of

10:05AM  12   Corrections before this halfway house release on August 15,

10:05AM  13   2011?  How long before that?

10:05AM  14   A.  2004 to 2006.  I got paroled in 2006 from SCI Houtzdale.

10:05AM  15   Q.  And then when did you go back in?

10:05AM  16   A.  July 2006.

10:05AM  17   Q.  And when did you get released from that stint?

10:05AM  18   A.  Well, I got released from federal jail September 2010,

10:05AM  19   but I had a warrant for Pennsylvania for parole violation, so

10:05AM  20   they came and got me and took me to SCI Albion.  Then I got

10:05AM  21   released on pre-release August 15th, 2011.

10:05AM  22   Q.  Both the Pennsylvania -- well, what was the -- the

10:05AM  23   underlying conviction for which you served time in

10:06AM  24   Pennsylvania?

10:06AM  25   A.  Possession of marijuana.

GRANT  --  BY MR. XIANG  --  4/24/18

| | | |
|---|---|---|
| 10:06AM | 1 | Q.  And then, the federal sentence? |
| 10:06AM | 2 | A.  Possession of a firearm.  Criminal in possession of a |
| 10:06AM | 3 | firearm. |
| 10:06AM | 4 | Q.  When you were in Pennsylvania prison, did you have access |
| 10:06AM | 5 | to telephone contact with people on the outside? |
| 10:06AM | 6 | A.  Yes. |
| 10:06AM | 7 | Q.  How were you able to do that? |
| 10:06AM | 8 | A.  Get a phone list, fill it out, put the numbers on there. |
| 10:06AM | 9 | Don't nobody else have a number, they approve it for you and |
| 10:06AM | 10 | you call them. |
| 10:06AM | 11 | Q.  The phone list, who did you submit that to? |
| 10:06AM | 12 | A.  The counselor on the unit.  The unit counselor. |
| 10:06AM | 13 | Q.  At the prison? |
| 10:06AM | 14 | A.  Yes. |
| 10:06AM | 15 | Q.  Did you give them, the Pennsylvania facility, a list of |
| 10:06AM | 16 | people for your phone list? |
| 10:06AM | 17 | A.  Yes, I did. |
| 10:06AM | 18 | Q.  Who was at the top of your list? |
| 10:06AM | 19 | A.  Aaron Hicks. |
| 10:06AM | 20 | Q.  Is the Aaron Hicks that you're talking about, is he in |
| 10:06AM | 21 | the courtroom with us today? |
| 10:07AM | 22 | A.  Yes. |
| 10:07AM | 23 | Q.  Can you identify him by a unique article of clothing he's |
| 10:07AM | 24 | wearing? |
| 10:07AM | 25 | A.  A blue jacket, suit jacket and glasses. |

10:07AM   1          MR. XIANG:  The record will reflect the witness has

10:07AM   2    identified the defendant.  Can you stop swinging?  It's

10:07AM   3    squeaking.

10:07AM   4    BY MR. XIANG:

10:07AM   5    Q.  Why did you put Aaron Hicks on the top of your telephone

10:07AM   6    list?

10:07AM   7    A.  At that time, he was somebody that I was talking to

10:07AM   8    pretty much the most.  So, when I filled out the list, that

10:07AM   9    was the first person to pop up in my mind.

10:07AM  10    Q.  How did you know him?

10:07AM  11    A.  From Schuele Street, around that area.

10:07AM  12    Q.  Since when?

10:07AM  13    A.  Since about -- I want to say about maybe 2000, early

10:07AM  14    2000, late 90's, early 2000's.

10:07AM  15    Q.  How old would that have made you at the time?

10:08AM  16    A.  Like probably 2000, I was 19, about to be 20.  About 20,

10:08AM  17    21, around that area.

10:08AM  18    Q.  And what street -- on what street were you living at that

10:08AM  19    time?

10:08AM  20    A.  I was staying on Schuele.

10:08AM  21    Q.  And where was Aaron Hicks?

10:08AM  22    A.  He was staying on Northland.

10:08AM  23    Q.  How did you first meet him?

10:08AM  24    A.  Just seen him around over there in the neighborhood.

10:08AM  25    Q.  Did you go to school with him?

10:08AM   1   A.  No.

10:08AM   2   Q.  In terms of age, are you older, younger?

10:08AM   3   A.  Older.

10:08AM   4   Q.  How did your relationship with him develop from the early

10:08AM   5   2000's?

10:08AM   6   A.  When I first got released from Houtzdale -- excuse me.

10:08AM   7   When I first got released from Houtzdale, I was in the

10:08AM   8   halfway house in Pennsylvania.  I think it was called Gateway

10:09AM   9   and --

10:09AM   10   Q.  What year is this?

10:09AM   11   A.  This was 2006.  Then, I talked to Stacks.

10:09AM   12   Q.  Who is Stacks?

10:09AM   13   A.  Antwon Steward.  And he told me that Boogy was going to

10:09AM   14   Edinboro down there.

10:09AM   15   Q.  Who is Boogy?

10:09AM   16   A.  Aaron Hicks.

10:09AM   17   Q.  How did you know Stacks or Antwon Steward?

10:09AM   18   A.  I have known him for a while, from around the Schuele

10:09AM   19   area.

10:09AM   20   Q.  In 2006, after you learned that Boogy was going to school

10:09AM   21   in Edinboro, what happened next?

10:09AM   22   A.  I called him.  He came down.  I was in Erie.  He came

10:09AM   23   down to pick me up from the halfway house.

10:09AM   24   Q.  Erie, Pennsylvania?

10:09AM   25   A.  Yeah.  Then, we went back out to his school.  Stayed out

GRANT  --  BY MR. XIANG  --  4/24/18

10:09AM   1   there for a little while 'til it was time for me to go back

10:09AM   2   to the halfway house.  And then I went back to the halfway

10:10AM   3   house and that's when we started hanging around each other.

10:10AM   4   Q.  What did you guys do together?

10:10AM   5   A.  Well, at that time, we really wasn't doing too much, a

10:10AM   6   little bit of weed.

10:10AM   7   Q.  What do you mean a little bit of weed?

10:10AM   8   A.  Like, nickle bags.

10:10AM   9   Q.  Using?

10:10AM  10   A.  Selling.  I couldn't smoke at that time because I was in

10:10AM  11   the halfway house and they was giving me urines.  So, I would

10:10AM  12   just sell.

10:10AM  13   Q.  What do you mean by we?

10:10AM  14   A.  Well, I got the weed from him.

10:10AM  15   Q.  Where were you selling?

10:10AM  16   A.  In Erie, Pennsylvania, to various people.

10:10AM  17   Q.  How much were you getting from Boogy?

10:10AM  18   A.  At that time, it was probably like an ounce, two ounces.

10:10AM  19   Q.  So, how many -- you said nickel bags?

10:10AM  20   A.  Yeah.

10:10AM  21   Q.  Give us an idea of quantity-wise, price-ise, what that

10:11AM  22   is?

10:11AM  23   A.  You take an ounce, you probably make maybe 20 nickle bags

10:11AM  24   out of it, if I'm not mistaken.

10:11AM  25   Q.  A nickel bag; what's a nickle bag?

GRANT  --  BY MR. XIANG  --  4/24/18                      562

10:11AM  1   A.  It's a $5 bag of weed.

10:11AM  2   Q.  You say you would get an ounce or so from Boogy every

10:11AM  3   time?

10:11AM  4   A.  Yeah.  At that time, yes.

10:11AM  5   Q.  And how much was an ounce?

10:11AM  6   A.  At that time, it was kind of cheap, it was $50, $75 an

10:11AM  7   ounce.

10:11AM  8   Q.  How often were you doing this with Boogy?  And I'll ask

10:11AM  9   you again; we're talking about 2006?

10:11AM  10  A.  I don't know.  Just pretty much if I needed it or if I

10:11AM  11  knew somebody who needed it, I would call.  So, whenever I

10:11AM  12  needed it or somebody else needed it.

10:11AM  13  Q.  Was there anyone else -- you mentioned Stacks earlier.

10:12AM  14  Was there anyone else you knew from Schuele involved in your

10:12AM  15  drug dealing with Hicks in the Edinboro/Erie area at this

10:12AM  16  time?

10:12AM  17  A.  Barkley was going there, too.

10:12AM  18  Q.  Who?

10:12AM  19  A.  Barkley, Anthony.  I think his name is Anthony Barkley.

10:12AM  20  Q.  What was he doing?

10:12AM  21  A.  He was selling weed.

10:12AM  22  Q.  Where was he from?

10:12AM  23  A.  Schuele.

10:12AM  24  Q.  Did you know him before?

10:12AM  25  A.  Yeah.

GRANT -- BY MR. XIANG -- 4/24/18                    563

10:12AM   1    Q.  I think earlier you said that in 2006 you went back to

10:12AM   2    prison?

10:12AM   3    A.  Yeah.

10:12AM   4    Q.  When -- and when you went back in, in 2006, when was the

10:12AM   5    next time you got out?

10:12AM   6    A.  2011.

10:12AM   7    Q.  And you said from -- is that the August 15, 2011?

10:12AM   8    A.  Yes.  That's when I was on pre-release -- or post-

10:13AM   9    release.  It's called -- it's actually called -- they have

10:13AM  10    pre-release if it's before your sentence; post-release if

10:13AM  11    it's after your sentence.

10:13AM  12    Q.  What you got out August 15, 2011, how did you get to the

10:13AM  13    halfway house?

10:13AM  14    A.  Boogy took me.

10:13AM  15    Q.  Where was this halfway house?

10:13AM  16    A.  On West 2nd Street in Erie.

10:13AM  17    Q.  Erie, Pennsylvania?

10:13AM  18    A.  Yes.

10:13AM  19    Q.  How long were you at this halfway house?

10:13AM  20    A.  Seven months before I went back to jail for taking too

10:13AM  21    long to get home from work.

10:13AM  22    Q.  During this seven-month period, starting August 15th,

10:13AM  23    2011, did you continue to sell drugs in the Erie area?

10:13AM  24    A.  Yeah.

10:13AM  25    Q.  What?

10:13AM   1   A.  Marijuana, cocaine.

10:13AM   2   Q.  How did you get it?

10:14AM   3   A.  From Boogy.

10:14AM   4   Q.  How?

10:14AM   5   A.  He would come up there and see me.  One time, I went to

10:14AM   6   Buffalo to get some weed from him.

10:14AM   7   Q.  Was there anyone else from the Schuele area who was also

10:14AM   8   involved in your drug dealing in Erie during this period?

10:14AM   9   A.  Yeah.  It was Hottie.

10:14AM  10   Q.  How did you know Hottie?

10:14AM  11   A.  I really met him when I first came home, because he

10:14AM  12   wasn't around before then.  But when I first came home, I

10:14AM  13   been --

10:14AM  14   Q.  When you first came home was when?

10:14AM  15   A.  Well, 2011.  That was when I first met him.

10:14AM  16   Q.  How did you get to meet Hottie?

10:14AM  17   A.  I met him through -- well, Boogy didn't introduce us.  He

10:14AM  18   was there when we like, met face to face, but he told me that

10:14AM  19   that was his peoples.

10:14AM  20   Q.  Where did you meet Hottie?

10:14AM  21   A.  First time I met him was at a Walmart.  He had came up

10:15AM  22   and brought me some CDs.

10:15AM  23   Q.  And what city was this?

10:15AM  24   A.  This was in Erie, Pennsylvania.

10:15AM  25   Q.  When you say that he went -- he came up or you went up,

565

10:15AM    1    Buffalo is north of Erie, correct?

10:15AM    2    A.  Yeah.

10:15AM    3    Q.  But are you referring to you met him in Pennsylvania?

10:15AM    4    A.  Yeah.  I met him at a Walmart in Pennsylvania.

10:15AM    5    Q.  Why did you meet Hottie then?

10:15AM    6    A.  Well, at that time, he was -- he had some CDs for me to

10:15AM    7    pass around Erie.

10:15AM    8    Q.  What kind of CDs?

10:15AM    9    A.  Rap CDs.

10:15AM   10    Q.  What relation did the rap CDs have with Hottie?

10:15AM   11    A.  Well, he was Black.

10:15AM   12    Q.  Who is Black?

10:15AM   13    A.  Sirius Black, Sandy Jones.

10:15AM   14    Q.  Did you know who Sirius Black or Sandy Jones was?

10:15AM   15    A.  Yeah.

10:15AM   16    Q.  Before Hottie passed you these CDs?

10:15AM   17    A.  Yes.

10:15AM   18    Q.  How did you know Sirius Black?

10:16AM   19    A.  From Schuele Street.

10:16AM   20    Q.  What time period?  As in, when did you first meet him?

10:16AM   21    A.  About late 90's, early 2000's.

10:16AM   22    Q.  And how did you meet Sirius Black?

10:16AM   23    A.  Being in the neighborhood.  At that time, he was selling

10:16AM   24    weed.

10:16AM   25    Q.  When Hottie gave you the Sirius Black CDs, did you ever

GRANT  --  BY MR. XIANG  --  4/24/18

| 10:16AM | 1 | view any music videos with -- of Sirius Black? |
|---|---|---|

10:16AM   1   view any music videos with -- of Sirius Black?

10:16AM   2   A.  Yes.

10:16AM   3   Q.  When you were at the halfway house in Erie, Pennsylvania,

10:16AM   4   from August 2011 to March of 2012, were you invited to be in

10:16AM   5   a music video with Sirius Black?

10:16AM   6   A.  Yes.

10:16AM   7   Q.  Who invited you?

10:16AM   8   A.  Boogy.

10:16AM   9   Q.  How?

10:16AM   10   A.  Phone.  I was talking to him on the phone.  He was

10:17AM   11   telling me that they was bringing Cheddar DVD down to Buffalo

10:17AM   12   and see if I can come to the video shoot.  And the reason why

10:17AM   13   he was asking is because I guess he wanted me to get fitted

10:17AM   14   for a tux.

10:17AM   15   Q.  How did you know he wanted to get you fitted for a tux?

10:17AM   16   A.  Because that's what he told me.

10:17AM   17   Q.  Were you able --

10:17AM   18   A.  If I can come.

10:17AM   19   Q.  Were you able to attend?

10:17AM   20   A.  No.

10:17AM   21   Q.  Why not?

10:17AM   22   A.  Because by me being on pre-release, I was technically

10:17AM   23   still in jail, so I wasn't allowed to leave the state.

10:17AM   24   Q.  You just said pre-release?

10:17AM   25   A.  Well, post-release.  It's the same.

10:17AM    1    Q.  The particular video that you were supposed to -- that

10:17AM    2    you were invited to be in with the tux, did you learn about

10:17AM    3    the finished video?

10:17AM    4    A.  Yes, I did.

10:17AM    5    Q.  How did you learn about the finished video?

10:17AM    6    A.  Boogy told me that it was on YouTube.  He called me and

10:17AM    7    told me it was on YouTube, or maybe I called him.  We was

10:18AM    8    talking on the phone.

10:18AM    9    Q.  Did you see the video afterwards after he told you about

10:18AM   10    it?

10:18AM   11    A.  Yes.

10:18AM   12    Q.  And is Hottie in that video?

10:18AM   13    A.  Yes.

10:18AM   14    Q.  Do you remember the scene or a scene where he's in?

10:18AM   15    A.  Yeah.  I remember a scene where he's in.

10:18AM   16    Q.  When?

10:18AM   17    A.  He was sitting at the table.  He had an unlit cigar in

10:18AM   18    his mouth and he was talking.

10:18AM   19    Q.  Did you recognize anyone else in that video?

10:18AM   20    A.  Yeah.

10:18AM   21         MR. XIANG:  Can we pull up 24 -- what's in evidence

10:18AM   22    as Government Exhibit 24H, please?

10:18AM   23    BY MR. XIANG:

10:19AM   24    Q.  Mr. Grant, do you see what's on the screen as

10:19AM   25    Exhibit 24H?

GRANT  --  BY MR. XIANG  --  4/24/18                          568

```
10:19AM    1    A.  Yes.

10:19AM    2    Q.  Is this still a lot of the video that we've been talking

10:19AM    3    about?

10:19AM    4    A.  Yes.

10:19AM    5    Q.  Do you recognize any persons shown in this still shot?

10:19AM    6    A.  Yes.  Yeah.

10:19AM    7    Q.  Why don't we start on the right-hand side?  Fair to say

10:19AM    8    that there's four people seated and then a number of people

10:19AM    9    standing in the back?

10:19AM   10    A.  Yes.

10:19AM   11    Q.  All right.  Let's start on the right-hand side with the

10:19AM   12    back row.  The first person on the right, do you recognize

10:19AM   13    that person?

10:19AM   14    A.  That's standing?

10:19AM   15    Q.  Yes.

10:19AM   16    A.  Holding the drink?  What are you talking about?

10:19AM   17    Q.  Just to be clear, on the back row.  The first person on

10:20AM   18    the right.

10:20AM   19    A.  Oh, yeah, yeah.  That's Dre.

10:20AM   20    Q.  How did you know him?

10:20AM   21    A.  From the Schuele Avenue.

10:20AM   22    Q.  What was your relationship to him?

10:20AM   23    A.  He was all right, cordial.

10:20AM   24    Q.  Let's move one over.  Second person on the right, back

10:20AM   25    row?
```

10:20AM    1    A.  Yeah, I know him.

10:20AM    2    Q.  Who is that?

10:20AM    3    A.  Torrance.

10:20AM    4    Q.  Do you know him by -- is that a first name, last name,

10:20AM    5    nickname?

10:20AM    6    A.  First name is Letorrance, last name Travis.

10:20AM    7    Q.  How did you know him?

10:20AM    8    A.  Well, I knew him before Schuele area.  His mom was one of

10:20AM    9    my teachers at the school, so I knew them by the Schuele

10:21AM   10    Avenue.  His grandmother stayed on Stevens.

10:21AM   11    Q.  Moving one left, still on the back row.

10:21AM   12    A.  The girl?

10:21AM   13    Q.  Yes.

10:21AM   14    A.  No, I'm not familiar with her.

10:21AM   15    Q.  Moving one over from her?

10:21AM   16    A.  That's Tory, Torrance's older brother.

10:21AM   17    Q.  Do you know Tory's full name?

10:21AM   18    A.  I think it's Shawntorrian Travis.

10:21AM   19    Q.  Moving one over from Tory?

10:21AM   20    A.  That's Mike.  Mikey Bird.

10:21AM   21    Q.  How did you know Mikey Bird?

10:21AM   22    A.  From the Schuele area.

10:21AM   23    Q.  Do you remember one over, the one in the White Sox hat?

10:21AM   24    A.  I can't really see his face, to be honest with you.

10:22AM   25    Q.  One over from the White Sox hat, individual holding up

10:22AM    1    the bottle with the gold chain?

10:22AM    2    A.  That's DJ Shay.

10:22AM    3    Q.  How did you know him?

10:22AM    4    A.  From being in the studio, his studio.

10:22AM    5    Q.  Do you see the person one over from him, the person on

10:22AM    6    the left-most side?

10:22AM    7    A.  Yeah.  It look like it could be Joe.

10:22AM    8    Q.  But you can't see his face?

10:22AM    9    A.  No, I can't see his whole face, but just from -- like,

10:22AM   10    what I assume he would look like.

10:22AM   11    Q.  I'm not asking you to assume anything.

10:22AM   12    A.  All right.

10:22AM   13    Q.  So, now let's go to the seated row.  Again, on the right-

10:22AM   14    hand side.  Starting on the right.

10:22AM   15    A.  Ra Ra.

10:22AM   16    Q.  Who?

10:22AM   17    A.  Ra Ra.

10:22AM   18    Q.  Do you know his -- is that a first name, last name,

10:23AM   19    nickname?

10:23AM   20    A.  No.  That's his nickname.  His first name is Roderick.

10:23AM   21    His last name is Arrington.

10:23AM   22    Q.  How did you know Roderick Arrington?

10:23AM   23    A.  I went to school with him and from around Schuele area.

10:23AM   24    Q.  Moving one left from Roderick Arrington?

10:23AM   25    A.  Boogy.

GRANT  --  BY MR. XIANG  --  4/24/18

571

10:23AM   1   Q.  One left from Boogy?

10:23AM   2   A.  Black.

10:23AM   3   Q.  Do you remember from the video, at least one left from

10:23AM   4   Black, who has his head down?

10:23AM   5   A.  That's Breeze.

10:23AM   6   Q.  Who?

10:23AM   7   A.  OP, Breeze.

10:23AM   8   Q.  How did you know OP/Breeze?

10:23AM   9   A.  Schuele Street.

10:23AM  10   Q.  Do you remember the layout of the rest of this table?  I

10:23AM  11   mean, who was seated to OP's right?  Who is off the screen on

10:23AM  12   the left-hand side?

10:23AM  13   A.  I'm thinking.  If I can remember correctly, it would be

10:24AM  14   Brill and Dan, maybe Hottie.

10:24AM  15   Q.  Was there any video that you were present for?

10:24AM  16   A.  Yeah.

10:24AM  17   Q.  Which one or which ones?

10:24AM  18   A.  The All White video.

10:24AM  19   Q.  When was that?

10:24AM  20   A.  That was in 2013.

10:24AM  21   Q.  2013?

10:24AM  22   A.  Yeah.

10:24AM  23   Q.  Now, you had previously said that you went back to

10:24AM  24   Pennsylvania's prison in March of 2012?

10:24AM  25   A.  Yes.

10:24AM   1   Q.  So, when did you get released, after March of 2012?

10:24AM   2   A.  I got released to the halfway house.  They paroled me to

10:24AM   3   the halfway house on October 9th, 2012.  And then, I maxed

10:24AM   4   out from the halfway house, January 18th, 2013.

10:24AM   5   Q.  Can you explain what it meant for you to have maxed out

10:25AM   6   from the halfway house?

10:25AM   7   A.  I was finished with my Pennsylvania state sentence.

10:25AM   8   Q.  So, in January of 2013, were you under any criminal

10:25AM   9   sentence?  Let me rephrase.  By February of 2013, were you

10:25AM  10   under any criminal sentence?

10:25AM  11   A.  I was on probation for my previous federal charge that I

10:25AM  12   had.

10:25AM  13   Q.  Did that mean that you were in or out of custody?

10:25AM  14   A.  Well, I was out of custody, but I had to just report to

10:25AM  15   probation.

10:25AM  16   Q.  Is it -- after you were released or you maxed out of your

10:25AM  17   Pennsylvania sentence, in January of 2013, where did you go?

10:25AM  18   A.  Came back to Buffalo.

10:25AM  19   Q.  The All White video that you mentioned being produced in

10:25AM  20   2013, where was that?

10:25AM  21   A.  It was in Buffalo.

10:25AM  22   Q.  And how is it that you were present for its making?

10:26AM  23   A.  Because I was in Buffalo.

10:26AM  24   Q.  How did you know that it was being made?

10:26AM  25   A.  Oh, because Boogy had told me that they were about to do

10:26AM   1   a video.  I was hanging around pretty much almost every day

10:26AM   2   around this time.

10:26AM   3   Q.  Do you know how the All White video was funded?

10:26AM   4   A.  Yeah, we had some marijuana that came in.

10:26AM   5   Q.  How do you know that?

10:26AM   6   A.  Because I was there.

10:26AM   7   Q.  Explain what you meant by you had marijuana come in?

10:26AM   8   A.  I think it was 33 pounds, if I'm not mistaken.  And

10:26AM   9   picked it up from one of his relative's houses and we took it

10:26AM  10   to Brill house and we broke it down.  It was all in like,

10:26AM  11   little bags.  And like, you had to open the bags up and break

10:26AM  12   the weed down because it was compressed.

10:26AM  13   Q.  Start from the beginning.  How did you learn that there

10:27AM  14   was a shipment coming in?

10:27AM  15   A.  I was with Boogy.  He told me.

10:27AM  16   Q.  You said that it was brought to Brill's house?

10:27AM  17   A.  Yes.  We picked it up and then took it to Brill's house.

10:27AM  18   Q.  Who is we?  When you say we picked up?

10:27AM  19   A.  It was me, Boogy and Black was with us.

10:27AM  20   Q.  And where did you say you went to pick this up?

10:27AM  21   A.  It was one of his relative's houses, off like Camp

10:27AM  22   Street.

10:27AM  23   Q.  Whose relative?

10:27AM  24   A.  Boogy's.

10:27AM  25   Q.  When was the first time you saw the package?

574

10:27AM  1   A.  When the UPS man dropped it off.

10:27AM  2   Q.  And give us an idea of what you saw, the package, before

10:27AM  3   it was opened.

10:27AM  4   A.  It was in a brown box.  The UPS man dropped it off.

10:28AM  5   Boogy got out the -- we was in a truck, I think at the time.

10:28AM  6   Boogy got out of the truck, he grabbed it, put it in the

10:28AM  7   truck and we pulled of.

10:28AM  8   Q.  Why were you there?

10:28AM  9   A.  Because I was with him all the time at that time.

10:28AM  10  Q.  Was Brill with you when you picked it up?

10:28AM  11  A.  No.  No.

10:28AM  12  Q.  And you know why it was taken to Brill's house to be

10:28AM  13  broken down?

10:28AM  14  A.  I really don't know.  Nobody said why we was taking it

10:28AM  15  over or nothing.  Just that's where we went to.  So, that's

10:28AM  16  when I got out of the car.

10:28AM  17  Q.  Can you explain what it means or what you meant by

10:28AM  18  breaking it down?

10:28AM  19  A.  It comes in, it's compressed.  You got to break it down,

10:28AM  20  take it out of its form and then, put it into pounds and

10:28AM  21  then, put them in a Ziplock bag.

10:28AM  22  Q.  What do you mean that it came compressed?

10:29AM  23  A.  Like, it would be -- sometimes it would be -- sometimes

10:29AM  24  it come in big -- it would be like, a -- just a big,

10:29AM  25  compressed like, bale.  Sometimes, it would come and it would

10:29AM   1   be compressed, but they would be about this big (indicating).

10:29AM   2   You got to take it, it's wrapped up.  You got to take it from

10:29AM   3   out of its wrapper and break it down.

10:29AM   4   Q.  And what do you mean by putting it in pounds?

10:29AM   5   A.  Weigh it up to a pound, then put it in a Ziplock bag

10:29AM   6   because you sell it in pounds, you sell it by the pound.

10:29AM   7   Q.  Is that a common denomination for sale, pounds for

10:29AM   8   marijuana?

10:29AM   9   A.  Yeah.

10:29AM  10   Q.  And so, what happened to this parcel that you're talking

10:29AM  11   about that you took to Brill's house?

10:29AM  12   A.  It got broke down and it got sold.

10:29AM  13   Q.  Who broke it down?

10:29AM  14   A.  Boogy was breaking it down.  I'm not sure if I touched

10:29AM  15   that one, but I know Boogy was breaking it down.

10:30AM  16   Q.  How do you know it got sold?

10:30AM  17   A.  Because I was there when they got it and I was there when

10:30AM  18   it was gone.

10:30AM  19   Q.  What did that have to do with the All White video that we

10:30AM  20   were talking about?

10:30AM  21   A.  Well, it was pretty much dependent on that, on the weed

10:30AM  22   making it through, because nobody had no money at that time

10:30AM  23   to finance the videos.  So, the weed, like if it would have

10:30AM  24   never gotten through, then we wouldn't have been able to do

10:30AM  25   the video.

GRANT  --  BY MR. XIANG  --  4/24/18                          576

10:30AM   1   Q.  The Brill that you're talking about, how did you know

10:30AM   2   Brill?

10:30AM   3   A.  I met him before.  I met him like, in the early 2000's,

10:30AM   4   briefly, but I really wasn't hanging around him then.  A

10:30AM   5   couple times I'd be around with Boogy.  And when I came home,

10:30AM   6   Boogy had introduced me to him.

10:30AM   7   Q.  When you first met Brill in the early 2000's, where did

10:30AM   8   you meet him?

10:30AM   9   A.  I met him -- at that time, I met him, he was coming

10:31AM  10   around Schuele neighborhood with Black Wheeze.  Black Wheeze

10:31AM  11   was on Lombard around that time.  So, I guess that's where he

10:31AM  12   was dealing on Lombard.  So, he would come around Schuele

10:31AM  13   from time to time, Brill would be with him.

10:31AM  14   Q.  You said that you didn't know him too well in the

10:31AM  15   beginning?

10:31AM  16   A.  No.  Just seeing him in passing.  I knew Black Wheeze.  I

10:31AM  17   didn't really know Brill.

10:31AM  18   Q.  Was there a time when you got to know Brill better?

10:31AM  19   A.  Yeah.  I got to know Brill better.

10:31AM  20   Q.  When?

10:31AM  21   A.  When I came home in 2013.

10:31AM  22   Q.  And how did you get to know him better then?

10:31AM  23   A.  From Boogy.

10:31AM  24   Q.  How?

10:31AM  25   A.  They was always together.

10:31AM   1   Q.  Doing what?

10:31AM   2   A.  Well, at that time, they really wasn't doing too much;

10:31AM   3   still getting some weed sent there.

10:31AM   4        MR. XIANG:  Can we pull up what's in evidence as

10:31AM   5   Government Exhibit 24B?

10:31AM   6   BY MR. XIANG:

10:31AM   7   Q.  Do you recognize what's on here?

10:31AM   8   A.  Yeah.

10:31AM   9   Q.  And how do you recognize it?

10:32AM  10   A.  That's the cover of the CD that I was passing out in

10:32AM  11   Erie.

10:32AM  12   Q.  The one that you had said Hottie gave you?

10:32AM  13   A.  Yeah.

10:32AM  14   Q.  Do you recognize any of the -- well, first, fair to say

10:32AM  15   that there are eight people or eight faces shown on here?

10:32AM  16   A.  Yeah.

10:32AM  17   Q.  Do you recognize any of them?

10:32AM  18   A.  Yeah.

10:32AM  19   Q.  How many?

10:32AM  20   A.  All of them.

10:32AM  21   Q.  Let's do what we did with the other one.  Start on the

10:32AM  22   right-hand side and go left.

10:32AM  23   A.  The -- the dark-skinned, bald-headed man, that's Black

10:32AM  24   dad.

10:32AM  25   Q.  That's whose dad?

GRANT  --  BY MR. XIANG  --  4/24/18

578

| | | |
|---|---|---|
| 10:32AM | 1 | A.  Sirius Black dad. |
| 10:32AM | 2 | Q.  One over on? |
| 10:32AM | 3 | A.  Torrance. |
| 10:32AM | 4 | Q.  One over? |
| 10:32AM | 5 | A.  Boogy. |
| 10:32AM | 6 | Q.  One over? |
| 10:32AM | 7 | A.  That's Cheese little brother, Wheeze. |
| 10:32AM | 8 | Q.  One over? |
| 10:32AM | 9 | A.  Black. |
| 10:32AM | 10 | Q.  One over? |
| 10:33AM | 11 | A.  Cheese. |
| 10:33AM | 12 | Q.  One over? |
| 10:33AM | 13 | A.  Brill. |
| 10:33AM | 14 | Q.  And then the last person on the -- |
| 10:33AM | 15 | A.  Ra Ra. |
| 10:33AM | 16 | Q.  Just let the question be finished.  The last person on |
| 10:33AM | 17 | the left side? |
| 10:33AM | 18 | A.  That's Ra Ra. |
| 10:33AM | 19 | Q.  The All White video, did you ever learn why it was made? |
| 10:33AM | 20 | A.  Yeah.  We had went to see -- |
| 10:33AM | 21 | Q.  Wait, wait, wait.  Just yes or no.  Did you ever learn -- |
| 10:33AM | 22 | A.  Yes. |
| 10:33AM | 23 | Q.  How did you learn it? |
| 10:33AM | 24 | A.  Well, we had went to see Black when he was in jail. |
| 10:33AM | 25 | Q.  Who is we? |

GRANT -- BY MR. XIANG -- 4/24/18
579

10:33AM   1   A.   Me and Boogy.

10:33AM   2   Q.   Okay.

10:33AM   3   A.   We went to see him.  He was like, saying some of the rap,

10:33AM   4   some of the songs that he had.  Then, we talking about pretty

10:33AM   5   much the situation that was revolving around Torrance.

10:34AM   6   Q.   Explain for us what that was about.

10:34AM   7   A.   He --

10:34AM   8   Q.   And by that, I mean what you, Boogy and Sirius Black were

10:34AM   9   discussing about Torrance.

10:34AM   10   A.   Just about how he was cooperating with the Feds.

10:34AM   11   Q.   When was that?

10:34AM   12   A.   That was in 2013.

10:34AM   13   Q.   And the cooperation -- or the perceived cooperation with

10:34AM   14   the Feds, when was that from?

10:34AM   15   A.   2011.

10:34AM   16   Q.   To be clear, were you in Buffalo for any arrest of

10:34AM   17   Letorrance Travis in 2011?

10:34AM   18   A.   No.

10:34AM   19   Q.   Where were you at the time?

10:34AM   20   A.   I was in Erie, Pennsylvania.

10:34AM   21   Q.   And what did you, Boogy and Sirius Black talk about in

10:34AM   22   2013, about Torrance cooperating?

10:34AM   23   A.   The -- well, at the jail, when we went to see him, he was

10:34AM   24   saying like, how he ain't messing with him.  Torrance, he

10:35AM   25   about to mess up his rap name.  And that's why he was making

10:35AM  1   some of the songs.

10:35AM  2   Q.  What does that have to do with All White?

10:35AM  3   A.  All White, that's like a formal -- it's like a slang word

10:35AM  4   for -- to represent cocaine.

10:35AM  5   Q.  And what did it have to do with Letorrance Travis?

10:35AM  6   A.  Well, of course it was All White.  That's -- well,

10:35AM  7   Torrance was selling cocaine, but that phrase wasn't

10:35AM  8   necessarily directed towards him.  Telling other niggas that

10:35AM  9   was bitch nigga shit was more of the phrase that was directed

10:35AM  10  towards him.

10:35AM  11  Q.  So, you're saying that there were lines in the song about

10:35AM  12  Letorrance?

10:35AM  13  A.  Yes.

10:35AM  14  Q.  What lines?

10:35AM  15  A.  Telling on niggas, that's bitch nigga shit.  That was

10:35AM  16  directed towards Torrance.

10:35AM  17  Q.  Was cooperating or providing information to the

10:36AM  18  government encouraged?

10:36AM  19  A.  Pardon?

10:36AM  20  Q.  Where you're from?

10:36AM  21  A.  No.

10:36AM  22  Q.  Were you present for picking up any other marijuana boxes

10:36AM  23  with Boogy?

10:36AM  24  A.  Yes.

10:36AM  25  Q.  How many?

10:36AM   1   A.  A few times, couple times, various times.

10:36AM   2   Q.  And what time period are we talking about?

10:36AM   3   A.  2013, 2014.

10:36AM   4   Q.  Was there anybody else present during those times that

10:36AM   5   you were?

10:36AM   6   A.  Yeah.  It was me and Black a couple times.

10:36AM   7   Q.  And Black, you're referring to whom?

10:36AM   8   A.  Sirius Black.  He was present one time when we picked it

10:36AM   9   up.  Then, he was present at the other time when we took it

10:36AM   10   down to Girard Street.

10:36AM   11   Q.  Girard?

10:37AM   12   A.  Yeah.

10:37AM   13   Q.  Who else was at Girard, if anybody?

10:37AM   14   A.  Ra Ra had came over there.  That was his mother house.

10:37AM   15   Q.  Why were you and Sirius Black with Boogy for picking up

10:37AM   16   these other parcels?

10:37AM   17   A.  He told us that he had it coming in.  We went with him

10:37AM   18   and got it, took it over there.

10:37AM   19   Q.  Did you have anything to do with the marijuana that he

10:37AM   20   received?

10:37AM   21   A.  Yeah.  I was -- sometimes, I would pick it up.  I would

10:37AM   22   be by myself and pick it up and take it to him or I would

10:37AM   23   sell some of it.

10:37AM   24   Q.  The time that you were talking about with Sirius Black,

10:37AM   25   how much did you, Boogy and Black pick up then?

GRANT  --  BY MR. XIANG  --  4/24/18

582

| | | |
|---|---|---|
| 10:37AM | 1 | A.  At that time, it was 40 pounds. |
| 10:37AM | 2 | Q.  And what did you all do with the 40 pounds? |
| 10:37AM | 3 | A.  Took it to Girard to Ra Ra's mother house and broke it |
| 10:38AM | 4 | down. |
| 10:38AM | 5 | Q.  Was Ra Ra's mother there? |
| 10:38AM | 6 | A.  No, she wasn't there. |
| 10:38AM | 7 | Q.  So, who else was there? |
| 10:38AM | 8 | A.  Me, Black and Ra Ra. |
| 10:38AM | 9 | Q.  You, Black, Ra Ra.  Anyone else? |
| 10:38AM | 10 | A.  Oh, Boogy. |
| 10:38AM | 11 | Q.  And what did the four of you -- each of the four of you |
| 10:38AM | 12 | do when -- with those 40 pounds? |
| 10:38AM | 13 | A.  I was breaking it down.  Boogy was putting it in pounds, |
| 10:38AM | 14 | weighing it up in pounds and putting it in a bag.  Black and |
| 10:38AM | 15 | Ra Ra really wasn't doing too much. |
| 10:38AM | 16 | Q.  Did you ever know of an individual by the name of Matt? |
| 10:38AM | 17 | A.  Yeah.  I heard of him.  I did.  I never met him, though, |
| 10:38AM | 18 | but I heard of him. |
| 10:38AM | 19 | Q.  Did you ever talk to him? |
| 10:39AM | 20 | A.  Yeah.  I talked to him before. |
| 10:39AM | 21 | Q.  How? |
| 10:39AM | 22 | A.  I was locked up one time and he was with Boogy and I had |
| 10:39AM | 23 | called Boogy. |
| 10:39AM | 24 | Q.  What time period of your incarceration are we talking |
| 10:39AM | 25 | about here? |

10:39AM   1   A.  This was when I was in FCI Petersburg, so that had to be

10:39AM   2   like, 2009, I want to say it was, maybe 2009, 2010, around

10:39AM   3   that time, before I got released from FCI Petersburg.

10:39AM   4   Q.  How is it that you were on the phone with Boogy and got

10:39AM   5   introduced to Matt?

10:39AM   6   A.  Because I had called him.  And Matt is from Cleveland.

10:39AM   7   And so, Stacks and all them, they from Cleveland, so he

10:39AM   8   was -- asked me did I know him, because he my cousin.

10:39AM   9   Q.  Who was asking you?

10:39AM   10  A.  Boogy.

10:39AM   11  Q.  Did you -- well, I think you answered that.  So, but you

10:39AM   12  said that you never met Matt in person?

10:39AM   13  A.  No, I never met him in person.

10:39AM   14  Q.  Did you ever learn of what happened to Matt?

10:40AM   15  A.  Yes, I did.

10:40AM   16  Q.  After you came home, did -- to Buffalo, did Boogy ever

10:40AM   17  talk to you about Matt?

10:40AM   18  A.  Yeah.

10:40AM   19  Q.  Under what circumstances?

10:40AM   20  A.  I had -- I was at -- he picked me up from --

10:40AM   21  Q.  Who is he?

10:40AM   22  A.  Boogy.  Boogy picked me up from the -- downtown mall.  We

10:40AM   23  went to his girlfriend house in the Town Gardens and he was

10:40AM   24  just pretty much like, filling me in on things that was

10:40AM   25  happening since I was gone, because that was like, one of the

GRANT  --  BY MR. XIANG  --  4/24/18                               584

10:40AM    1    main times that we got a chance to really sit down and talk.

10:40AM    2    And he was telling me about how I would have liked him.  How

10:40AM    3    he, you know, he got on his nerves sometimes, but he had love

10:40AM    4    for him.

10:40AM    5    Q.  He had what?

10:40AM    6    A.  He had love for him.

10:40AM    7    Q.  Did Boogy say anything to you about Matt's death?

10:40AM    8    A.  Yeah.  He said that it hurt him.  And he was talking

10:40AM    9    about how Matt's uncle asked him and welcomed him into the

10:41AM   10    church, about how it was really hurting him and he couldn't

10:41AM   11    let it go.

10:41AM   12    Q.  Were you in Buffalo on August 26th, 2012?

10:41AM   13    A.  No.

10:41AM   14    Q.  Where were you then?

10:41AM   15    A.  August 26th, 2012, I was in SCI Albion.

10:41AM   16    Q.  What about four days later, on August 30th, 2012?

10:41AM   17    A.  No, I wasn't there.

10:41AM   18    Q.  Still in prison?

10:41AM   19    A.  Yeah.

10:41AM   20    Q.  Did Ra Ra ever -- Roderick Arrington ever show you

10:41AM   21    anything regarding August 30th, 2012?

10:41AM   22    A.  Yes.

10:41AM   23    Q.  What?

10:41AM   24    A.  He showed me a letter from Dame.

10:41AM   25    Q.  Where were you and Ra Ra when Ra Ra showed you this

GRANT  --  BY MR. XIANG  --  4/24/18

585

10:41AM   1   letter?

10:41AM   2   A.   The Erie County Holding Center.

10:41AM   3   Q.   And around when was that?

10:41AM   4   A.   That was in -- I want to say maybe like, the early part

10:42AM   5   of 2015.  Yeah, it was about the early part of 2015.  I want

10:42AM   6   to say like, around January 2015.

10:42AM   7   Q.   Explain for us how it is that you saw Ra Ra at the

10:42AM   8   holding center at that time.

10:42AM   9   A.   I was in Allegany County on this charge I'm on now.  And

10:42AM  10   I had a city case in Buffalo that I had to go to court for.

10:42AM  11   So that they do it -- the sheriffs from Buffalo come and take

10:42AM  12   me to the holding center.  So, when they took me to the

10:42AM  13   holding center, I went to the -- they moved me to the block

10:42AM  14   that Roderick was on.

10:42AM  15   Q.   Explain for us the layout of the block where Ra Ra was on

10:42AM  16   at this time.

10:42AM  17   A.   It's just like, a big room with a bunch of cells on the

10:42AM  18   side, a shower, a TV area, a microwave area, CO's desk.

10:42AM  19   Q.   Did inmates in this block have their own sleeping

10:43AM  20   quarters?

10:43AM  21   A.   Yes.

10:43AM  22   Q.   Like, individual beds?

10:43AM  23   A.   Yes.  They're all single cells, all individual rooms.

10:43AM  24   All single cells.

10:43AM  25   Q.   By single cell, you mean there's only one person who is

10:43AM   1   in the cell?

10:43AM   2   A.   Yes.

10:43AM   3   Q.   Or one person who is assigned to a cell?

10:43AM   4   A.   Yes.

10:43AM   5   Q.   So, explain for us how Ra Ra showed you a letter from

10:43AM   6   Dame.

10:43AM   7   A.   When I came up, he was playing chess.  I said, what's up?

10:43AM   8   And he asked me what I was doing there.  When I told him I

10:43AM   9   had a city case that I had to go to court for, because I had

10:43AM   10  to go to court the next day for it, Dame, he got to asking me

10:43AM   11  about were you guys questioning me about him.

10:43AM   12  Q.   Were the Feds asking you about Arrington?

10:43AM   13  A.   Yeah.   Somebody had -- I think somebody had told him that

10:43AM   14  he was on our criminal compliant.  So, he was -- kept asking

10:43AM   15  me about that.  Did you guys -- did the Feds say anything

10:43AM   16  about me?  I pretty much telling him, no and he kept asking

10:43AM   17  me and I kept telling him no.

10:43AM   18  Q.   You told him that we hadn't -- that the Feds were not

10:44AM   19  asking about Ra Ra?

10:44AM   20  A.   Yeah.   That he wasn't on --

10:44AM   21  Q.   Was that true?

10:44AM   22  A.   No.

10:44AM   23  Q.   Why did you lie to Ra Ra?

10:44AM   24  A.   Because if I would have told him that you was asking

10:44AM   25  about me and that I was cooperating, it would have been a

GRANT -- BY MR. XIANG -- 4/24/18

10:44AM 1    different situation.

10:44AM 2    Q.  Like what?

10:44AM 3    A.  It would turn around, pretty sure.

10:44AM 4    Q.  So, after you told him no, what happened next?

10:44AM 5    A.  He got to telling me about how Dame not telling on him.

10:44AM 6    And then that's when I asked him if Dame not telling on you

10:44AM 7    about what.  And he said, Dame about shooting Shooter.  And

10:44AM 8    then, he took me to his cell because at that time, we was at

10:44AM 9    my cell and he took me to his cell and he showed me the

10:44AM 10   letter.

10:44AM 11   Q.  Did you read the letter?

10:44AM 12   A.  Yeah.  I read it.

10:44AM 13   Q.  I'm handing to you what's in evidence as Government

10:45AM 14   Exhibit 41 and 41A.  Do you recognize those two exhibits?

10:45AM 15   A.  Yes.

10:45AM 16   Q.  How do you recognize them?

10:45AM 17   A.  Well, I recognize the letter from -- this is the letter

10:45AM 18   that I read from Dame -- or that he told me it was from Dame.

10:45AM 19   Q.  That Ra Ra showed to you?

10:45AM 20   A.  Yeah.

10:45AM 21   Q.  And what, if any, reaction did Ra Ra have to that letter?

10:45AM 22   A.  He seemed like he was relieved that Dame -- he was

10:45AM 23   convinced that Dame wasn't telling on him.

10:45AM 24   Q.  Do you see where Ra Ra had the letter stored?

10:45AM 25   A.  He just had it in an envelope.  I didn't see exactly

GRANT -- BY MR. XIANG -- 4/24/18

588

10:46AM   1   what -- I mean, I think he pulled it out of the envelope,

10:46AM   2   because his back was towards me when he was pulling it out.

10:46AM   3   Q.  What I was referring to was in the cell itself?

10:46AM   4   A.  Oh, yeah.  He was in his cell.  He had like, a desk and

10:46AM   5   he had like, some mail and it was like, a little cubby hole.

10:46AM   6   He had mail sitting down there and that's what he reached and

10:46AM   7   grabbed it from.

10:46AM   8   Q.  Was he showing it to everybody on the block that you saw?

10:46AM   9   A.  Not that I seen, no.

10:46AM  10   Q.  What happened after you read the letter in Ra Ra's cell?

10:46AM  11   A.  I gave it back to him.

10:46AM  12   Q.  Did you do anything with your knowledge of the letter?

10:46AM  13   A.  Yeah.  I wrote a letter to George Burgasser.

10:46AM  14   Q.  Who is that?

10:46AM  15   A.  He was the prosecutor on the case that I was on.

10:46AM  16   Q.  You told the prosecutor on your case about Ra Ra's

10:47AM  17   letter?

10:47AM  18   A.  Yes.

10:47AM  19   Q.  You mentioned your current charge a little bit.

10:47AM  20   You're currently convicted on a 2014 cocaine charge here in

10:47AM  21   Federal Court?

10:47AM  22   A.  Yes.

10:47AM  23   Q.  And after your arrest, continuing to today, are you

10:47AM  24   cooperating with the investigation and prosecution of

10:47AM  25   criminal conduct?

10:47AM  1   A.  Yes.

10:47AM  2   Q.  Have you already been sentenced?

10:47AM  3   A.  Yes.

10:47AM  4   Q.  To what?

10:47AM  5   A.  188 months.

10:47AM  6   Q.  In years' terms, what is that?

10:47AM  7   A.  Fifteen and a half.

10:47AM  8   Q.  By whom?

10:47AM  9   A.  By the Judge.  You're talking about who sentenced me?

10:47AM  10  Q.  Correct.

10:47AM  11  A.  The Judge.

10:47AM  12  Q.  And who is that?

10:47AM  13  A.  Judge Arcara.

10:48AM  14  Q.  Are you hoping for a sentencing reduction?

10:48AM  15  A.  Yes.

10:48AM  16  Q.  Did you receive -- as far as you knew, any credit at the

10:48AM  17  time of your sentence?

10:48AM  18  A.  No.

10:48AM  19  Q.  Let me rephrase.  Did you receive any credit at the time

10:48AM  20  of your sentence?

10:48AM  21  A.  For cooperating?

10:48AM  22  Q.  Correct.

10:48AM  23  A.  No.  I got 188 months.  That was my low end of my

10:48AM  24  sentencing guidelines.

10:48AM  25  Q.  In terms of any sentencing reduction, had anyone made any

10:48AM    1    promises to you about a specific reduction or a specific

10:48AM    2    sentence?

10:48AM    3    A.   No.

10:48AM    4    Q.   Who makes the final determination?

10:48AM    5    A.   The Judge.

10:48AM    6    Q.   Judge Arcara?

10:48AM    7    A.   Yes.

10:48AM    8            MR. XIANG:   No other questions, Judge.

10:48AM    9

10:49AM   10                       CROSS-EXAMINATION

10:49AM   11

10:49AM   12    BY MR. FOGG:

10:49AM   13    Q.   Mr. Grant, you had testified that you wrote George

10:50AM   14    Burgasser a letter.

10:50AM   15    A.   Yes.

10:50AM   16    Q.   In fact, you wrote George Burgasser several letters,

10:50AM   17    right?

10:50AM   18    A.   Yes.

10:50AM   19    Q.   How many letters, all together, would you say?

10:50AM   20    A.   I don't know a specific number.

10:50AM   21    Q.   Well, the one letter, did you -- do you recall writing a

10:50AM   22    letter to George Burgasser, I guess that would be 12/12/2016

10:50AM   23    and that would be a Christmas card?

10:50AM   24    A.   Where -- do you know where it was sent from?

10:51AM   25    Q.   Do you recall?

10:51AM    1    A.  It's possible.

10:51AM    2    Q.  Let me show you what's been marked as Government's

10:51AM    3    Exhibit -- well, excuse me -- Defendant's Exhibit 9 for

10:51AM    4    identification.  Look through that.

10:51AM    5    A.  Oh, yeah.  All right.

10:51AM    6    Q.  Do you recognize that?

10:51AM    7    A.  Yes, sir.

10:51AM    8    Q.  And that's your Christmas card, right?

10:51AM    9    A.  Well, they was giving them away in Allegany County, so --

10:51AM   10    Q.  That's a Christmas card you prepared, right?

10:51AM   11    A.  Well, prepared?  Did I prepare?  What do you mean?

10:51AM   12    Q.  Did you sent this Christmas card to Mr. Burgasser?

10:51AM   13    A.  Oh, yeah.

10:51AM   14    Q.  Yeah.  Okay.  And that consists of the card, what's

10:52AM   15    inside the card, correct?

10:52AM   16    A.  Yes.

10:52AM   17    Q.  And then, there was a letter attached, right?

10:52AM   18    A.  Yes.

10:52AM   19    Q.  And then, of course, the envelope, right?

10:52AM   20    A.  Yes.

10:52AM   21    Q.  And the back of the envelope, right?

10:52AM   22    A.  Yes.

10:52AM   23    Q.  Okay.  And does Government -- excuse me.  Does Defense 9

10:52AM   24    fairly and accurately represent what you sent?

10:52AM   25    A.  Pardon me?

GRANT -- BY MR. FOGG -- 4/24/18

592

10:52AM 1  Q.  Does it -- is it accurate?  Does this represent what you

10:52AM 2  sent?

10:52AM 3  A.  Oh, yes.

10:52AM 4  Q.  It does?

10:52AM 5      MR. FOGG:  Defendant moves Defendant's 9 into

10:52AM 6  evidence, Judge.

10:52AM 7      MR. XIANG:  Objection.  Hearsay.

10:52AM 8      THE COURT:  Ladies and gentlemen, would you step in

10:52AM 9  the jury room?

10:52AM 10 (The jury left the room at 10:52 a.m.)

10:53AM 11     THE COURT:  Marshal, would you have the witness step

10:53AM 12 out of the courtroom for a minute?

10:53AM 13 (The witness left the stand at 10:53 a.m.)

10:53AM 14     THE COURT:  What's the objection?

10:53AM 15     MR. XIANG:  Hearsay objection.  There's no purpose to

10:53AM 16 the exhibit, other than the statements that are contained

10:53AM 17 therein, which are statements -- out-of-court statements.  And

10:54AM 18 unless there was some -- I don't hear any impeachment.  I

10:54AM 19 don't hear anything that would say that it's not for the truth

10:54AM 20 of any matter asserted, which would make it hearsay.

10:54AM 21     THE COURT:  Mr. Fogg?

10:54AM 22     MR. FOGG:  Judge, this is some documents -- he had

10:54AM 23 mentioned that he wrote George Burgasser.  There are several

10:54AM 24 letters that I have that basically state certain things.  And

10:54AM 25 what he says to George Burgasser --

10:54AM   1          THE COURT:  So what?

10:54AM   2          MR. FOGG:  It established a relationship with George

10:54AM   3   Burgasser and the office and also his attempts to curry favor

10:54AM   4   and also to somehow work out deals.

10:54AM   5          THE COURT:  I'm not sure I fully understand the

10:54AM   6   relevance of this.

10:54AM   7          MR. FOGG:  Well --

10:54AM   8          THE COURT:  I want you to give me some authority on

10:54AM   9   this.  We'll take a 10-minute recess.  I want some authority

10:54AM  10   on this.

10:55AM  11          MR. FOGG:  Your Honor, I don't have access to --

10:55AM  12          THE COURT:  It's not my problem.

10:55AM  13   (Brief recess)

11:08AM  14          THE CLERK:  All rise.  You may be seated.

11:08AM  15          THE COURT:  Now, as I see it, there's like 29 letters

11:08AM  16   here?  Where is Mr. Fogg?

11:08AM  17          MR. FOGG:  Yeah, Judge.

11:08AM  18          THE COURT:  What do you intend to use in the

11:08AM  19   29 letters?

11:08AM  20          MR. FOGG:  I'm probably not going to be using all

11:08AM  21   these letters, Judge.

11:08AM  22          THE COURT:  Well, I want to know which ones you

11:08AM  23   intend to use.  What is -- the purpose of it is.  I had no

11:08AM  24   notice on any of this and I'm trying to make a fair decision

11:08AM  25   here, on evidentiary grounds, of whether any of this is

11:08AM   1   admissible or not admissible and I am not shooting from the

11:08AM   2   hip.

11:08AM   3        MR. FOGG:  I understand, Judge.

11:08AM   4        THE COURT:  So -- and the government should have been

11:08AM   5   aware of these letters and briefed these points, as well as

11:09AM   6   the defense.

11:09AM   7        MR. XIANG:  Judge, we got the binder yesterday.

11:09AM   8        MR. FOGG:  Judge, the -- some of the letters are

11:09AM   9   actually handed in the last trial.  They were actually in the

11:09AM  10   last trial.  A lot of these letters were.

11:09AM  11        THE COURT:  Well, I don't know which ones were.  I

11:09AM  12   don't remember which ones were and which ones were not and

11:09AM  13   there's 29 letters here.  And I don't know what these letters

11:09AM  14   say.  I never read these letters.  And they're not that easy

11:09AM  15   to read right now.  So, I don't know what you want to do about

11:09AM  16   this.

11:09AM  17        MR. FOGG:  Well --

11:09AM  18        THE COURT:  You can do this, you can call him as your

11:09AM  19   own witness, if you want, But I'm not -- but I got 29 letters

11:09AM  20   here.  I don't know which ones you want to use, which ones --

11:09AM  21   how you identify them, which ones may be hearsay.  Which ones

11:09AM  22   may be -- I saw two letters here that may have to raise

11:09AM  23   concern of mine as to whether or not it may be a privileged

11:09AM  24   communication between you and your client, in that quick 15

11:10AM  25   minutes that I had a recess.  So, I don't know what's in here.

11:10AM    1            MR. FOGG:  Which one was that?

11:10AM    2            THE COURT:  Well, I don't remember exactly which one,

11:10AM    3    but I was looking at them.  I said, listen, some of this stuff

11:10AM    4    may be confidential communication you had with Mr. Hicks.  I

11:10AM    5    don't know.

11:10AM    6            MR. FOGG:  Well, this --

11:10AM    7            THE COURT:  I think you got to step back here a

11:10AM    8    little bit --

11:10AM    9            MR. FOGG:  Okay.

11:10AM   10            THE COURT:  -- and figure out where you want to go

11:10AM   11    with these things.  I think you can take a look at these

11:10AM   12    things.  I don't know how long you're going to be on cross-

11:10AM   13    examination, but it may be a point that -- we'll break at

11:10AM   14    lunch time and you want to take a look at these things more

11:10AM   15    precisely, tell the government exactly which ones you intend

11:10AM   16    to use.  I want to know what the purpose of it is and I want

11:10AM   17    to hear some argument on these things.  You gave this to the

11:10AM   18    government yesterday?

11:10AM   19            MR. FOGG:  I -- they've had most of them.  They've

11:10AM   20    had quite a few from the last trial.

11:10AM   21            THE COURT:  We didn't -- none of these -- were any of

11:10AM   22    these used in evidence at the last trial?  None of them were

11:11AM   23    in evidence at the last trial.

11:11AM   24            MR. XIANG:  No.

11:11AM   25            MR. FOGG:  They weren't in evidence, Judge, but they

11:11AM   1   were provided.

11:11AM   2            THE COURT:  How am I supposed to know?  I can't just

11:11AM   3   sit here and you know --

11:11AM   4            MR. FOGG:  Well, Jerome Grant didn't testify last

11:11AM   5   time.

11:11AM   6            THE COURT:  Pardon me?

11:11AM   7            MR. FOGG:  I'm sorry, Judge.

11:11AM   8            THE COURT:  Stay on one microphone.

11:11AM   9            MR. FOGG:  Jerome Grant didn't testify last time, so

11:11AM  10   there was no need to present them, but they were there and

11:11AM  11   ready to go.  At the last moment, only because my secretary's

11:11AM  12   husband died, I wasn't able to package it all and I was trying

11:11AM  13   to get it all together.  And I don't really mean for that to

11:11AM  14   be on the record, but we've had a little problem in the

11:11AM  15   office.

11:11AM  16            And this is something I let counsel know from the

11:11AM  17   very beginning, that I was trying to get some documents

11:11AM  18   together.  I'm not saying that they have any obligation to me.

11:11AM  19   I'm not saying that they had -- well, even consented, but I

11:11AM  20   did notify them I was having trouble getting some of the

11:12AM  21   documents together.  Now, Judge, this is --

11:12AM  22            THE COURT:  Well, I'll tell you what we'll do, we'll

11:12AM  23   just put this aside for now --

11:12AM  24            MR. FOGG:  This is a major part of the cross-exam,

11:12AM  25   Judge.  That's basically the letters.  And I know it's too

11:12AM   1   early for a lunch break, but it is the major part of the exam.

11:12AM   2   What I can do is go through each one and see -- definitely

11:12AM   3   pull up the ones we had before, because those are the ones we

11:12AM   4   should be using.  And anything extra, I'll notify both the

11:12AM   5   Court and counsel with regard to what's greater than it was

11:12AM   6   before.

11:12AM   7        But some of these things I wanted to step through,

11:12AM   8   they actually say quite a few things.  This gentleman actually

11:13AM   9   wrote me and you know, I'm not his attorney.  He wrote me a

11:13AM  10   letter.  He wrote Wei a letter.

11:13AM  11        THE COURT:  Well, what is the government's position

11:13AM  12   on this?

11:13AM  13        MR. XIANG:  Judge, regarding the timing, I mean, I

11:13AM  14   think there's -- if counsel wants to use them for impeachment,

11:13AM  15   there are ways to do that, but we --

11:13AM  16        THE COURT:  He can ask him questions about that to

11:13AM  17   refresh his memory without getting the letters in evidence.

11:13AM  18        MR. XIANG:  Right.  Same thing that was done with the

11:13AM  19   transcripts.  These are no different.  They're prior

11:13AM  20   statements made outside of the courtroom -- outside of here,

11:13AM  21   so, I don't know what --

11:13AM  22        MR. FOGG:  But they're not hearsay.  They can't be

11:13AM  23   considered hearsay.

11:13AM  24        THE COURT:  Well, then, what are they being offered

11:13AM  25   for?

11:13AM    1            MR. FOGG:  Well, it wouldn't be inadmissible, because

11:13AM    2    it's being offered for the truth of the matter asserted.  That

11:13AM    3    would be the wrong basis --

11:13AM    4            THE COURT:  I think it's being offered for the truth

11:13AM    5    of the matter asserted, that he wants to move from one prison

11:13AM    6    to another?

11:13AM    7            MR. FOGG:  Yes.

11:13AM    8            THE COURT:  I mean, what is it being offered for?

11:13AM    9            MR. FOGG:  Well, he's looking -- he's trying to curry

11:14AM   10    favor.  He's trying to bury his own dirt and actually increase

11:14AM   11    someone else's liability and get favors from the government.

11:14AM   12    Now, I'm not saying that the government actually did it, But

11:14AM   13    you can see the steps.  Burgasser is a very honorable man.

11:14AM   14    So, I'm not saying that the government is complicit in some

11:14AM   15    illegal activity.  I'm pretty sure they were stalwart, but the

11:14AM   16    fact is that this gentleman is trying to manipulate people.

11:14AM   17    He comes up with a plan.  It's all contrived.

11:14AM   18            THE COURT:  What's contrived?

11:14AM   19            MR. FOGG:  He's got a plan and the plan is to

11:14AM   20    manipulate, to keep sending letters and keep requesting this.

11:14AM   21    He wants to get out of jail.  He wants to get home.  And he's

11:14AM   22    trying his best to offer things so he can get things in

11:14AM   23    return.

11:14AM   24            THE COURT:  Well, if you want to ask him questions

11:14AM   25    about some of the information that's in these letters

| | | |
|---|---|---|
| 11:14AM | 1 | without -- and you can use the letters to maybe refresh his |
| 11:15AM | 2 | memory.  If it's proper cross-examination, we'll consider it. |
| 11:15AM | 3 | But the letters themselves, right now, I'm not |
| 11:15AM | 4 | inclined to allow them in, because I don't -- there's |
| 11:15AM | 5 | 29 letters here.  I haven't read them.  I have no idea what |
| 11:15AM | 6 | these letters say and I'm not about to bring all these letters |
| 11:15AM | 7 | in evidence and start reading them to the jury.  First of all, |
| 11:15AM | 8 | they're very confusing.  We're going to have a like, |
| 11:15AM | 9 | mini-trial here and I'm not going to do that.  So, think about |
| 11:15AM | 10 | what you want to do before we go any further.  We'll take a |
| 11:15AM | 11 | five-minute recess. |
| 11:15AM | 12 | THE CLERK:  All rise. |
| 11:15AM | 13 | (Brief recess) |
| 11:27AM | 14 | (The jury entered the room at 11:27 a.m.) |
| 11:28AM | 15 | THE CLERK:  All rise.  You may be seated. |
| 11:28AM | 16 | THE COURT:  Ladies and gentlemen, in trials sometimes |
| 11:29AM | 17 | issues come up and it takes time to try to resolve them.  It's |
| 11:29AM | 18 | not the attorneys' fault.  It's basically mine, I guess, But I |
| 11:29AM | 19 | don't like to have you just sitting around, waiting around. |
| 11:29AM | 20 | So, what I'm going to do is -- I don't know what you want to |
| 11:29AM | 21 | call it, breakfast, brunch or lunch.  I'm going to send you |
| 11:29AM | 22 | out at 11:30.  I don't want you to sit there, waiting around. |
| 11:29AM | 23 | So, let's see if we can try to start back about 1 o'clock, |
| 11:29AM | 24 | Okay?  I'm sorry for the delay.  It happens in trials. |
| 11:29AM | 25 | And certainly, I don't mean to ignore you at all. |

11:29AM   1   Just sitting around, waiting around is kind of -- can be

11:29AM   2   irritating.  I know that when I'm on an airplane and there's a

11:29AM   3   delay and they don't tell you what's going on and you sit

11:29AM   4   there for a while and you get -- will someone tell me the

11:30AM   5   truth, what's really going on?  So, that's the truth.  I've

11:30AM   6   got to work out some issues.

11:30AM   7          So, see if we can come back here at 1 o'clock.  I

11:30AM   8   can't guarantee 1 o'clock, but we're going to try for it,

11:30AM   9   okay?  Thank you.  Enjoy your lunch, folks.

11:30AM  10   (The jury left the room at 11:30 a.m.)

11:30AM  11          THE COURT:  I have three other matters on at

11:30AM  12   1 o'clock.  I'm going to just put them off until later in the

11:30AM  13   day.  It's probably the government and the one public

11:30AM  14   defenders office and one private practice lawyer.  So, I'd

11:31AM  15   like you back here at quarter to one and see where we're going

11:31AM  16   to go from there.

11:31AM  17          MR. FOGG:  Thank you, Judge.

11:31AM  18          THE CLERK:  All rise.

11:31AM  19          THE COURT:  And the government, I want the

11:31AM  20   government's position a little bit more carefully articulated

11:31AM  21   to what it is as to what's in these letters.

11:31AM  22   (Lunch recess at 11:31 a.m.)

01:51PM  23   (The jury entered the room at 1:51 p.m.)

01:43PM  24          THE CLERK:  All rise.

01:53PM  25          THE COURT:  Sorry for the delay, folks.  We're

01:53PM   1   trying.  I hope you enjoyed your lunch.  All right, Mr. Fogg.

01:53PM   2            MR. FOGG:  Thank you, Judge.

01:53PM   3   (An off-the-record discussion was held.)

01:53PM   4   BY MR. FOGG:

01:54PM   5   Q.  Mr. Grant, previously, I showed you a document that was

01:54PM   6   marked as Exhibit 8 -- excuse me -- as Exhibit 9 and that was

01:54PM   7   your card.  Do you recall that?

01:54PM   8   A.  Yes.

01:54PM   9   Q.  All right.  You'll have to excuse me.

01:54PM  10            MR. FOGG:  It's now marked as Exhibit 8, for the

01:54PM  11   record, Judge.  Defendant's Exhibit 8.

01:54PM  12   BY MR. FOGG:

01:54PM  13   Q.  And I'll show you what's been marked as Defense

01:54PM  14   Exhibit 8.  Now, that Exhibit 8 is the same exhibit that was

01:55PM  15   produced to you as Exhibit 9; am I correct?

01:55PM  16   A.  Yes.

01:55PM  17   Q.  All right.  You had a chance to look it over?

01:55PM  18   A.  Yes.

01:55PM  19   Q.  Now, when did you write that card?

01:55PM  20   A.  When did I write the card?

01:55PM  21   Q.  Mm-hmm.  Was that December 12th?

01:55PM  22   A.  I never wrote the card.  I sent the card.

01:55PM  23   Q.  Okay.  When did you send the card and write the letter?

01:55PM  24   A.  I don't know the exact date.

01:56PM  25   Q.  12/12/2016 sound familiar?

GRANT  --  BY MR. FOGG  --  4/24/18                    602

01:56PM   1   A.  Yeah.  It was before Christmas.

01:56PM   2   Q.  Okay.  And at that time, you were looking to come home;

01:56PM   3   am I right?

01:56PM   4   A.  Is that what it says in the letter?

01:56PM   5   Q.  Sorry?

01:56PM   6   A.  Is that what it says in the letter?

01:56PM   7   Q.  Well, what you were looking to do was actually be

01:56PM   8   relocated from Youngstown, Ohio or at least being located in

01:56PM   9   Youngstown, Ohio, right?

01:56PM  10   A.  I was looking to be relocated somewhere.

01:56PM  11   Q.  Okay.  Where were you housed at that time?

01:56PM  12   A.  Allegany.

01:56PM  13   Q.  In Allegany.  And at that time, you just simply wrote

01:56PM  14   him -- and not your attorney -- but you wrote the prosecutor

01:56PM  15   to ask him to relocate you to Youngstown, correct?

01:56PM  16   A.  Be relocated somewhere, yeah.

01:56PM  17   Q.  Okay.  Do you recall where?

01:56PM  18   A.  I don't.

01:56PM  19   Q.  No?  All right.

01:56PM  20   A.  Be relocated numerous places.

01:57PM  21   Q.  I'll show you, again, Exhibit 8.  And you can turn to the

01:57PM  22   page with your letter on it.  And if you would read that to

01:57PM  23   yourself, the first one and two lines.  Do you see that?

01:57PM  24   A.  Oh, yeah.

01:57PM  25   Q.  Okay.  I'll take that back.  Does that refresh your

01:57PM | 1 | recollection?

01:57PM | 2 | A.  Yeah.

01:57PM | 3 | Q.  And you wished him a merry Christmas, too; am I right?

01:57PM | 4 | A.  Yeah, I think so.

01:57PM | 5 | Q.  Now, you also wrote a letter to -- I guess that would be

01:58PM | 6 | Judge -- excuse me -- you also wrote a letter to

01:58PM | 7 | Mr. Burgasser again and that would be 7/25/2006.  Do you

01:58PM | 8 | recall that?

01:58PM | 9 | A.  7/25/2006?

01:58PM | 10 | Q.  Excuse me.  2016.  Sorry about that.

01:58PM | 11 | A.  No.  You probably have to show me the letter.

01:58PM | 12 | Q.  Okay.

01:58PM | 13 | A.  I wrote a lot of letters.

01:58PM | 14 | Q.  I'll show you what's been marked as Defendant's 10.  Look

01:58PM | 15 | that over to yourself.  At the bottom of Defendant's 10,

01:58PM | 16 | that's your signature?

01:58PM | 17 | A.  Yeah.

01:58PM | 18 | Q.  Okay.  And it's dated 7/20/2016, right?

01:59PM | 19 | A.  There's a little tape in the way, but I see a 7.  I see a

01:59PM | 20 | 2.  It looks like a 0.  I think that's the date.

01:59PM | 21 | Q.  20 slash and then a large 1 and a 6, right?

01:59PM | 22 | A.  That thing right there is in the way of those numbers.

01:59PM | 23 | It looks like a 2, though.

01:59PM | 24 | Q.  How about I give you the original?

01:59PM | 25 | A.  That will work.

01:59PM    1    Q.  I'll show you what's been marked as also 10, but it's the

01:59PM    2    original in the plastic container.

01:59PM    3    A.  Oh, yeah.  That's the date.

01:59PM    4    Q.  Okay.

01:59PM    5    A.  Do you need this back?

01:59PM    6    Q.  Now, you were again asking Mr. Burgasser to move you; am

01:59PM    7    I correct?

01:59PM    8    A.  Yes.

01:59PM    9    Q.  All right.  And you were asking that -- you were

01:59PM   10    informing him that if you were to become a CI, you would have

02:00PM   11    to be moved; am I correct?  Let me take that from you.  You

02:00PM   12    shouldn't be reading it at this time.

02:00PM   13    A.  Oh, I shouldn't?

02:00PM   14    Q.  No.

02:00PM   15    A.  I'm not sure.

02:00PM   16    Q.  Oh, you're not sure?

02:00PM   17    A.  I needed it -- I need it.

02:00PM   18    Q.  Then, you can review it to -- Have you had an opportunity

02:00PM   19    to look it over?

02:00PM   20    A.  Yeah.

02:00PM   21    Q.  Okay.  Now, this was around July, there was some sort of

02:01PM   22    affidavit going around in the jail; am I correct?

02:01PM   23    A.  Well, I had asked for the affidavit before July.  I think

02:01PM   24    I was in Warsaw, Virginia when I had got the affidavit sent

02:01PM   25    to me.

02:01PM    1    Q.  And that was an affidavit for, what, people, inmates to

02:01PM    2    sign, to say that there was no RICO conspiracy in this case;

02:01PM    3    am I right?

02:01PM    4    A.  Well, the one that I got was from -- well, it had

02:01PM    5    Roderick's name on it and Boogy's name on it, saying that we

02:01PM    6    never talked about things or nothing like that.

02:01PM    7    Q.  All right.  So, you've got something from Roderick

02:01PM    8    Arrington?

02:01PM    9    A.  Well, it was all in one letter.

02:01PM   10    Q.  All right.  So, you received the letter.  Do you know

02:01PM   11    where you got the letter from?

02:01PM   12    A.  Yeah.

02:01PM   13    Q.  Where did you get the affidavit from?

02:01PM   14    A.  Aaron.

02:01PM   15    Q.  How did you get the affidavit from Aaron?

02:01PM   16    A.  He mailed it to me.

02:01PM   17    Q.  And do you have that address?  Do you have that mail?

02:01PM   18    A.  No, I don't.

02:01PM   19    Q.  And when did he mail that?

02:01PM   20    A.  When I was in Warsaw, Virginia.

02:02PM   21    Q.  And it came from where?

02:02PM   22    A.  Niagara County.

02:02PM   23    Q.  And it had his name on it?

02:02PM   24    A.  Yeah.

02:02PM   25    Q.  So, you wrote to George to tell him that you didn't want

02:02PM   1   to sign the affidavit, correct?

02:02PM   2   A.  It's possible.  I didn't sign it, so --

02:02PM   3   Q.  And that's because you didn't want to lose your credit as

02:02PM   4   far as cooperation; am I correct?

02:02PM   5   A.  Well, the reason I couldn't -- didn't want to sign it is

02:02PM   6   because I didn't want to -- that would be lying and I would

02:02PM   7   perjure myself.

02:02PM   8   Q.  I understand, but you actually told them that you didn't

02:02PM   9   want to lose your credit with the U.S. Attorney's Office.  Do

02:02PM  10   you recall stating that?

02:02PM  11   A.  Is that in this letter?

02:02PM  12   Q.  If you would go up to at least fifth from the bottom.

02:02PM  13   A.  So, I can read it now?

02:02PM  14   Q.  You can.  To yourself, please.

02:02PM  15   A.  Fifth from the bottom.  Yeah, that's what it say.

02:02PM  16   Q.  Okay.  Now, in that letter, you were stating that you

02:03PM  17   wanted to go home to your kids; am I correct?

02:03PM  18   A.  I would have to read that.  What line is that?

02:03PM  19   Q.  Is that what you said?

02:03PM  20   A.  I don't remember, but if you said it's in here, can you

02:03PM  21   show me?

02:03PM  22   Q.  Now, you also wrote a letter to Mr. Burgasser.  And that

02:04PM  23   would have been 12 -- let's see, 12/24 -- let's see.  That

02:04PM  24   would be 12/19/2014, it looks like.  Do you recall writing

02:04PM  25   Mr. Burgasser then?

02:04PM   1   A.  It's possible.

02:04PM   2   Q.  All right.  And do you recall a letter where you were

02:04PM   3   asking for your release from custody, so that you can see

02:04PM   4   your kids?

02:04PM   5   A.  That's possible.

02:04PM   6   Q.  And that -- well, do you recall doing that?  Yes or no?

02:04PM   7   A.  You would have to show me a letter.

02:04PM   8   Q.  All right.  Now, you have what's been marked as

02:05PM   9   Defendant's 12.  Have you had an opportunity to read that?

02:05PM  10   A.  Yeah.

02:05PM  11   Q.  I'm sorry?

02:05PM  12   A.  Yes, I did.

02:05PM  13   Q.  Okay.  So, this letter was written on what date?

02:05PM  14   A.  12/19/2014.

02:05PM  15   Q.  2014.  And where were you there, at that time?  Where

02:06PM  16   were you housed in?

02:06PM  17   A.  I think Monroe County.  Yeah, Monroe County.

02:06PM  18   Q.  Monroe County?

02:06PM  19   A.  Yeah.

02:06PM  20   Q.  And you were writing this letter to express to

02:06PM  21   Mr. Burgasser that you wanted to go home to see your babies

02:06PM  22   and your girlfriend, right?

02:06PM  23   A.  Well, that was part of the reason.  I was expressing to

02:06PM  24   him why I wouldn't -- why I probably can't read this right

02:06PM  25   here because you said I ain't supposed to read it, read it to

GRANT  --  BY MR. FOGG  --  4/24/18                      608

02:06PM    1   myself, but I was expressing that I wouldn't lie to him.

02:06PM    2   Q.  And where did you express that in that letter?

02:06PM    3   A.  I didn't say it, but I said bullshit.

02:06PM    4   Q.  And where did you express that?

02:06PM    5   A.  You want me to read it?

02:06PM    6   Q.  No, I don't.

02:06PM    7   A.  On the same letter, 12/19/14.

02:06PM    8   Q.  You never stated that you wouldn't bullshit him -- you

02:06PM    9   weren't bullshitting him; am I right?  You were serious about

02:06PM   10   a plan?

02:06PM   11   A.  No.  I was serious about telling the truth.  I wasn't

02:06PM   12   going to lie or anything like that.  I mean, if I could read

02:06PM   13   it, I could read what it says.

02:07PM   14   Q.  And you were asking Mr. Burgasser to bring you home on

02:07PM   15   certain dates; am I correct?

02:07PM   16   A.  Bring me home?

02:07PM   17   Q.  Yeah.  On 12/24 and 12/06, those are important dates for

02:07PM   18   you, right?

02:07PM   19   A.  Am I asking him to bring me home in this letter?

02:07PM   20   Q.  Yes.

02:07PM   21   A.  12/24.

02:07PM   22   Q.  Sixth line down.  Not bring you home.  You wanted to come

02:07PM   23   into the office, is that what it was and speak to him?

02:07PM   24   A.  Oh, yeah, yeah, yeah.  I see it now.

02:07PM   25   Q.  I apologize.

02:07PM    1    A.   No problem.

02:07PM    2    Q.   Right.  So, you just wanted to offer your information to

02:07PM    3    him; is that what it was?

02:07PM    4    A.   Yeah.  I guess if that's what you want to say.

02:08PM    5    Q.   Now, you also wrote Mr. Burgasser on 10/22/2014.  Do you

02:08PM    6    recall that at all?

02:08PM    7    A.   Again, you got to show me the letter.

02:08PM    8    Q.   Showing you what's been marked as Defendant's 11.

02:08PM    9    A.   Okay.

02:08PM   10    Q.   What is the date on that?

02:08PM   11    A.   I don't see anything on this one.

02:08PM   12    Q.   Is that your letter?  Is that your handwriting?

02:08PM   13    A.   Yeah, that's my handwriting.

02:08PM   14    Q.   And that's your signature at the bottom?

02:08PM   15    A.   Yes.

02:08PM   16    Q.   And if you flip through the next two pages, you'll see an

02:09PM   17    envelope, right?

02:09PM   18    A.   Yeah.

02:09PM   19    Q.   And that's your writing?

02:09PM   20    A.   Yeah.  That's my handwriting.

02:09PM   21    Q.   And there's a postmark October 20th, 2014, correct?

02:09PM   22    A.   October 27th.

02:09PM   23    Q.   Postmark, the postal mark?

02:09PM   24    A.   Yeah.  It says received October 27th, 2014, U.S.

02:09PM   25    Attorneys Office.

02:09PM    1    Q.  That's received, true.  And the stamp shows October 20th,

02:09PM    2    correct?

02:09PM    3    A.  Oh, yeah.  Okay.

02:09PM    4    Q.  All right.  Now, in that letter you actually mentioned an

02:09PM    5    agent by first name Shawn, right?  You meant Sean Hill,

02:09PM    6    correct?

02:09PM    7    A.  Yeah, that was my -- the lawyer that I had at the time.

02:09PM    8    Q.  Sean Hill was a lawyer?

02:09PM    9    A.  Yeah, that's the one I was -- mentioned.

02:09PM   10    Q.  Okay.  And so, you were talking about your lawyer?

02:09PM   11    A.  I would have to read it to be sure.

02:09PM   12    Q.  Okay.  And you were asking Mr. Burgasser that -- what you

02:09PM   13    wanted to do is you wanted to give up some murders in

02:10PM   14    exchange for bail; am I correct?

02:10PM   15    A.  Yeah.

02:10PM   16    Q.  And you had stated to him that you felt the murder is

02:10PM   17    worth a signature bond; isn't that correct?

02:10PM   18    A.  Let's see.  Yeah.  I said -- yeah, that's what I said.

02:10PM   19    Q.  And you also told Mr. Burgasser one good deed deserves

02:10PM   20    another, sir; am I correct?

02:10PM   21    A.  Yeah, that's what it says.

02:10PM   22    Q.  All right.  Now, you wrote Mr. Burgasser again on

02:11PM   23    September 19th, 2016.  Do you recall that at all?

02:11PM   24    A.  Yeah.  I wrote a lot of letters.  You're going to need to

02:11PM   25    show me.

GRANT -- BY MR. FOGG -- 4/24/18                          611

02:11PM    1    Q.  I'll show you what's been marked as Defendant's 13.  Is

02:11PM    2    that your letter that you wrote?  Is that your handwriting?

02:11PM    3    A.  Yeah, looks like my handwriting.

02:11PM    4    Q.  And you wrote that letter; am I correct?

02:11PM    5    A.  Yeah.

02:11PM    6    Q.  And you wrote that letter to George?  It says, dear

02:12PM    7    George?

02:12PM    8    A.  Yeah.

02:12PM    9    Q.  Now, do you remember informing George that you needed a

02:12PM   10    root canal and you were hoping that he can get you out on

02:12PM   11    bail, correct?

02:12PM   12    A.  Yes, I do, actually.

02:12PM   13    Q.  And you actually proposed bail conditions to George; am I

02:12PM   14    right?

02:12PM   15    A.  Yeah.

02:12PM   16    Q.  Now, this George is George Burgasser, who is an Assistant

02:12PM   17    U.S. Attorney, just like the gentlemen behind me here for the

02:12PM   18    government, correct?

02:12PM   19    A.  Yeah.

02:12PM   20    Q.  Now, on 8/10/2015, you wrote George Burgasser a letter as

02:12PM   21    well.  Do you recall that or should I --

02:13PM   22    A.  Yeah.  You would be better off just showing me the

02:13PM   23    letters.

02:13PM   24    Q.  I'll show you what's marked as Defendant's 14.  Is that

02:13PM   25    your letter?

02:13PM  1   A.  Yes, it is.

02:13PM  2   Q.  Okay.  And that's the letter that you wrote to George --

02:13PM  3   or Mr. Burgasser -- excuse me; am I correct?

02:13PM  4   A.  Yes, sir.

02:13PM  5   Q.  All right.  And what's the date on that one?

02:13PM  6   A.  I don't see no date on this first page.  Well, it says

02:13PM  7   received May 8th, 2015 on the second page.  Is that the date

02:13PM  8   you're talking about?

02:13PM  9   Q.  That's when it was received.  And the date postmarked?

02:14PM  10  A.  Oh, May 5th, 2015.

02:14PM  11  Q.  May 5th, okay.  So, this is a May 5th letter; is that

02:14PM  12  what this is?

02:14PM  13  A.  Yeah.

02:14PM  14  Q.  And then do you recall writing to George and still

02:14PM  15  looking for some sort of decrease in your time; is that

02:14PM  16  correct?

02:14PM  17  A.  Well, I think this letter was concerning my relevant

02:14PM  18  conduct, as far as the phone conversations that -- that they

02:14PM  19  had that I heard and that they had, like in the criminal

02:14PM  20  complaints so --

02:14PM  21  Q.  So, this is a phone conversation as far as a wiretap; am

02:14PM  22  I correct?

02:14PM  23  A.  Correct.

02:14PM  24  Q.  All right.  So, they wiretapped your phone?

02:14PM  25  A.  Not my phone.

02:14PM     1    Q.  Someone else's phone?

02:14PM     2    A.  Yes.

02:14PM     3    Q.  And in that wiretap of that other individual, it was a

02:14PM     4    co-defendant on your case?

02:14PM     5    A.  Yes.

02:14PM     6    Q.  All right.  And in that wiretap, there was discussions

02:14PM     7    about drug transactions?

02:14PM     8    A.  Yes.

02:15PM     9    Q.  And they actually had you on the wiretap; am I correct?

02:15PM    10    A.  Yes.

02:15PM    11    Q.  And you were discussing drug transactions with those --

02:15PM    12    with that person, right?

02:15PM    13    A.  Yes.

02:15PM    14    Q.  All right.  And you were trying to explain to George that

02:15PM    15    this should not have an effect on your relevant conduct; is

02:15PM    16    that what it is?

02:15PM    17    A.  No.  I think my relevant conduct -- well, I felt like it

02:15PM    18    was wrong at the time, based off of those phone

02:15PM    19    conversations.  So, I was trying to clear that up.

02:15PM    20    Q.  But you were also talking to George about -- to take you

02:15PM    21    off of probation for some reason.  Were you trying to work

02:15PM    22    out a deal with George to get you off of your violation of

02:16PM    23    probation?  First page.

02:16PM    24    A.  First page?

02:16PM    25    Q.  Bottom, lower half.

GRANT  --  BY MR. FOGG  --  4/24/18
614

02:16PM   1   A.  I don't see nothing on the first page.  Oh, I think I was

02:16PM   2   talking about what you questioned about being on probation,

02:16PM   3   as far as the guidelines.  When you get guidelines -- and I'm

02:16PM   4   pretty sure you know how the guidelines work.  So, that's the

02:16PM   5   only thing I can see on the first page pertaining to

02:16PM   6   probation.

02:16PM   7   Q.  So, what you're trying to explain to George Burgasser is

02:16PM   8   the point system in which you would fall under; am I correct?

02:16PM   9   A.  As far -- from the way I see it, yeah.

02:16PM  10   Q.  Okay.  Now, you have also written, I guess, Judge

02:17PM  11   Skretny; is that correct?

02:17PM  12   A.  It's possible.

02:17PM  13   Q.  And what would be the purpose of writing Judge Skretny;

02:17PM  14   do you recall?

02:17PM  15   A.  Skretny was the Judge that I had on my first federal

02:17PM  16   charge.

02:17PM  17   Q.  And you wrote to him for what purpose?

02:17PM  18   A.  If I'm not mistaken, I'm pretty sure -- you got the

02:17PM  19   letter, just so I'm not mistaken.

02:17PM  20   Q.  Sure.

02:17PM  21   A.  All right.  I appreciate that.

02:17PM  22   Q.  I'll show you what's been marked Defendant's 9.  And

02:18PM  23   Defendant's 9 is a letter that you wrote.  That's your

02:18PM  24   handwriting; am I correct?

02:18PM  25   A.  Yes.

02:18PM    1   Q.  All right.  And it says, Dear Judge Skretny and

02:18PM    2   2/23/2015, correct, at the top?

02:18PM    3   A.  Yes.

02:18PM    4   Q.  Okay.  So, this is not to be confused with prior

02:18PM    5   testimony with regard to Exhibit 9, which has been changed.

02:18PM    6   So, this is your letter to Judge Skretny, correct?

02:18PM    7   A.  Yes.

02:18PM    8   Q.  Now, you were hoping that the Judge would plead you out

02:18PM    9   to time served; am I correct?  And you were trying to get a

02:18PM   10   bail on your other charge; isn't that correct?

02:18PM   11   A.  It's possible.  I haven't read that far yet, to tell you

02:18PM   12   if it's correct or not.  Yeah.  Yeah.  It was time served.

02:18PM   13   Yeah.

02:18PM   14   Q.  Time served on your probation and you were trying to get

02:18PM   15   bail on the other charge?

02:19PM   16   A.  Yes.

02:19PM   17   Q.  And that was the federal charge that you were on, right?

02:19PM   18   A.  Yes.

02:19PM   19   Q.  All right.  So, you were hoping, because they didn't

02:19PM   20   release you on your federal charge, you were hoping that if

02:19PM   21   you could negotiate with the Judge to get time served, they

02:19PM   22   would release you on your federal charge, correct?

02:19PM   23   A.  Well, I was hoping that if I could get time served from

02:19PM   24   him, that they wouldn't be able to use the fact that I was on

02:19PM   25   probation as a reason not to give me bail.

02:19PM  1  Q.  And you were asking for, at least, maybe home confinement

02:19PM  2  or something like that; am I correct?

02:19PM  3  A.  Yes.

02:19PM  4  Q.  And you actually informed the Judge that the agents on

02:19PM  5  your case didn't mind you getting bail; am I correct?

02:19PM  6  A.  Yes, that's what it says.

02:19PM  7  Q.  And that was the Agent Vanessa M. Paris, right?

02:19PM  8  A.  Yes.

02:19PM  9  Q.  She's the agent that investigated your case?

02:19PM  10  A.  Yes.

02:19PM  11  Q.  And she's the agent that investigated this case -- well,

02:19PM  12  the case that you were indicted on, right?

02:20PM  13  A.  Yes.

02:20PM  14  Q.  Now, on January 31st, 2017, you wrote a letter to

02:20PM  15  Mr. Hicks; am I correct?

02:20PM  16  A.  Again, I wrote plenty of letters.  You going to have to

02:20PM  17  show me.  I've been in jail four years.  I ain't done nothing

02:20PM  18  but write letters.

02:20PM  19  Q.  I'll show you what's been marked as Defendant's 5.

02:20PM  20  A.  Okay.

02:20PM  21  Q.  Now, in that letter -- that is your letter that you

02:20PM  22  wrote, right?  That's your handwriting?

02:20PM  23  A.  Yeah.  It looks like it.

02:21PM  24  Q.  Okay.  Now, in the letter, you're explaining to Mr. Hicks

02:21PM  25  how you were going to discuss, with his attorney, how you

02:21PM   1   were going to help his attorney; am I right?

02:21PM   2   A.  I have to read this letter to be sure.  Yeah.  I know

02:22PM   3   this letter.

02:22PM   4   Q.  You remember?  Okay.  So, in that letter you were talking

02:22PM   5   about Bones.  Who's Bones?

02:22PM   6   A.  He's one of my co-defendants.

02:22PM   7   Q.  And what's his real name; do you know?

02:22PM   8   A.  Yeah.  Michael Robertson.

02:22PM   9   Q.  Michael Robertson?

02:22PM  10   A.  Yeah.

02:22PM  11   Q.  So, you were explaining to Mr. Hicks how Michael

02:22PM  12   Robertson was selling drugs; am I correct?

02:22PM  13   A.  Yes.

02:22PM  14   Q.  And you were explaining how Michael Robertson was getting

02:22PM  15   drugs from Spence; am I correct?

02:22PM  16   A.  No.  I don't think you correct with that one.  You going

02:22PM  17   to have to show me where it says that.

02:22PM  18   Q.  Well, if you look lower on the second page.

02:22PM  19   A.  I said Bones was getting drugs from Spence?

02:23PM  20   Q.  If you look at the second page.

02:23PM  21   A.  I'm on the second page.

02:23PM  22   Q.  All right.  Halfway down.

02:23PM  23   A.  Halfway down.

02:23PM  24   Q.  Things that you can say to your lawyer is what you said.

02:23PM  25   A.  Oh, okay.  I see what you're saying.  It's towards the

02:23PM    1    end, right?

02:23PM    2    Q.  Yes.

02:23PM    3    A.  All right.  Yeah.  I see that it did say that.

02:23PM    4    Q.  Right.  Okay.  And you wanted Mr. Hicks to let me know --

02:24PM    5    let his lawyer know; am I correct?

02:24PM    6    A.  Do you want me to -- how do you want me to answer this?

02:24PM    7    Q.  Well, is it correct that you wanted Hicks to inform me of

02:24PM    8    the information that you had, so it can help Mr. Hicks?

02:24PM    9    A.  Well, sort of, but it was a letter that I had received

02:24PM   10    from Mr. Hicks before.  This was me answering him.

02:24PM   11    Q.  Well, hold on a second.  Is that what you're saying in

02:24PM   12    that letter, though?

02:24PM   13    A.  No.  What I -- do you want to read what I said in the

02:24PM   14    letter?

02:24PM   15    Q.  No.  Did you advise him that you believed they were lying

02:24PM   16    on Mr. Hicks and that you wanted Mr. Hicks to have the

02:24PM   17    information from you?

02:24PM   18    A.  Well, I advised that if Spence was talking about drugs,

02:25PM   19    as far as he go, then I had no knowledge of it.  And as far

02:25PM   20    as I know Spence was lying but --

02:25PM   21    Q.  All right.  And you wanted to reach out and talk to his

02:25PM   22    lawyer, correct?

02:25PM   23    A.  Well, actually, that is what he wanted me to tell his

02:25PM   24    lawyer.

02:25PM   25    Q.  And this is a letter that you addressed to Mr. Hicks; am

619

02:25PM    1    I right?

02:25PM    2    A.  I don't see --

02:25PM    3    Q.  That's the letter you sent to Mr. Hicks?

02:25PM    4    A.  Yeah.  Yeah.

02:25PM    5    Q.  And did you eventually write me?

02:25PM    6    A.  Yes.

02:25PM    7    Q.  And why did you reach out to me?

02:25PM    8    A.  Because he asked me to.

02:25PM    9    Q.  Now, you reached out to me and sent me a letter.  And you

02:25PM   10    knew that I was his attorney, correct?

02:26PM   11    A.  Correct.

02:26PM   12    Q.  And you stated that you were the driver for Michael

02:26PM   13    Robertson, correct?

02:26PM   14    A.  I would have to see the letter.

02:26PM   15    Q.  Were you the driver for Michael Robertson?

02:26PM   16    A.  I mean, I drove him places.

02:26PM   17    Q.  So, then that was a correct statement, right?

02:26PM   18    A.  Like, to an extent, yeah.

02:26PM   19    Q.  I'll show you what's been marked as Defendant's

02:26PM   20    Exhibit 6.  Now, that's a letter you wrote, correct?

02:26PM   21    A.  Yes.

02:26PM   22    Q.  And you wrote that to me; am I right?

02:26PM   23    A.  Yes.

02:26PM   24    Q.  And that's your signature, correct?

02:26PM   25    A.  Yes, it is.

02:26PM   1   Q.  And you were explaining how Michael Robertson was dealing

02:26PM   2   drugs, at least and he never bought it from Spence.  And you

02:26PM   3   were a driver for Michael Robertson, correct?

02:26PM   4   A.  Yeah.

02:27PM   5   Q.  Now, this is because -- that would -- Spence would be

02:27PM   6   who; Spencer Rogers?

02:27PM   7   A.  Yes.

02:27PM   8   Q.  Now, at that time, just as people were thinking that you

02:27PM   9   were a CI, people were also thinking that Spencer Rogers was

02:27PM  10   a CI, correct?

02:27PM  11   A.  Correct.

02:27PM  12   Q.  And that he was talking to the government, correct?

02:27PM  13   A.  Correct.

02:27PM  14   Q.  And what you were trying to do, is you were trying to at

02:27PM  15   least set the record straight; am I right?

02:27PM  16   A.  Pertaining to as far as I knew, from Spencer getting

02:27PM  17   drugs from Boogy, yes.

02:27PM  18   Q.  All right.  Now, you're saying that you were willing to

02:27PM  19   be a witness for Aaron; am I correct?

02:27PM  20   A.  Yes, I did.  Pertaining to that.

02:27PM  21   Q.  And that's -- excuse me?

02:27PM  22   A.  Pertaining to Spencer Rogers.

02:27PM  23   Q.  Now, you've written Aaron quite a few times; am I right?

02:28PM  24   A.  Yeah.  We write each other.  Well, we did.

02:28PM  25   Q.  How many times would Aaron write you?

02:28PM  1   A.  I can't keep count.  I don't know.  A lot, though.

02:28PM  2   Q.  Did you ever save the letters?

02:28PM  3   A.  Yes.  I saved some.

02:28PM  4   Q.  Did you provide the government with those letters?

02:28PM  5   A.  I gave them to my lawyer.

02:29PM  6   Q.  And did you instruct your lawyer to give it to the

02:29PM  7   government?

02:29PM  8        MR. XIANG:  Objection.  Privilege.  Not to be

02:29PM  9   asserted by the government, but by the witness.

02:29PM  10       THE COURT:  Overruled.  Go ahead.  You may answer the

02:29PM  11  question, sir.

02:29PM  12       THE WITNESS:  Can you repeat that for me?

02:29PM  13  BY MR. FOGG:

02:29PM  14  Q.  Did you advise your attorney to give it to the

02:29PM  15  government?

02:29PM  16  A.  I don't remember advising him to give it to them, but it

02:29PM  17  is a possibility.  I'm pretty sure that's why I sent it to

02:29PM  18  him.

02:29PM  19  Q.  I'm going to show you what's been marked -- well, you

02:30PM  20  wrote George Burgasser and you explained to George --

02:30PM  21  Mr. George Burgasser, the Assistant U.S. Attorney, you

02:30PM  22  explained your daughter's first birthday was January 30,

02:30PM  23  2015, correct?  Do you remember telling him that?

02:30PM  24  A.  Well, yeah.  At that time I thought that it --

02:30PM  25  Q.  Okay.

GRANT  --  BY MR. FOGG  --  4/24/18                    622

| | | |
|---|---|---|
| 02:30PM | 1 | A.  -- was my daughter.  But, yeah -- |
| 02:30PM | 2 | Q.  Okay.  All right. |
| 02:30PM | 3 | A.  -- I remember saying that. |
| 02:30PM | 4 | Q.  All right.  And you also explained that your grandmother |
| 02:30PM | 5 | may pass that year; am I correct? |
| 02:30PM | 6 | A.  You would have to show me where I said that at. |
| 02:30PM | 7 | Q.  All right.  I'll show you Government's Exhibit 3506Y. |
| 02:30PM | 8 | Now, this is a typed letter; am I correct? |
| 02:30PM | 9 | A.  Mm-hmm. |
| 02:30PM | 10 | Q.  All right.  So, where were you when you typed that |
| 02:30PM | 11 | letter? |
| 02:30PM | 12 | A.  I assume at Allegany County.  That's the only place I |
| 02:30PM | 13 | remember having a typewriter. |
| 02:31PM | 14 | Q.  Now, in this letter, you were explaining how your |
| 02:31PM | 15 | grandmother was going to pass within the year and you're |
| 02:31PM | 16 | explaining how your daughter was having a birthday and you |
| 02:31PM | 17 | were asking Mr. Burgasser, again, if you could get out on |
| 02:31PM | 18 | bail; am I correct? |
| 02:31PM | 19 | A.  I don't see where it says my grandmother is going to pass |
| 02:31PM | 20 | in a year.  Can you show me that? |
| 02:31PM | 21 | Q.  Can you read one, two, three, four, fifth one down. |
| 02:31PM | 22 | Fifth sentence down where it says, sir, my grandmother is. |
| 02:31PM | 23 | A.  Not doing the best.  Want me to keep going? |
| 02:31PM | 24 | Q.  No.  You don't -- just read it to yourself. |
| 02:31PM | 25 | A.  Yeah.  I never said that she was going to pass in a year. |

GRANT  --  BY MR. FOGG  --  4/24/18                                    623

02:31PM   1   Q.  Well, you said she will not -- you know, you can't say if

02:31PM   2   she will make it past this year, Lord willing; am I right?

02:31PM   3   Do you remember that?

02:31PM   4   A.  Oh, yeah.  Okay.

02:31PM   5   Q.  All right.  And then you went on to say that she will not

02:31PM   6   be alive if I do some years, sir.  Do you remember that?

02:32PM   7   A.  Yes.

02:32PM   8   Q.  All right.  And you wrote Mr. Burgasser again?

02:32PM   9   A.  Yeah.

02:32PM  10   Q.  And that would be, what, December 10th, 2014?  Do you

02:33PM  11   recall that or should I show you?

02:33PM  12   A.  Yeah.  It probably would be better for you to show it to

02:33PM  13   me.

02:33PM  14   Q.  All right.  All right.  I'm going to show you what's been

02:33PM  15   marked as Government Exhibit 3506AA.  Do you remember writing

02:33PM  16   that letter?

02:33PM  17   A.  I don't really necessarily remember writing it, because I

02:34PM  18   didn't finish reading it yet, but it's my handwriting.

02:34PM  19   Q.  And do you remember telling Mr. Burgasser that you wanted

02:34PM  20   to go home and that you -- you had a plan that will work so

02:34PM  21   that you can get Mr. Hicks convicted?  Do you remember that?

02:34PM  22   A.  I don't see the plan part.

02:34PM  23   Q.  Take your time.

02:34PM  24   A.  I will.  You have to let me know where the plan part at.

02:34PM  25   Q.  Do you see it?

02:35PM    1    A.  I seen I had no plans on running.  I see I didn't have no

02:35PM    2    plans on harming anyone.  I see that.

02:35PM    3    Q.  Do you see where it says that you know that the U.S.

02:35PM    4    Attorneys are -- they want Hicks?

02:35PM    5            MR. XIANG:  Objection.  Speculation.

02:35PM    6    BY MR. FOGG:

02:35PM    7    Q.  Do you see that?

02:35PM    8    A.  Yeah.

02:35PM    9            THE COURT:  Overruled.

02:35PM   10    BY MR. FOGG:

02:35PM   11    Q.  Do you see it?

02:35PM   12    A.  Do I see that the U.S. Attorneys want Hicks?

02:35PM   13    Q.  Yeah.  I know you guys want Hicks, Aaron Hicks?

02:35PM   14    A.  Yes.  I see that.

02:35PM   15    Q.  All right.  And you were telling them that you -- you're

02:35PM   16    sure that you can be a big help; am I right?

02:35PM   17    A.  Yes.

02:35PM   18    Q.  All right.  And then you're advising them that you could

02:36PM   19    have been in the same line of business as they were, right?

02:36PM   20    A.  I think I remember something like that.  Pretty much

02:36PM   21    saying if I was -- chose a different path, I could have been.

02:36PM   22    Q.  And then later on, at the end, you were saying that you

02:36PM   23    have a plan that will work; am I right?

02:36PM   24    A.  Yeah.  I see that.

02:36PM   25    Q.  Okay.  Then you wished him happy holidays; am I correct?

02:36PM    1    A.  Yeah.

02:36PM    2    Q.  All right.  I'll take that back.

02:36PM    3    A.  Okay.

02:36PM    4    Q.  Now, as you stated, you wrote many letters, right?

02:37PM    5    A.  Yeah.

02:37PM    6    Q.  You wrote letters to the Judge Magistrate Scott for your

02:37PM    7    release; am I correct?

02:37PM    8    A.  Yeah.

02:37PM    9    Q.  Right.  And you wrote letters to Judge Magistrate Scott

02:37PM   10    with regard to complaints about your attorney, correct?

02:37PM   11    A.  Yes.

02:37PM   12    Q.  And you did that about three times, didn't you?

02:37PM   13    A.  Yes.

02:37PM   14    Q.  And that was after each time the Court admonished you and

02:37PM   15    told you not to write letters and you continued to do so,

02:37PM   16    correct?

02:37PM   17    A.  Yeah.  I didn't know who I was supposed to write to if it

02:37PM   18    wasn't the Courts.

02:37PM   19    Q.  But you were in court when the Judge told you not to

02:37PM   20    write him letters; am I correct?

02:37PM   21    A.  Yeah.  Yeah.  I was there.

02:37PM   22    Q.  But even though he told you not to write letters the

02:37PM   23    first time, you wrote him three -- two or three successive

02:38PM   24    times?

02:38PM   25    A.  Yeah.  I was having a lot of problems with my lawyer.

02:38PM   1   Q.  Okay.

02:38PM   2   A.  I didn't know who else to write.

02:38PM   3   Q.  Now, you have an arrest -- a criminal history, correct?

02:39PM   4   A.  Yeah.

02:39PM   5   Q.  And you had stated, on the record a couple times, as far

02:39PM   6   as your charges were, right?

02:39PM   7   A.  Right now?

02:39PM   8   Q.  Well, you had previously testified to your charges,

02:39PM   9   correct?

02:39PM  10   A.  Previously testified of my charges?

02:39PM  11   Q.  Yeah.

02:39PM  12   A.  Right now, you're talking about?  I had plenty of charges

02:39PM  13   before.

02:39PM  14   Q.  You had plenty of charges?

02:39PM  15   A.  Yes.  Before this one, I have.

02:39PM  16   Q.  All right.  And you went back as far as what, 2003?  Or

02:39PM  17   it goes further?

02:39PM  18   A.  First time I was arrested, I think I was like, 16.  I got

02:40PM  19   an ACD, so it goes further -- a little further than 2003.

02:40PM  20   Q.  When was that?

02:40PM  21   A.  That was '97.

02:40PM  22        MR. XIANG:  Objection.  Improper impeachment.

02:40PM  23        THE COURT:  Sustained.

02:40PM  24   BY MR. FOGG:

02:40PM  25   Q.  And you were arrested -- well, did you get a conviction

GRANT  --  BY MR. FOGG  --  4/24/18                          627

02:40PM    1    in 2003?

02:40PM    2    A.  2003, no.  I think I got convicted in 2004.

02:40PM    3    Q.  It was 2004.  And that was for an arrest in 2003?

02:40PM    4    A.  Yeah.  Which one?  I got arrested twice in 2003.

02:40PM    5    Q.  You tell me.  What happened in 2003?

02:40PM    6    A.  You want to know about them both?

02:40PM    7    Q.  Sure.

02:40PM    8    A.  All right.  The first one I was on Bissell Street.  I

02:40PM    9    got -- I had like, a half a gram of crack on me and a

02:40PM   10    firearm.

02:40PM   11    Q.  So, there was a firearm possession, right?

02:40PM   12    A.  Yes.

02:40PM   13    Q.  Okay.

02:40PM   14    A.  Then I got caught with -- I had 55 grams of weed on me in

02:41PM   15    Erie, Pennsylvania.

02:41PM   16    Q.  And those were in two different locations?

02:41PM   17    A.  Yes.

02:41PM   18    Q.  So, you had a firearms possession and you had a

02:41PM   19    controlled substance possession, right?

02:41PM   20    A.  Yes.

02:41PM   21    Q.  All right.  And you were convicted on both?

02:41PM   22    A.  Yes.

02:41PM   23    Q.  And one was up here in Buffalo and one was in Erie,

02:41PM   24    Pennsylvania?

02:41PM   25    A.  Yes.

02:41PM    1    Q.   Which one were you convicted on first?

02:41PM    2    A.   Buffalo.

02:41PM    3    Q.   In Buffalo.  And you received a sentence?

02:41PM    4    A.   Of eight months.

02:41PM    5    Q.   Eight months?

02:41PM    6    A.   One year.

02:41PM    7    Q.   One year.

02:41PM    8    A.   Yeah.

02:41PM    9    Q.   And were you transferred down to Erie?

02:41PM   10    A.   Yeah.  When I finished my county year, Erie, Pennsylvania

02:41PM   11    came and got me.

02:41PM   12    Q.   All right.  So, they were waiting for you to do that

02:41PM   13    year.  So, you were sitting in jail until you got to Erie,

02:41PM   14    Pennsylvania, right?

02:41PM   15    A.   Yeah.  They came and got me in like, two days or

02:42PM   16    something.

02:42PM   17    Q.   All right.  And that was on a criminal possession of a

02:42PM   18    controlled substance.  And you were convicted on that one?

02:42PM   19    A.   Yes.

02:42PM   20    Q.   And that was a felony conviction, correct?

02:42PM   21    A.   Well, it got dropped to a misdemeanor 1.

02:42PM   22    Q.   Okay.  And were you sentenced on that?

02:42PM   23    A.   Yes.

02:42PM   24    Q.   What was your sentence on that?

02:42PM   25    A.   One to four.

02:42PM   1   Q.  So, that was one to four years?

02:42PM   2   A.  Yes.

02:42PM   3   Q.  On a misdemeanor?

02:42PM   4   A.  Yeah.

02:42PM   5   Q.  And you did state time?

02:42PM   6   A.  Yeah.

02:42PM   7   Q.  And you got out on post-release supervision; is that what

02:42PM   8   it was?

02:42PM   9   A.  No.  At that time I got paroled in 2006 to a halfway

02:42PM  10   house.  I think it was Gateway, Erie, Pennsylvania.

02:42PM  11   Q.  Okay.  So, you got out early; is that what it is?

02:42PM  12   A.  No.  Actually, I got out late because by the time I

02:42PM  13   was -- I did 20 months instead of one year.

02:42PM  14   Q.  So, after you were doing your time, you were on post-

02:42PM  15   release supervision or parole; is that what is?

02:42PM  16   A.  Yeah.  One to four, you do a minimum of one year, that

02:43PM  17   you can get paroled, but I didn't get paroled until

02:43PM  18   20 months, based off of the time that I had in Buffalo,

02:43PM  19   county.  So, I already had my year in when I got sentenced,

02:43PM  20   so I had to go see the parole board.

02:43PM  21   Q.  So, parole is basically court supervision where you're

02:43PM  22   supervised after you do your time; am I right?

02:43PM  23   A.  Yeah.

02:43PM  24   Q.  Okay.  And that's sort of like post-release supervision

02:43PM  25   in Federal Court, where you're just supervised after you do

02:43PM   1   your time?

02:43PM   2   A.   No.  It's counted differently.

02:43PM   3   Q.   How so?

02:43PM   4   A.   Because parole like, you -- you have a sentence.  I had a

02:43PM   5   one to four.  After the four years, my time is up.

02:43PM   6   Corrections, you know, parole -- I mean, supervision, they

02:43PM   7   can reinstate you.  They can keep you a year, they can

02:43PM   8   reinstate you on three years probation.  They can't do that

02:43PM   9   on parole.

02:43PM  10   Q.   So, you're saying with federal post-release supervision,

02:44PM  11   you do your time and that's it or are you saying --

02:44PM  12   A.   No.  What I'm saying with federal post-supervisory --

02:44PM  13   supervised release, if you violate, you can do whatever you

02:44PM  14   fall at in the guidelines, but I think it's up to the Judge

02:44PM  15   to cancel your probation or extend it all over again.

02:44PM  16   Q.   Okay.  But at least with the state, or at least with

02:44PM  17   parole, time is the time and it can't end early; is that what

02:44PM  18   you're saying?

02:44PM  19   A.   I've never seen nobody get off it early.

02:44PM  20   Q.   I'm sorry?

02:44PM  21   A.   I ain't never seen nobody get off early.

02:44PM  22   Q.   Well, then, they don't extend it as much as, I guess, the

02:44PM  23   federal post-release; is that what it is?

02:44PM  24   A.   Well, yeah.  They extended mine.

02:44PM  25   Q.   And they extended it for how long?

02:44PM    1    A.  I was supposed to max out from parole in 2008, but they

02:44PM    2    extended it all the way back to 2013, based off of my arrests

02:44PM    3    in 2006.

02:44PM    4    Q.  All right.  So, now you got a rearrest in 2006?

02:45PM    5    A.  Yeah.

02:45PM    6    Q.  And that rearrest was for what?

02:45PM    7    A.  Felon in possession of a firearm.

02:45PM    8    Q.  And where was that?

02:45PM    9    A.  On Carl Street in Buffalo.

02:45PM   10    Q.  In Buffalo?

02:45PM   11    A.  Yes, sir.

02:45PM   12    Q.  And because of that, you violated the -- your --

02:45PM   13    A.  Parole.

02:45PM   14    Q.  Parole.  Which you were at Gateway at the time.  I guess

02:45PM   15    you were let out of Gateway?

02:45PM   16    A.  Yes.  I was finished with Gateway.

02:45PM   17    Q.  And then, you decided to possess a weapon.  And you also

02:45PM   18    were charged with drug charges then, too; am I correct?

02:45PM   19    A.  No.  You're not correct.

02:45PM   20    Q.  So, no drug charges at that time, just the weapon?

02:45PM   21    A.  Yeah, just the weapon.

02:45PM   22    Q.  They didn't dismiss the drug charge?

02:45PM   23    A.  No drug charge.

02:45PM   24    Q.  It was just the weapon?

02:45PM   25    A.  Yes.

02:45PM   1   Q.  And did you do time on that one?

02:45PM   2   A.  On the weapon charge?

02:45PM   3   Q.  Yeah.  2006.

02:45PM   4   A.  Yeah.

02:45PM   5   Q.  And that was in what year?

02:45PM   6   A.  What year did I do time?

02:45PM   7   Q.  Yeah.  When were you sentenced on that one?

02:45PM   8   A.  Well, I was sentenced in 2007, if I'm not mistaken, maybe

02:46PM   9   2008.

02:46PM  10   Q.  And you were sentenced to what?

02:46PM  11   A.  Fifty-seven months.

02:46PM  12   Q.  And that was 57 months federal time or is that --

02:46PM  13   A.  Federal.

02:46PM  14   Q.  Okay.  So, this was -- in 2006, this was a federal case;

02:46PM  15   am I right?

02:46PM  16   A.  Yeah.  It started off a city case, but I guess, due to

02:46PM  17   all the violence that was going to at that time --

02:46PM  18   Q.  They transferred it over?

02:46PM  19   A.  Yeah.

02:46PM  20   Q.  All right.  And this is the case that you were before

02:46PM  21   Judge Skretny on?

02:46PM  22   A.  Yes.

02:46PM  23   Q.  All right.  And that's when you wrote the letter to --

02:46PM  24   well, not when -- but that's the same Judge you wrote the

02:46PM  25   letter to; am I right?

02:46PM  1    A.  The letter talking about my probation situation?

02:46PM  2    Q.  Yes.

02:46PM  3    A.  Yeah.  Not at the same time, though, of course.

02:46PM  4    Q.  So, now, you were found to be a felon in possession of a

02:46PM  5    firearm; am I right?

02:46PM  6    A.  Yes.

02:47PM  7    Q.  Because you have a prior felony and you were possessing a

02:47PM  8    firearm, correct?

02:47PM  9    A.  Yes.

02:47PM  10   Q.  And that's how you were charged with federal charges,

02:47PM  11   correct?

02:47PM  12   A.  Yes.

02:47PM  13   Q.  All right.  You did -- you were sentenced to 57 months by

02:47PM  14   Judge Skretny, correct?

02:47PM  15   A.  Correct.

02:47PM  16   Q.  How much time on post-super -- excuse me -- post-release

02:47PM  17   supervision?

02:47PM  18   A.  Three years.

02:47PM  19   Q.  Hmm?

02:47PM  20   A.  Three years.

02:47PM  21   Q.  Three years.  And did you do all your time on the 57?

02:47PM  22   A.  Well, no.  I had good time.

02:47PM  23   Q.  Okay.  So, you got out a little earlier, right?

02:47PM  24   A.  Yeah.

02:47PM  25   Q.  And then, you were placed on post-release supervision for

02:47PM   1   three years, correct?

02:47PM   2   A.  Well, no.  Correct, to an extent.  But no, because when I

02:47PM   3   finished, Pennsylvania came and got me from Virginia and I

02:47PM   4   had to answer to my parole.

02:47PM   5   Q.  All right.  So, the 2006 criminal possession of a

02:47PM   6   weapon --

02:47PM   7   A.  Felon in possession.

02:47PM   8   Q.  It's a -- yes.  Felony possession violated the Erie,

02:47PM   9   Pennsylvania --

02:47PM  10   A.  Parole.

02:48PM  11   Q.  -- parole?

02:48PM  12   A.  Yes.

02:48PM  13   Q.  So, you did 57 months on federal time, correct?

02:48PM  14   A.  Correct.

02:48PM  15   Q.  And then, when you were about to be released, or

02:48PM  16   released, you were sent back to Erie, Pennsylvania?

02:48PM  17   A.  No.  I was sent back -- yeah, Albion.

02:48PM  18   Q.  So, you were sent back to Pennsylvania, though?

02:48PM  19   A.  Oh, yeah.

02:48PM  20   Q.  Right.  So, you were sent back to Pennsylvania to answer

02:48PM  21   for the VOP, right?

02:48PM  22   A.  Yes.

02:48PM  23   Q.  All right.  And you got sentenced on that?

02:48PM  24   A.  Yeah.  They gave me 18 months.

02:48PM  25   Q.  And did you get out early on 18 months?

02:48PM   1   A.  Yeah.  I got out, I want to say maybe seven months.  It

02:48PM   2   was I think, maybe nine.  One of the two.  I got out earlier,

02:48PM   3   though.

02:48PM   4   Q.  All right.  And what year that would be?

02:48PM   5   A.  That would be 2011.  That's when I got home.  Well,

02:48PM   6   technically, I wasn't released, because it was post-release.

02:48PM   7   I was still under the Department of Corrections custody, but

02:48PM   8   I was in a halfway house.

02:49PM   9   Q.  And what year was that?  Did you say 2011?

02:49PM  10   A.  Yes, sir.

02:49PM  11   Q.  So, 2011, were you on post-release still or that ended

02:49PM  12   that?

02:49PM  13   A.  No.  Post-release didn't start at that time because,

02:49PM  14   technically, I was still incarcerated.  You talking about as

02:49PM  15   far as the federal go, right?

02:49PM  16   Q.  Mm-hmm.

02:49PM  17   A.  Yeah.

02:49PM  18   Q.  So, now, with the federal case, 2006 criminal possession

02:49PM  19   of a weapon, the felony case, you pled guilty?  You entered a

02:49PM  20   plea; am I right?

02:49PM  21   A.  Of guilty?

02:49PM  22   Q.  Mm-hmm.

02:49PM  23   A.  Yeah.

02:49PM  24   Q.  And you actually had a plea agreement, correct?

02:49PM  25   A.  Yes.

02:49PM    1    Q.  All right.  Now, in that plea agreement, you agreed not

02:50PM    2    to violate the conditions of your post-release; am I right?

02:50PM    3    A.  I don't know.  You got a copy of my plea agreement?  I

02:50PM    4    don't want to answer a question that I am not 100 percent

02:50PM    5    sure.

02:51PM    6    Q.  Sure.  Sure.

02:51PM    7              MR. FOGG:  Can I have this marked?

02:51PM    8    BY MR. FOGG:

02:51PM    9    Q.  I'm going to show you what's been marked as Defendant's

02:52PM   10    Exhibit 15.  It's a pink label, but it's Defendant's 15.

02:52PM   11    A.  What page would it be that I agree not to -- what you

02:52PM   12    say?

02:52PM   13    Q.  May I?  Your plea agreement specifies that -- talks about

02:52PM   14    supervised release; am I correct?  Do you recall that at all?

02:52PM   15    A.  It's possible.

02:52PM   16    Q.  All right.  And do you recall that if you violate those

02:52PM   17    conditions, that you can be resentenced?  Do you recall that?

02:52PM   18    A.  I would need to --

02:52PM   19    Q.  All right.  Turn to page 2, paragraph 2.  Read it to

02:52PM   20    yourself.  Did you read that paragraph?

02:54PM   21    A.  Mm-hmm.

02:54PM   22    Q.  You're supposed to let me know.  So, you agree with that;

02:54PM   23    am I right?

02:54PM   24    A.  What was your question again?

02:54PM   25    Q.  So, in your plea agreement, you had agreed to -- that if

02:54PM   1   you violated your -- you wouldn't violate your supervised

02:54PM   2   release.  And if you did, you could be resentenced; am I

02:54PM   3   right?

02:54PM   4   A.  Well, it says to the defendant's understanding, so --

02:54PM   5   Q.  So, right?  That's correct?

02:54PM   6   A.  Yeah, I guess.

02:54PM   7   Q.  Okay.  And your plea agreement also spoke to you

02:54PM   8   cooperating with the government and providing truthful

02:54PM   9   information, right?

02:54PM  10   A.  Yes.

02:54PM  11   Q.  And helping in the prosecution of other people; am I

02:54PM  12   correct?

02:54PM  13   A.  I would need to see it again.

02:55PM  14   Q.  Start at page 10.

02:55PM  15   A.  Okay.  And where to stop?

02:55PM  16   Q.  That one paragraph will do it, the one section.

02:55PM  17   A.  Okay.

02:55PM  18   Q.  But you can go up to page -- I mean paragraph 25.

02:55PM  19   A.  It starts on page 10?  It's on 11, that's why I'm not

02:55PM  20   seeing it.

02:55PM  21   Q.  Yes.  Page 10, where the cooperation starts.

02:55PM  22   A.  Okay.  I got you.

02:56PM  23   Q.  Are you finished?

02:56PM  24   A.  All you wanted me to read was this right here, right?

02:56PM  25   Q.  Did you -- do you recall actually agreeing to provide

02:57PM    1    substantial assistance in the prosecution of others?  Do you

02:57PM    2    recall that?

02:57PM    3    A.  Yeah.  I can recall that.

02:57PM    4    Q.  Huh?

02:57PM    5    A.  Yes.

02:57PM    6    Q.  You do?  Now, 2011 is when you came out of Pennsylvania

02:57PM    7    off of time; am I correct?

02:57PM    8    A.  Well, 2011 is when I was released on post-release.  So,

02:57PM    9    technically, I was still doing time.

02:57PM   10    Q.  You were on post-release in 2011, right?

02:57PM   11    A.  Yes.

02:57PM   12    Q.  And your next arrest was?

02:57PM   13    A.  2014, if I'm not mistaken.  Oh, no.  No.  No.  No.  2013.

02:57PM   14    Q.  And that was for what?

02:58PM   15    A.  They said I had possession, but I never was charged with

02:58PM   16    that.

02:58PM   17    Q.  Right.  And then after that came?

02:58PM   18    A.  2014.

02:58PM   19    Q.  2014; am I correct?

02:58PM   20    A.  Yeah.

02:58PM   21    Q.  Now, the 2014 arrest, you were arrested.  Do you recall

02:58PM   22    the month?

02:58PM   23    A.  In 2014?

02:58PM   24    Q.  Mm-hmm.

02:58PM   25    A.  Hold up.  I think Buffalo times was in 2014.  I think one

02:58PM    1    of them was April, I want to say maybe 24th.  And was that

02:58PM    2    April 24th, 2013 or '14?  I think it was '14, though.

02:58PM    3    Q.  So, May 2014?

02:58PM    4    A.  No.  I said April.

02:58PM    5    Q.  I'm sorry.  April?

02:58PM    6    A.  Yeah.  I said April.  The charges had gotten dismissed.

02:59PM    7    That was in April.

02:59PM    8    Q.  That was in April?

02:59PM    9    A.  Yes.

02:59PM   10    Q.  Okay.  And then, you were arrested in July, right, of

02:59PM   11    2014?

02:59PM   12    A.  I turned myself in in July.

02:59PM   13    Q.  All right.  You turned yourself in in July?

02:59PM   14    A.  Yeah.

02:59PM   15    Q.  And that was to federal agents?

02:59PM   16    A.  Well, not necessarily to the agent, but to the court

02:59PM   17    building.

02:59PM   18    Q.  To the court building?  All right.

02:59PM   19    A.  Yeah.

02:59PM   20    Q.  And that was July 24th, 2014?

02:59PM   21    A.  Yes, sir.

02:59PM   22    Q.  Now, before that, April 29th, 2014, you actually met with

02:59PM   23    federal agents, didn't you?

02:59PM   24    A.  April 29th, 2014?

02:59PM   25    Q.  Mm-hmm.

640

02:59PM   1    A.  You would have to show me that.

02:59PM   2    Q.  Well, do you recall being interviewed by the agents at

02:59PM   3    the Buffalo Central Booking Department?

02:59PM   4    A.  April 29th, 2014?

02:59PM   5    Q.  Well, excuse me.  That would probably be the 25th.

02:59PM   6    Sorry.  April 25th, 2014.

02:59PM   7    A.  And they interviewed me?

02:59PM   8    Q.  Yes.

03:00PM   9    A.  Can you show me that?

03:00PM  10    Q.  I'll show you what's been marked as Government

03:00PM  11    Exhibit 3506B.

03:00PM  12    A.  Yeah.  I think this might be the false document.  Oh, you

03:00PM  13    mean did they come and try to talk to me?

03:00PM  14    Q.  Where were you located at that time?

03:00PM  15    A.  I think it was in central booking, if I'm not mistaken.

03:00PM  16    Yeah, central booking.

03:00PM  17    Q.  And you were on some other arrest?

03:00PM  18    A.  That's the charge that got submitted.

03:00PM  19    Q.  So, while you were being held on that charge, they came

03:00PM  20    to visit you?

03:00PM  21    A.  Yeah.  That next morning, before I went to court,

03:00PM  22    actually I thought I had court, but when I got around the

03:00PM  23    corner, the lady was telling me that there was some people

03:00PM  24    that wanted to speak to me.  They asked to speak to me.  Once

03:01PM  25    he showed me his badge, that's when I said I had nothing to

03:01PM    1    say to them.

03:01PM    2    Q.  All right.  Now, that was the FBI, correct?

03:01PM    3    A.  Yeah.  FBI.

03:01PM    4    Q.  Sorry?

03:01PM    5    A.  Yeah.  He had a FBI badge.

03:01PM    6    Q.  Now, you also filed a petition in the Western District of

03:01PM    7    New York -- well, excuse me.  You were under supervision, am

03:01PM    8    I correct?  And they violated you in, what, April?  I mean --

03:01PM    9    excuse me -- in May 2014; is that what it was?

03:01PM   10    A.  You would have to show me.  It's possible.  What was the

03:01PM   11    violation for?

03:01PM   12    Q.  Well, 4/24, Buffalo Police pulled you over and found

03:02PM   13    criminal possession of drugs.

03:02PM   14    A.  Oh, yeah, that's --

03:02PM   15    Q.  4/24 they pulled you over and said you were tampering

03:02PM   16    with physical evidence, driving without a license, possession

03:02PM   17    of marijuana.  You tested positive for marijuana?

03:02PM   18    A.  Okay.

03:02PM   19    Q.  They actually issued a violation; am I right?

03:02PM   20    A.  Yeah, yeah, yeah.

03:02PM   21    Q.  All right.  And that was before Judge Skretny?

03:02PM   22    A.  Yes.

03:02PM   23    Q.  All right.  So, you were violated again before Judge

03:02PM   24    Skretny; am I right?

03:02PM   25    A.  That was the first time, if I am not mistaken.

03:02PM  1   Q.  Well, this is now, actually, May of 2005 -- I mean,

03:02PM  2   excuse me, 2014.

03:02PM  3   A.  So, you -- I'm confused.

03:02PM  4   Q.  Okay.  Well, you were arrested -- well, you were placed

03:02PM  5   on post-release supervision by Pennsylvania while you were

03:02PM  6   still on post-release supervision in the Federal Court; am I

03:03PM  7   right?  So, in 2006, you had three-years post-release

03:03PM  8   supervision, right?

03:03PM  9   A.  For who?

03:03PM  10  Q.  Was that for the federal court?

03:03PM  11  A.  No.

03:03PM  12  Q.  So, this new post-release supervision --

03:03PM  13  A.  New?  No.  It's probably old, 2006, 2014.  It's 2018

03:03PM  14  right now, right?

03:04PM  15  Q.  I'll show you what's been marked as Defendant's 16 for

03:04PM  16  identification.

03:04PM  17  A.  Okay.  And you said I violated my federal probation in

03:04PM  18  2006?

03:04PM  19  Q.  That's a violation petition, right?

03:04PM  20  A.  Yes, it is.

03:04PM  21  Q.  And that's with Judge Skretny?

03:04PM  22  A.  Yes, it is.

03:04PM  23  Q.  It's got the same docket on it as the original docket; am

03:04PM  24  I correct?

03:04PM  25  A.  Yes, it does.

03:04PM    1    Q.  Flip the page and it shows the conditions relating to

03:04PM    2    April 24th, right?

03:04PM    3    A.  Of 2014, right.

03:04PM    4    Q.  2014?

03:04PM    5    A.  Okay.

03:04PM    6    Q.  Correct?

03:04PM    7    A.  Yeah.

03:04PM    8    Q.  So, you were violated at that time?

03:04PM    9    A.  Yeah.  He sent -- my probation officer sent -- yeah, he

03:04PM   10    sent the violation paperwork to the Judge.  Yes, if I'm not

03:04PM   11    mistaken.

03:04PM   12    Q.  And that was on the federal case?

03:04PM   13    A.  Yes.

03:04PM   14    Q.  All right.

03:04PM   15    A.  But this was after 2006.  When you first was talking, you

03:04PM   16    mentioned 2006.

03:05PM   17    Q.  I'll show you again Defendant's 16.  And the date on that

03:05PM   18    filing is what day?

03:05PM   19    A.  This date right here (indicating)?

03:05PM   20    Q.  Yes.  What is the date?

03:05PM   21    A.  5/4/14.

03:05PM   22    Q.  And the date of the filing of the document is what date?

03:05PM   23    A.  5/5/14.

03:05PM   24    Q.  '14.  So, on 5/5 --

03:05PM   25    A.  I was done with Pennsylvania.

03:05PM  1   Q.  On 5/5/14, the Federal Court actually pled -- you were

03:05PM  2   done with Pennsylvania, right?

03:05PM  3   A.  Yes.

03:05PM  4   Q.  All right.  And the Federal Court placed a violation on

03:05PM  5   you, correct?

03:05PM  6   A.  Yes.  My probation officer did --

03:05PM  7   Q.  Your probation officer --

03:05PM  8   A.  -- advise the court.

03:05PM  9   Q.  Right.  And that's because you got rearrested, even

03:05PM  10  though those cases were dismissed, right?  Now, you were

03:05PM  11  placed in custody at that time?

03:05PM  12  A.  Yeah.

03:05PM  13  Q.  All right.

03:05PM  14  A.  On the 24th of April, yeah.

03:05PM  15  Q.  Right.  And did you get out of custody or your probation

03:06PM  16  officer filed it and you remained in custody, in federal

03:06PM  17  custody?

03:06PM  18  A.  No, I bailed out.

03:06PM  19  Q.  You bailed out?

03:06PM  20  A.  Yeah.

03:06PM  21  Q.  When your federal probation officer placed the violation

03:06PM  22  petition, were you placed in custody?

03:06PM  23  A.  No.

03:06PM  24  Q.  So, Judge Skretny allowed you to come in and out of

03:06PM  25  court; am I right?

GRANT  --  BY MR. FOGG  --  4/24/18

645

03:06PM    1    A.  Yes.

03:06PM    2    Q.  All right.  And you had to make an appearance before the

03:06PM    3    Court, so they can see what happens in Buffalo City Court,

03:06PM    4    right?

03:06PM    5    A.  Yes.

03:06PM    6    Q.  To determine if they're going to consider it a violation;

03:06PM    7    am I right?

03:06PM    8    A.  Yes.

03:06PM    9    Q.  And that was May 5th, 2014, right?

03:06PM   10    A.  That's when the paper got put in, yes.

03:06PM   11    Q.  When the paperwork got in.  Now, it just turns out that

03:06PM   12    on July 24th is when you turned yourself in?

03:06PM   13    A.  Yeah.

03:06PM   14    Q.  And that's 2014, correct?

03:06PM   15    A.  Yes.

03:06PM   16    Q.  Now, you turned yourself in because you found that FBI

03:06PM   17    agents were actually inquiring about you and looking for you,

03:07PM   18    correct?

03:07PM   19    A.  Well, yeah, because they had my picture all over the

03:07PM   20    news.

03:07PM   21    Q.  Right.  Okay.  So, you decided just to walk on in; am I

03:07PM   22    right?

03:07PM   23    A.  Yeah, turn myself in, yeah.

03:07PM   24    Q.  All right.  Now -- and that would be on this case, but at

03:07PM   25    the time, your case number was a little different, 14-2082,

03:07PM    1    right?  Do you remember?

03:07PM    2    A.  You would have to show me the criminal complaint.

03:07PM    3    Q.  All right.  I'll show you what's been marked as

03:08PM    4    Defendant's 17.  Can you see that?

03:08PM    5    A.  Mm-hmm.

03:08PM    6    Q.  That's the cover sheet to the complaint you made; am I

03:08PM    7    right?

03:08PM    8    A.  Yes.

03:08PM    9    Q.  Okay.  And at the top, it has a docket number up there;

03:08PM   10    am I right?

03:08PM   11    A.  Yes.

03:08PM   12    Q.  And you recognize that docket number as 14-M-2082, right?

03:08PM   13    A.  I didn't memorize it by heart, but I am assuming.

03:08PM   14    Q.  But this is the case; am I right?  And --

03:08PM   15    A.  Yeah.  That's what my criminal complaint looked like.

03:08PM   16    But as far the numbers, I don't remember was that the exact

03:08PM   17    numbers or not.

03:08PM   18    Q.  All right.  And your -- a criminal complaint was filed

03:08PM   19    consisting of 17 co-defendants, right?

03:08PM   20    A.  Yeah.  I think it was 17.

03:08PM   21    Q.  And each one considered to be conspiring with each other,

03:09PM   22    correct?  So, you had 17 co-conspirators all together.  And

03:09PM   23    you were one of them, right?  So, that was 16 co-

03:09PM   24    conspirators, right?

03:09PM   25    A.  Yeah, plus me, which makes 17.

03:09PM   1   Q.  Which makes 17.

03:09PM   2   A.  Yeah.

03:09PM   3   Q.  All right.  Now, the people that are on this, on the case

03:09PM   4   with you and that was July, you knew those people; am I

03:09PM   5   right?

03:09PM   6        THE COURT:  Would you mind telling me what the

03:09PM   7   relevance of this is?

03:09PM   8        MR. FOGG:  Judge, we're getting --

03:09PM   9        THE COURT:  I think we better get into a different

03:09PM  10   area.

03:09PM  11        MR. FOGG:  Well, this is the --

03:09PM  12        THE COURT:  I think we've heard enough.

03:09PM  13        MR. FOGG:  Yes, Judge.

03:09PM  14        THE COURT:  Go on to some other area.

03:09PM  15        MR. FOGG:  All right.

03:09PM  16   BY MR. FOGG:

03:09PM  17   Q.  Now, you had testified about dealing, what, 33 pounds of

03:10PM  18   marijuana?  When did that transpire?

03:10PM  19   A.  I didn't testify to dealing 33 pounds of marijuana.  Are

03:10PM  20   you talking today?

03:10PM  21   Q.  Yes.

03:10PM  22   A.  I never said that I dealt 33 pounds of marijuana.

03:10PM  23   Q.  Well, did you deal in marijuana?

03:10PM  24   A.  Yeah.

03:10PM  25   Q.  All right.  And when did you do that, in 2014?

03:10PM   1    A.  When didn't I.

03:10PM   2    Q.  I'm sorry?

03:10PM   3    A.  I said, when didn't I.

03:10PM   4    Q.  And where were you getting your marijuana from?

03:10PM   5    A.  Aaron.  Boogy.

03:10PM   6    Q.  All right.  And you believed that the people in the

03:10PM   7    neighborhood, or at least Aaron, had a Mexican connection?

03:10PM   8         MR. XIANG:  Objection to speculation and relevance.

03:10PM   9         THE COURT:  Sustained.

03:10PM  10    BY MR. FOGG:

03:10PM  11    Q.  Where did you believe Aaron was getting it from?

03:10PM  12         MR. XIANG:  Objection.  Relevance and speculation.

03:10PM  13         THE COURT:  Well, it's a perception of the witness.

03:10PM  14    If you know, sir.

03:10PM  15         MR. FOGG:  Well, I'll --

03:10PM  16         THE COURT:  It's all right.  He can answer it.

03:10PM  17         THE WITNESS:  Where I do believe that he was getting

03:10PM  18    it from?

03:10PM  19    BY MR. FOGG:

03:10PM  20    Q.  Mm-hmm.

03:10PM  21    A.  Texas.

03:10PM  22    Q.  Texas.  But you didn't know that?

03:10PM  23    A.  I mean, I did pick up a couple boxes before.

03:11PM  24    Q.  And you picked up a couple of boxes from where?

03:11PM  25    A.  Texas.

03:11PM    1    Q.  You drove down to Texas and went down to Texas?

03:11PM    2    A.  No.  They were mailed.

03:11PM    3    Q.  How do you --

03:11PM    4    A.  You know, like the letters that I had, on the envelope,

03:11PM    5    my name was like, on the return address and where I was

03:11PM    6    sending the letter to.  Same thing with the UPS service.

03:11PM    7    Q.  And it was marijuana?

03:11PM    8    A.  Yeah.

03:11PM    9    Q.  You saw what was in the box?

03:11PM   10    A.  Yeah.

03:11PM   11    Q.  When did that happen?

03:11PM   12    A.  Couple times.

03:11PM   13    Q.  How many times is a couple?

03:11PM   14    A.  Well, all right.  Let me rephrase that, because I think a

03:11PM   15    couple is two.  Numerous times.

03:11PM   16    Q.  All right.  How many times?

03:11PM   17    A.  I don't know how many times, to be exact.

03:11PM   18    Q.  Okay.

03:11PM   19    A.  Whenever he called me.

03:11PM   20    Q.  All right.  So, what year?

03:11PM   21    A.  2013.  As far as me, per se, picking them up, 2013, 2014.

03:11PM   22    Q.  All right.  So, in two-years' time.  And do you know when

03:11PM   23    in 2013?

03:11PM   24    A.  No.

03:11PM   25    Q.  Do you know how many times in 2013?

03:11PM    1   A.   However many times he called me and told me he needed me.

03:12PM    2   Q.   So, you don't know?

03:12PM    3   A.   No.

03:12PM    4   Q.   And in 2014, do you know how many times in 2014?

03:12PM    5   A.   Like, you asking for an exact number?

03:12PM    6   Q.   I'm asking how many times.  You said numerous times.  How

03:12PM    7   many times in 2014?

03:12PM    8   A.   If I give you an exact number, it's a possibility that I

03:12PM    9   could be --

03:12PM   10   Q.   I'm not asking for possibility --

03:12PM   11       THE REPORTER:  Wait.  Wait.  One at a time.

03:12PM   12       MR. FOGG:  I'm sorry.

03:12PM   13   BY MR. FOGG:

03:12PM   14   Q.   I'm not asking for possibilities.  I just want to know,

03:12PM   15   do you know how many times in 2014?  Do you know?

03:12PM   16       THE COURT:  Approximately, sir.

03:12PM   17       THE WITNESS:  No.

03:12PM   18       THE COURT:  Approximately?

03:12PM   19       THE WITNESS:  Approximately, I don't have an

03:12PM   20   approximate.

03:12PM   21       THE COURT:  Would it be more than five?

03:12PM   22       THE WITNESS:  Yes.

03:12PM   23       THE COURT:  More than 10?

03:12PM   24       THE WITNESS:  I'd say about 10.  I'd say maybe 10 to

03:12PM   25   15, at the most.

03:12PM   1          THE COURT:  All right.

03:12PM   2   BY MR. FOGG:

03:12PM   3   Q.  All right.  And do you know what months they may have

03:12PM   4   been?

03:12PM   5   A.  No.

03:12PM   6   Q.  Summertime, wintertime?

03:12PM   7   A.  I mean, summertime, wintertime, spring.

03:12PM   8   Q.  Okay.  And do you know what houses they were delivered

03:13PM   9   at?

03:13PM  10   A.  Different houses.  One time, he got it sent to me.

03:13PM  11   Q.  And what address is that?

03:13PM  12   A.  The address that's in the criminal complaint, 2 West

03:13PM  13   Cleveland Drive.  Actually, two times.

03:13PM  14   Q.  And when was that?

03:13PM  15   A.  That was in 2014.

03:13PM  16   Q.  They were both in 2014?

03:13PM  17   A.  Yes.  A couple days apart from each other, actually.

03:13PM  18   Q.  Now, how do you know they were coming from Aaron or

03:13PM  19   purposed for Aaron?

03:13PM  20   A.  Because I took it to him.

03:13PM  21   Q.  All right.

03:13PM  22   A.  One time, he came to the house.  The second time, I took

03:13PM  23   it to him.

03:13PM  24   Q.  All right.  Have you ever dealt with Letorrance Travis?

03:13PM  25   A.  What do you mean?

| | | |
|---|---|---|
| 03:13PM | 1 | Q.  Drug dealing? |
| 03:13PM | 2 | A.  No. |
| 03:13PM | 3 | Q.  Have you ever purchased from him?  Have you ever -- ever |
| 03:13PM | 4 | sell to him? |
| 03:13PM | 5 | A.  No. |
| 03:13PM | 6 | Q.  You described this one particular time where there was |
| 03:14PM | 7 | 33 pounds.  You made reference to 33 pounds? |
| 03:14PM | 8 | A.  Yes. |
| 03:14PM | 9 | Q.  And where did that occur? |
| 03:14PM | 10 | A.  I want to say it was at his grandfather's house, maybe on |
| 03:14PM | 11 | Camp Street, one of them streets over there.  We picked it up |
| 03:14PM | 12 | from there.  His aunt dropped -- she grabbed it -- she |
| 03:14PM | 13 | dropped it on the floor.  He grabbed it, picked it up on the |
| 03:14PM | 14 | concrete.  He grabbed it, picked it up, put it in the back of |
| 03:14PM | 15 | the truck.  We took it to Brill house. |
| 03:14PM | 16 | Q.  And who's Brill? |
| 03:14PM | 17 | A.  I don't know his first name. |
| 03:14PM | 18 | Q.  All right.  And was this in a vehicle?  Did he pick you |
| 03:14PM | 19 | up in his vehicle or your vehicle? |
| 03:14PM | 20 | A.  Did who pick me up? |
| 03:14PM | 21 | Q.  Well, how did you get to the house to pick up the |
| 03:14PM | 22 | package? |
| 03:14PM | 23 | A.  How did I get to the house? |
| 03:14PM | 24 | Q.  Yes. |
| 03:14PM | 25 | A.  Boogy.  I didn't -- what is you saying?  Can you be a |

03:15PM   1   little more -- so I can understand you?

03:15PM   2   Q.  Well, I'm asking --

03:15PM   3   A.  I don't want to answer it wrong.

03:15PM   4   Q.  No.  No.  I don't want you to answer it wrong.  You said

03:15PM   5   you picked up 33 pounds in a box, right?  It was at Camp?

03:15PM   6   A.  Well, I didn't pick him up.  I was there.

03:15PM   7   Q.  Okay.  And how did you get there?  Were you driven there?

03:15PM   8   Were you -- did you walk there?  How did you get to that

03:15PM   9   location to see that?  Does that make sense to you?

03:15PM   10  A.  Yes.  Boogy.  Boogy's.

03:15PM   11  Q.  And how did he get you there?

03:15PM   12  A.  He had a rental from somebody.

03:15PM   13  Q.  Somebody?

03:15PM   14  A.  Yeah, I don't know who, one of his girlfriends.

03:15PM   15  Q.  Now, the white video -- All White video, did you

03:16PM   16  participate in that?

03:16PM   17  A.  Yeah, I was there.

03:16PM   18  Q.  Okay.  Were you in the video itself?

03:16PM   19  A.  No.

03:16PM   20  Q.  All right.

03:16PM   21  A.  Well, there was two makes of it.  I might have been in

03:16PM   22  the second one.

03:17PM   23  Q.  Now, you went to -- you testified that you went to a

03:17PM   24  relative's house on Camp Street to deliver the 33 pounds?

03:17PM   25  A.  To deliver?

03:17PM   1   Q.  Well, to pick up the 33 pounds, right?

03:17PM   2   A.  You saying that I did it?  Because you just said that I

03:17PM   3   took it, but I got it.

03:17PM   4   Q.  Well, you said you went there; am I right?

03:17PM   5   A.  Oh, yeah.

03:17PM   6   Q.  Am I right?

03:17PM   7   A.  Yeah, you right.  I was there.

03:17PM   8   Q.  All right.  And you recall the address, right?

03:17PM   9   A.  No, I don't recall the address.

03:17PM  10   Q.  No?  Now, you testified at a prior proceeding on

03:17PM  11   September 18, 2017; do you recall?

03:18PM  12   A.  That's sounds about correct.  I'm not sure on the date,

03:18PM  13   but --

03:18PM  14   Q.  And at that time you swore, under oath, to tell the

03:18PM  15   truth, right?

03:18PM  16   A.  Mm-hmm.

03:18PM  17   Q.  And you did -- and to tell the whole truth, right?

03:18PM  18   A.  Mm-hmm.

03:18PM  19   Q.  And you did, didn't you?

03:18PM  20   A.  Yeah.

03:18PM  21   Q.  Do you recall being asked questions about the 33 pounds

03:18PM  22   then?

03:18PM  23   A.  No.  It was 40 pounds that time.

03:18PM  24   Q.  So, you recall it wasn't 33 pounds; it was 40 pounds?

03:18PM  25   A.  Two different incidents.

03:18PM  1    Q.  Two different incidents?

03:18PM  2    A.  Yeah.

03:18PM  3    Q.  But you didn't know where the 40 pounds was delivered; is

03:18PM  4    that what it is?

03:18PM  5    A.  I didn't know where it was delivered?

03:18PM  6    Q.  Right.

03:18PM  7    A.  Yeah, I knew where it was delivered.

03:18PM  8    Q.  Where was the 40 pounds delivered?

03:18PM  9    A.  On Girard Street.

03:18PM 10    Q.  On Girard?

03:18PM 11    A.  Yeah.

03:19PM 12    Q.  But it was not 33 pounds; am I right?

03:19PM 13    A.  At that time, no.

03:19PM 14         THE COURT:  This was a different time?

03:19PM 15         THE WITNESS:  Yes.

03:19PM 16         MR. FOGG:  A different time?

03:19PM 17         THE COURT:  One time it was 33 pounds.  One time it

03:19PM 18    was 40 pounds?

03:19PM 19         THE WITNESS:  The 33 pound was, I think that was

03:19PM 20    2013, if I am not mistaken.  The 40 was in 2014.

03:19PM 21         THE COURT:  We'll take a 15-minute recess, ladies and

03:19PM 22    gentlemen.  Court will be in recess.

03:19PM 23         THE CLERK:  All rise.

03:19PM 24    (The jury left the room at 3:19 p.m.)

03:19PM 25    (Brief recess)

| | | |
|---|---|---|
| 03:35PM | 1 | (The jury entered the room at 3:36 p.m.) |
| 03:36PM | 2 | THE CLERK:  All rise.  You may be seated. |
| 03:36PM | 3 | THE COURT:  All right. |
| 03:36PM | 4 | BY MR. FOGG: |
| 03:37PM | 5 | Q.  Mr. Grant, do you recall also writing letters to George |
| 03:37PM | 6 | Burgasser with regard to -- excuse me.  Have you also -- do |
| 03:37PM | 7 | you recall writing a letter to Mr. Wei Xiang, here, on |
| 03:37PM | 8 | September 15th, 2017? |
| 03:37PM | 9 | A.  You have to show me the letter, man. |
| 03:37PM | 10 | Q.  I'll show you what's been marked as Government's |
| 03:37PM | 11 | Exhibit 3506DD.  Do you recognize that? |
| 03:37PM | 12 | A.  Yeah. |
| 03:37PM | 13 | Q.  You recognize that, right? |
| 03:38PM | 14 | A.  Yeah. |
| 03:38PM | 15 | Q.  And you were advising him -- or letting him know that |
| 03:38PM | 16 | you're ready to get prepped for trial; am I right? |
| 03:38PM | 17 | A.  What line is that? |
| 03:38PM | 18 | Q.  Is that what you were doing on that date?  Do you recall |
| 03:38PM | 19 | writing that letter? |
| 03:38PM | 20 | A.  Yeah.  I recall writing the letter. |
| 03:38PM | 21 | Q.  All right.  And the purpose to write him was to inform |
| 03:38PM | 22 | him that you're ready to get prepped for trial?  Is that the |
| 03:38PM | 23 | purpose? |
| 03:38PM | 24 | A.  I think my purpose here was -- yeah.  I would think I was |
| 03:38PM | 25 | being threatened.  So, I think that was my purpose for |

03:38PM  1   writing him, but you can show me the line that you're talking

03:38PM  2   about?

03:38PM  3   Q.  Well, look at the bottom.

03:38PM  4   A.  Oh, okay.  Yeah.

03:38PM  5   Q.  Yeah?

03:38PM  6   A.  Yeah.

03:38PM  7           MR. FOGG:  No further questions.

03:38PM  8

03:38PM  9                   REDIRECT EXAMINATION

03:38PM  10

03:39PM  11  BY MR. XIANG:

03:39PM  12  Q.  Mr. Grant, let's start with where defense counsel left

03:39PM  13  off, the letter that you wrote to me.  What did you say your

03:39PM  14  purpose for writing that letter was?

03:39PM  15  A.  Well, my purpose was, I was being threatened.  I had

03:39PM  16  actually -- was told to check into the SHU, protective

03:39PM  17  custody.

03:39PM  18  Q.  In fact, lines 3 to 4 of that letter:  I was threatened

03:40PM  19  by a guy at the jail due to me cooperating against Roderick

03:40PM  20  Arrington.  Is that right?

03:40PM  21  A.  Yes.

03:40PM  22  Q.  What do you mean by the SHU, you just said?

03:40PM  23  A.  It's -- like I said, it's a segregated housing unit where

03:40PM  24  they put people for either administrative -- I was placed

03:40PM  25  under administrative -- due to me checking myself -- solitary

GRANT  --  BY MR. XIANG  --  4/24/18

658

03:40PM  1  confinement.

03:40PM  2  Q.  Can you explain what checking yourself in means?

03:40PM  3  A.  It's like when you be threatened.  Somebody tell you get

03:40PM  4  out the compound.  You got to check yourself in for coop --

03:40PM  5  there's many people who check their selves as people who

03:40PM  6  cooperate.

03:40PM  7  Q.  What did you mean by the term compound you just used?

03:40PM  8  A.  Oh, that's what they call the jail, as a whole, the

03:40PM  9  different units.  There's a chow hall, the library, medical

03:40PM  10  units.  So, I'm assuming that that's why they call it a

03:40PM  11  compound.

03:40PM  12  Q.  Now, putting yourself in solitary confinement, what was

03:41PM  13  the purpose?

03:41PM  14  A.  Protection.  To be protected.

03:41PM  15  Q.  Defense counsel had asked you during cross-

03:41PM  16  examination -- actually, he started with a couple of letters

03:41PM  17  about you asking George Burgasser about being relocated.  Do

03:41PM  18  you recall that line of questioning?

03:41PM  19  A.  Yes.

03:41PM  20  Q.  Relocated from Allegany County?

03:41PM  21  A.  Yeah.

03:41PM  22  Q.  And relocated to Youngstown?

03:41PM  23  A.  Yeah.

03:41PM  24  Q.  And relocated -- or being housed at Monroe County.  Do

03:41PM  25  you remember there's a letter he asked you about that you

GRANT  --  BY MR. XIANG  --  4/24/18

659

03:41PM    1    were housed at Monroe County?

03:41PM    2    A.   Yeah.

03:41PM    3    Q.   And you also mentioned in one of the letters you got it

03:41PM    4    at Warsaw, Virginia?

03:41PM    5    A.   Yes.

03:41PM    6    Q.   Can you just explain for the jury here, how is it that

03:41PM    7    you were at these county jails in the past four years?

03:41PM    8    A.   What do you mean?  Like, how was I -- like, why I was

03:42PM    9    getting moved?

03:42PM   10    Q.   Yes.

03:42PM   11    A.   Well, my cooperation.  I was being -- I was cooperating

03:42PM   12    and everybody knew about it.  So, they, you know, I was

03:42PM   13    getting threatened from time to time.

03:42PM   14    Q.   First off, is there a federal detention center here in

03:42PM   15    the Western District of New York?

03:42PM   16    A.   No, not in the Western District of New York, no.

03:42PM   17    Q.   So, are federal inmates located -- farmed out to local

03:42PM   18    facilities?

03:42PM   19    A.   Yes.

03:42PM   20    Q.   Including, you said, as far down south as Warsaw,

03:42PM   21    Virginia?

03:42PM   22    A.   Yes.

03:42PM   23    Q.   So, when you wrote to George Burgasser asking to be

03:42PM   24    relocated from Allegany County, that was Defendant's

03:42PM   25    Exhibit 8, being relocated in that letter, Defendant's

03:43PM  1  Exhibit 10, why were you asking to be relocated from where

03:43PM  2  you were housed?

03:43PM  3  A.  Because I was having problems there due to my

03:43PM  4  cooperation.

03:43PM  5  Q.  What kind of problems?

03:43PM  6  A.  People was threatening me.  Ra Ra, he was sending threats

03:43PM  7  to me through people.

03:43PM  8  Q.  Defense counsel also asked you about letters that you

03:43PM  9  wrote to the defendant while you were in jail.

03:43PM  10  A.  Yeah.

03:43PM  11  Q.  Do you remember that?

03:43PM  12  A.  Yeah.

03:43PM  13  Q.  I mean, him asking you those questions?

03:43PM  14  A.  Yeah.

03:43PM  15  Q.  Why were you exchanging letters with Aaron Hicks when you

03:43PM  16  were in jail?

03:43PM  17  A.  Well, I felt like that if I write him and maybe try to

03:44PM  18  persuade him that I am not going to cooperate with you guys,

03:44PM  19  I'm not going to follow complete all the way through with it,

03:44PM  20  that like, as far as all of the threats that I was getting

03:44PM  21  might cease.

03:44PM  22  Q.  Might cease?

03:44PM  23  A.  Yeah, stop.

03:44PM  24  Q.  Similar to when you told Roderick Arrington to his face

03:44PM  25  that you weren't -- that the government didn't ask about him?

GRANT  --  BY MR. XIANG  --  4/24/18

661

03:44PM   1   A.  Yeah.

03:44PM   2   Q.  Defense counsel also asked you about writing to George

03:44PM   3   Burgasser, trying to get credit.  Do you remember he used

03:44PM   4   that term, to get credit?

03:44PM   5   A.  Yeah.  I remember that term.

03:44PM   6   Q.  Under the terms of your plea agreement, do you get credit

03:44PM   7   if you falsely accuse anyone of a crime?

03:44PM   8   A.  No.

03:44PM   9   Q.  Why not?

03:45PM   10  A.  That's perjury.  If you perjure, you get extra charges

03:45PM   11  against you.

03:45PM   12  Q.  Is it in your interest or against your interest to be

03:45PM   13  truthful in your testimony right now?

03:45PM   14  A.  In my interest.

03:45PM   15  Q.  Why is that?

03:45PM   16  A.  I won't -- would not get charged with perjury.

03:45PM   17  Q.  And then, defense counsel also asked you about -- well,

03:45PM   18  first off, let's clarify.  Am I George Burgasser?

03:45PM   19  A.  No.

03:45PM   20  Q.  Is my counsel here George Burgasser?

03:45PM   21  A.  No.

03:45PM   22  Q.  Is it a different United States Attorney than the two of

03:45PM   23  us who are here today?

03:45PM   24  A.  As far as George Burgasser?

03:45PM   25  Q.  Correct.

03:45PM    1    A.  Yeah.

03:45PM    2    Q.  And all of the -- what defense counselor went over, your

03:46PM    3    request for bail, for the root canal, whatnot, did the U.S.

03:46PM    4    Attorney's Office agree to any of it?

03:46PM    5    A.  No.

03:46PM    6    Q.  Defense counsel asked you about your 2006 firearm

03:46PM    7    possession.  Do you remember that line of questioning?

03:46PM    8    A.  Yeah.

03:46PM    9    Q.  You said it was on Carl Street?

03:46PM   10    A.  Yes.

03:46PM   11    Q.  Why did you have a gun on Carl Street in 2006?

03:46PM   12    A.  At that time, it was a lot of shooting going back and

03:46PM   13    forth.  Yeah, a lot going on.

03:46PM   14    Q.  Well, with you having a gun, what did that do for you?

03:46PM   15    A.  Got me arrested.

03:46PM   16    Q.  Well, if you weren't arrested, what was your purpose in

03:47PM   17    having the gun?

03:47PM   18    A.  To protect myself.

03:47PM   19    Q.  Is that a common tool of the trade in the drug trade?

03:47PM   20    A.  Yeah.

03:47PM   21    Q.  Then, defense counsel asked you about the 33 pounds of

03:47PM   22    marijuana with Brill.  Do you remember that line of

03:47PM   23    questioning?

03:47PM   24    A.  Yeah.

03:47PM   25    Q.  And he asked you how you got there or got to the Camp

| | | |
|---|---|---|
| 03:47PM | 1 | Street -- |
| 03:47PM | 2 | A.  Yes. |
| 03:47PM | 3 | Q.  -- address.  You said rental? |
| 03:47PM | 4 | A.  Yeah. |
| 03:47PM | 5 | Q.  Was using rentals common? |
| 03:47PM | 6 | A.  Yeah. |
| 03:47PM | 7 | Q.  Why? |
| 03:47PM | 8 | A.  Keeps it -- keeps you off the radar.  Like, one minute, |
| 03:47PM | 9 | people might hear you in this and then, you would switch to |
| 03:47PM | 10 | something else. |
| 03:47PM | 11 | THE COURT:  You say rental, you mean a rental car? |
| 03:48PM | 12 | THE WITNESS:  Yeah. |
| 03:48PM | 13 | BY MR. XIANG: |
| 03:48PM | 14 | Q.  Was that also a common tactic in the drug trade? |
| 03:48PM | 15 | A.  Yes. |
| 03:48PM | 16 | MR. XIANG:  No other questions, Judge. |
| 03:48PM | 17 | MR. FOGG:  Judge, may I ask three questions? |
| 03:48PM | 18 | THE COURT:  All right. |
| 03:48PM | 19 | MR. FOGG:  Thank you, Judge.  Maybe four. |
| 03:48PM | 20 | |
| 03:48PM | 21 | RECROSS-EXAMINATION |
| 03:48PM | 22 | |
| 03:48PM | 23 | BY MR. FOGG: |
| 03:48PM | 24 | Q.  Counsel for the government asked, is it in your best |
| 03:48PM | 25 | interest to lie; am I right?  Do you remember that? |

664

| | | |
|---|---|---|
| 03:48PM | 1 | A.  In my best interest to lie? |
| 03:48PM | 2 | Q.  Do you remember that? |
| 03:48PM | 3 | A.  I was never asked if it -- |
| 03:48PM | 4 | Q.  Okay. |
| 03:48PM | 5 | A.  -- was in my -- |
| 03:48PM | 6 | Q.  Okay. |
| 03:48PM | 7 | A.  -- best interest to lie. |
| 03:48PM | 8 | Q.  Right. |
| 03:48PM | 9 | A.  I said tell the truth. |
| 03:48PM | 10 | Q.  You're serving a sentence of 188 months? |
| 03:48PM | 11 | A.  Correct. |
| 03:48PM | 12 | Q.  And that's a little over 15 years, correct? |
| 03:48PM | 13 | A.  Yes. |
| 03:49PM | 14 | Q.  Will you get a reduction in sentencing if you cooperate |
| 03:49PM | 15 | here today? |
| 03:49PM | 16 | A.  If I'm truthful, I assume. |
| 03:49PM | 17 | Q.  So, you're hopeful that this -- so, it is in your best |
| 03:49PM | 18 | interest to actually talk -- to testify today, at least; am I |
| 03:49PM | 19 | correct, because you're hoping to get a sentence reduction, |
| 03:49PM | 20 | correct? |
| 03:49PM | 21 | A.  I mean, like give me what you -- I need an example. |
| 03:49PM | 22 | Q.  Your testimony here would help you get a reduction in |
| 03:49PM | 23 | your sentence, correct? |
| 03:49PM | 24 | A.  If I'm telling the truth. |
| 03:49PM | 25 | Q.  Right.  When you were in the hold today, did you -- |

03:49PM   1   yesterday, did you refer to someone else, saying that you're

03:49PM   2   going to lie against Aaron in the hold?

03:49PM   3   A.  Hmm?

03:49PM   4   Q.  Did you say, in the hold yesterday, that you were looking

03:49PM   5   to come home a lot earlier than 15 years and you're going to

03:49PM   6   say whatever you have to say, to lie against Aaron today?

03:50PM   7   Did you say something like that in the hold?

03:50PM   8   A.  What?  No.  I was in the hold -- it was probably one

03:50PM   9   other person in the hold with me.  No.  So, if you have --

03:50PM  10   Q.  You didn't --

03:50PM  11   A.  -- somebody that heard that.

03:50PM  12   Q.  Did you say that; yes or no?

03:50PM  13   A.  No.

03:50PM  14          MR. FOGG:  No further questions, Judge.

03:50PM  15   (The witness was excused at 3:50 p.m.)

03:50PM  16          THE COURT:  All right.  Ladies and gentlemen, we'll

03:50PM  17   take a five-minute recess.  Court will be in recess.

03:50PM  18          THE CLERK:  All rise.

03:50PM  19   (The jury left the room at 3:50 p.m.)

03:50PM  20   (Brief recess)

03:56PM  21   (The jury entered the room at 3:56 p.m.)

03:57PM  22          THE CLERK:  All rise.  You may be seated.

03:57PM  23          THE COURT:  All right.  Mr. Parisi?

03:57PM  24          MR. PARISI:  The government calls Jeremy Peterson,

03:57PM  25   witness number 24.

PETERSON -- BY MR. PARISI -- 4/24/18

03:58PM   1    (The witness was sworn at 3:58 p.m.)

03:58PM   2         THE CLERK:  State your full name and spell your last

03:58PM   3    name for the record.

03:58PM   4         THE WITNESS:  Jeremy Peterson, P-E-T-E-R-S-O-N.

03:58PM   5

03:58PM   6                      DIRECT EXAMINATION

03:58PM   7

03:58PM   8    BY MR. PARISI:

03:58PM   9    Q.  Good afternoon.

03:58PM  10    A.  Good afternoon.

03:58PM  11    Q.  What do you do for a living?

03:58PM  12    A.  I am an investigator with the New York State Police.

03:58PM  13    Q.  How long have you worked for the New York State Police

03:58PM  14    Department?

03:58PM  15    A.  Almost 20 years.

03:58PM  16    Q.  How long have you been an investigator?

03:58PM  17    A.  2014 I was promoted, so 14 years.

03:58PM  18    Q.  Are you assigned to any special unit within the New York

03:58PM  19    State Police?

03:58PM  20    A.  Yes.  The Community Narcotics Enforcement Team.

03:58PM  21    Q.  And do you have any specialty within the Community

03:58PM  22    Narcotics Enforcement Team?

03:58PM  23    A.  My specialty is interdiction work with shipping

03:59PM  24    companies.

03:59PM  25    Q.  Can you tell the jury a little bit about what you do as

03:59PM    1    an investigator in the interdiction unit?

03:59PM    2    A.  I go to shipping companies and target packages, look for

03:59PM    3    packages that contain narcotics, marijuana or proceeds from

03:59PM    4    those.

03:59PM    5    Q.  How long have you been doing that as part of the

03:59PM    6    interdiction unit?

03:59PM    7    A.  Since February 2011.

03:59PM    8    Q.  Do you have training in the recognition of controlled

03:59PM    9    substances, including marijuana?

03:59PM   10    A.  Yes, I do.

03:59PM   11    Q.  What kind of training do you have?

03:59PM   12    A.  We trained at the New York State Police Academy on the

03:59PM   13    identification of different drugs and then of -- being in the

03:59PM   14    unit that I'm in, when we go out and do operations or buys,

03:59PM   15    we -- everybody usually takes a look at it.  And then,

03:59PM   16    there's a test kit that is involved and that gives a positive

04:00PM   17    yes or no that -- if the substance is what we think it is.

04:00PM   18    Q.  And with respect to marijuana, if you can, approximate

04:00PM   19    how many investigations have you been involved in that have

04:00PM   20    concerned marijuana?

04:00PM   21    A.  A hundred and fifty.

04:00PM   22    Q.  I'd like to discuss with you February 18th of 2014.  Were

04:00PM   23    you working with the New York State Police on that day?

04:00PM   24    A.  Yes, I was.

04:00PM   25    Q.  In the early morning hours of February 18, 2017, were you

04:00PM  1   on the interdiction unit?

04:00PM  2   A.  Yes, I was.

04:00PM  3   Q.  As part of your assignment, did you become involved in

04:00PM  4   the investigation of a suspicious package that was

04:00PM  5   intercepted by UPS?

04:00PM  6   A.  Yes, I did.

04:00PM  7   Q.  How did you become involved in that?

04:00PM  8   A.  I received a phone call from a task force in Louisville

04:00PM  9   that targets and looks for packages containing narcotics.

04:00PM  10  They called me and said they had a suspicious package coming

04:00PM  11  to Buffalo and asked me if I was interested in working the

04:01PM  12  package.  If they would send it through, if I would work the

04:01PM  13  package.

04:01PM  14  Q.  Prior to that phone call, did you have any knowledge that

04:01PM  15  a package was going to be shipped?

04:01PM  16  A.  No, not prior to the phone call.

04:01PM  17  Q.  And did you indicate that you were interested in

04:01PM  18  investigating that package?

04:01PM  19  A.  Yes, I did.

04:01PM  20  Q.  What did you direct them to do?

04:01PM  21  A.  I directed them to send the package on and that once it

04:01PM  22  was in Buffalo, that I would intercept the package and go

04:01PM  23  from there and conduct an investigation.

04:01PM  24  Q.  Did you, in fact, intercept the package in Buffalo on

04:01PM  25  February 18th, 2014?

PETERSON -- BY MR. PARISI -- 4/24/18

669

04:01PM   1   A.  Yes, I did.

04:01PM   2   Q.  How did you do that?

04:01PM   3   A.  I responded to UPS.  Louisville had given me the tracking

04:01PM   4   number of the package.  So, I contacted UPS security and

04:01PM   5   asked them to hold the package when it comes and I responded

04:01PM   6   to UPS with a narcotics K-9 and did a drug search with the

04:01PM   7   K-9 and then we seized the package.

04:02PM   8   Q.  Where is the UPS facility that you went to?

04:02PM   9   A.  1907 Casey Boulevard -- James Casey Boulevard, in

04:02PM  10   Buffalo.

04:02PM  11   Q.  And when you went there, where was the package?

04:02PM  12   A.  The package was in the hold area of UPS.

04:02PM  13   Q.  And can you just describe what the package would look

04:02PM  14   like?

04:02PM  15   A.  This one, in particular, was a brown cardboard box that

04:02PM  16   was -- had a shipping label on it and then it was taped

04:02PM  17   closed.

04:02PM  18   Q.  With respect to the shipping label, did it indicate a

04:02PM  19   sender?

04:02PM  20   A.  Yes, it did.

04:02PM  21   Q.  Did it indicate a person that it was being sent to?

04:02PM  22   A.  Yes, it did.

04:02PM  23   Q.  Do you recall those individuals?

04:02PM  24   A.  I recall who it was shipped to, but I would have to look

04:02PM  25   at the report or the search warrant for the name of the

PETERSON -- BY MR. PARISI -- 4/24/18

670

04:02PM   1   shipper.

04:02PM   2   Q.  I'm going to hand you what's marked for identification as

04:03PM   3   Government Exhibit 3531A and ask you to look through that

04:03PM   4   document -- and first of all, with respect to the shipper,

04:03PM   5   does that refresh your recollection as to the name of the

04:03PM   6   person that shipped it?

04:03PM   7   A.  Yes, it does.

04:03PM   8   Q.  And what was the name of the person that shipped it?

04:03PM   9   A.  Cory Billings.

04:03PM  10   Q.  Was there an address associated with the person that

04:03PM  11   shipped it?

04:03PM  12   A.  Yes, there was.

04:03PM  13   Q.  What was the address?

04:03PM  14   A.  615 East Schreiner Street, Kerrville, Texas.

04:03PM  15   Q.  How do you spell Kerrville, just so we're clear?

04:03PM  16   A.  K-E-R-R-V-I-L-L-E.

04:03PM  17   Q.  Thank you.  And you said there was also the receiver, the

04:03PM  18   person it was being shipped to?

04:03PM  19   A.  Yes, there was.

04:03PM  20   Q.  And do you recall -- and you said you do recall who the

04:03PM  21   receiver was?

04:03PM  22   A.  Yes.

04:03PM  23   Q.  What was the name of the person receiving it?

04:03PM  24   A.  Marcus Gibson.

04:04PM  25   Q.  What was the address that the package was supposed to go

04:04PM   1   to?

04:04PM   2   A.   204 Stevens Street -- I'm sorry -- Ave.

04:04PM   3   Q.   In what city?

04:04PM   4   A.   In Buffalo, New York.

04:04PM   5   Q.   With respect to the sender, did you do any investigation

04:04PM   6   into the sender, particularly the name and the address?

04:04PM   7   A.   Yes.

04:04PM   8   Q.   Tell us about that.

04:04PM   9   A.   I checked the white pages through the internet to see if

04:04PM  10   I could locate the name in Buffalo or in Kerrville, Texas.

04:04PM  11   And then, I checked New York State DMV and Texas DMV to see

04:04PM  12   if that name was associated with either of those locations.

04:04PM  13   Q.   Start with the sender.  Was the name associated with the

04:04PM  14   address?

04:04PM  15   A.   No.

04:04PM  16   Q.   And what about the receiver, the Gibbons name, was that

04:04PM  17   associated with the address on Stevens Street?

04:04PM  18   A.   Not with that address, no.

04:04PM  19   Q.   What made you suspicious of this package?

04:05PM  20   A.   The way it was packaged, where it was coming from is a

04:05PM  21   source area for narcotics to be shipped from.  The names did

04:05PM  22   not match the address of the shipper or recipient location.

04:05PM  23   The phone number for the shipper was not associated with a

04:05PM  24   person, but a business and then, it was shipped from a third-

04:05PM  25   party shipper, a UPS store, instead of from a business or a

672

04:05PM   1   person's address.

04:05PM   2   Q.  And you said you went with a K-9 dog?

04:05PM   3   A.  Yes, I did.

04:05PM   4   Q.  Did you have the K-9 dog perform any tests on the

04:05PM   5   package?

04:05PM   6   A.  It ran a drug search.  What I do is I put out five to ten

04:05PM   7   packages and then the dog is introduced to all of them and

04:05PM   8   the dog works from there.

04:05PM   9   Q.  So, is it five to ten packages that all contain suspected

04:05PM  10   controlled substances?

04:05PM  11   A.  No.  There's five to ten packages from the shipping

04:05PM  12   company with the one package that we've identified as

04:06PM  13   suspicious and we do not know what the contents of the other

04:06PM  14   packages are.

04:06PM  15   Q.  So, kind of like a package lineup?

04:06PM  16   A.  Yes.

04:06PM  17   Q.  Did the K-9 indicate on the package, the suspected

04:06PM  18   package?

04:06PM  19   A.  Yes, he did.

04:06PM  20   Q.  What did you do with the package after your investigation

04:06PM  21   and after the K-9 ran its test?

04:06PM  22   A.  After the K-9 indicated that there was narcotics, the

04:06PM  23   odor of narcotics or marijuana, I seized it at that point in

04:06PM  24   time and took it from UPS to the State Police office here in

04:06PM  25   Buffalo.

673

04:06PM   1   Q.  And with -- did you open it?  From the time that you

04:06PM   2   brought it from the UPS office until the time you brought it

04:06PM   3   to the State Police office, did you open the package?

04:06PM   4   A.  No, it remained closed.

04:06PM   5   Q.  And was it sealed?

04:06PM   6   A.  Yes, it was.

04:06PM   7   Q.  At the State Police office, did you notify any other law

04:06PM   8   enforcement of what you were investigating?

04:06PM   9   A.  Yes.  I requested assistance from other people in my

04:07PM  10   office that usually work in Buffalo and they requested

04:07PM  11   assistance from Buffalo PD.  So, Buffalo PD and some other

04:07PM  12   people in my office assisted.

04:07PM  13   Q.  Did you eventually go with -- to the Buffalo Police

04:07PM  14   Department -- to the Buffalo Police Department Narcotics

04:07PM  15   offices?

04:07PM  16   A.  Yes, we did.

04:07PM  17   Q.  And did you take the package with you?

04:07PM  18   A.  Yes, I did.

04:07PM  19   Q.  Was the package in your custody from the time you brought

04:07PM  20   it into UPS until the time you went to the Buffalo Police

04:07PM  21   Department Narcotics office?

04:07PM  22   A.  Yes, I had possession of it.

04:07PM  23   Q.  And up until that point in time, was it opened?

04:07PM  24   A.  No, it was not.

04:07PM  25   Q.  Did you take any steps then to open the package before

PETERSON -- BY MR. PARISI -- 4/24/18

04:07PM    1    you opened the package?

04:07PM    2    A.  Yes.  We did some -- we did the checking of the internet

04:07PM    3    and the locale to see if there were any association with the

04:07PM    4    name and the address that were on the package.  Somebody

04:07PM    5    drove by the address where the package was going to and then,

04:07PM    6    I wrote up a search warrant to request permission to open the

04:08PM    7    package.

04:08PM    8    Q.  Did you or another member of the New York State Police go

04:08PM    9    in front of a judge --

04:08PM   10    A.  Yes, I did.

04:08PM   11    Q.  -- with the search warrant?

04:08PM   12    A.  Yes, I did.

04:08PM   13    Q.  And did the judge authorize the search of that package?

04:08PM   14    A.  Yes.

04:08PM   15    Q.  Was that package still in a sealed condition when you

04:08PM   16    left it to go sign the search warrant?

04:08PM   17    A.  Yes, it was.

04:08PM   18    Q.  When you returned and went back to the package, was it in

04:08PM   19    the same condition as it was when you left it?

04:08PM   20    A.  Yes.

04:08PM   21    Q.  Had it been opened at all?

04:08PM   22    A.  No.  It was not opened.

04:08PM   23    Q.  After the judge signed the search warrant to open the

04:08PM   24    package, was the package opened?

04:08PM   25    A.  After the judge signed the search warrant, yes, we opened

04:08PM    1    it.

04:08PM    2    Q.  What was the weight of the package?

04:08PM    3    A.  I believe it was approximately 36 pounds.

04:08PM    4    Q.  That's the entire package?

04:08PM    5    A.  The entire package, yes.

04:08PM    6    Q.  And did you look inside the package?

04:08PM    7    A.  Yes, we did.

04:08PM    8    Q.  What was inside the package?

04:08PM    9    A.  Three bundles of green vegetation, wrapped in cellophane.

04:09PM   10    Q.  Based on your training and experience, could you tell

04:09PM   11    what those green bundles were?

04:09PM   12    A.  Marijuana.

04:09PM   13    Q.  I'm going to show you what's been marked for

04:09PM   14    identification as Government Exhibit 36A.  Do you recognize

04:09PM   15    what that is?

04:09PM   16    A.  Yes.  That is a bundle of marijuana with cellophane

04:09PM   17    inside of it.

04:09PM   18    Q.  Is that -- well, is that related to what you opened on

04:09PM   19    February 18th of 2014?

04:09PM   20    A.  Yes.  It is how the bundles came, just like this.  And

04:10PM   21    then the cellophane was wrapped -- the plastic bag that it's

04:10PM   22    currently in was not on it.  The cellophane inside the bag

04:10PM   23    was wrapped around the marijuana in the bundle.

04:10PM   24    Q.  So, the cellophane that it was wrapped around is

04:10PM   25    currently in that bag?

PETERSON  --  BY MR. PARISI  --  4/24/18

676

04:10PM    1    A.  Yes.

04:10PM    2    Q.  And you said there were three of those?

04:10PM    3    A.  Yes.

04:10PM    4    Q.  Handing you Government Exhibit 36B and 36D for

04:10PM    5    identification.  I'm handing you scissors.  Start with 36B.

04:11PM    6    First of all, the brown packaging, was it in the brown

04:11PM    7    packaging when you observed those materials in the bag?

04:11PM    8    A.  No, it was not.

04:11PM    9    Q.  Can you cut open 36B, please and just look to see if you

04:11PM   10    recognize what's inside of there?

04:11PM   11    A.  Yes.  It's a bundle of marijuana wrapped in cellophane.

04:12PM   12    Q.  And is that consistent with how the marijuana was that

04:12PM   13    you observed on February 18th, 2014?

04:12PM   14    A.  Yes.

04:12PM   15    Q.  And just so the record is clear, on Government

04:12PM   16    Exhibit 36B, you used scissors to open the package and open

04:12PM   17    the seal, correct?

04:12PM   18    A.  Correct.

04:12PM   19    Q.  And three packages, all the same size and it was all

04:12PM   20    those similar sizes that we see in front of you, 36A, 36B and

04:12PM   21    36D?

04:12PM   22    A.  Correct.  Yes.

04:12PM   23    Q.  Did you keep possession of the package from UPS then, you

04:12PM   24    personally?

04:12PM   25    A.  Once we opened it, it was turned over to Buffalo Police

| 04:12PM | 1 | Department. |
|---|---|---|

04:12PM  1    Department.

04:12PM  2    Q.  And was it put back in the UPS package that it came in?

04:12PM  3    A.  Yes.  The marijuana was resealed back in the package so

04:12PM  4    that we could attempt a delivery.

04:12PM  5    Q.  And did you see it put back in the sealed package?

04:12PM  6    A.  Yes.

04:12PM  7    Q.  Investigator, were you the one that attempted the

04:13PM  8    delivery?

04:13PM  9    A.  No.  A Buffalo PD officer did.

04:13PM  10   Q.  Investigator, if I could have you reseal the package in

04:13PM  11   front of us.  Nothing like 20 people watching you do that,

04:15PM  12   right?

04:15PM  13   A.  The tape is very sensitive.  I'm sorry.

04:15PM  14         MR. PARISI:  No further questions.

04:16PM  15         MR. FOGG:  No questions, Judge.

04:16PM  16         THE COURT:  All right.  Thank you, sir.

04:16PM  17         THE WITNESS:  Thank you, sir.

04:16PM  18   (Witness excused at 4:16 p.m.)

04:16PM  19         THE COURT:  Ladies and gentlemen, we're going to

04:16PM  20   conclude for the day.  I think we had enough witness and we'll

04:16PM  21   resume again tomorrow.  I've got some matters on.  We better

04:16PM  22   make it 10:30 tomorrow.  I don't want to have you waiting in

04:16PM  23   there.  So, we'll resume the trial tomorrow at 10:30.

04:16PM  24         During the recess, please do not discuss the case

04:16PM  25   with anyone.  Do not discuss the case among yourselves.  Do

PETERSON -- BY MR. PARISI -- 4/24/18
678

04:16PM    1    not read anything about the case.  Do not do any research or

04:16PM    2    conduct any investigation.  You're reminded not to talk to any

04:16PM    3    of the witnesses or the lawyers or the parties.  Keep an open

04:16PM    4    mind, ladies and gentlemen.  Do not form any opinion or

04:16PM    5    judgment.  Wait until you have heard all the evidence.

04:16PM    6            Enjoy the evening, folks and we'll see you tomorrow

04:16PM    7    morning.  I hate to start at 10:30, but I don't want to keep

04:16PM    8    you waiting.  So, we'll start at 10:30.  Okay?  Have a nice

04:17PM    9    evening.

04:17PM    10   (The jury left the room at 4:17 p.m.)

04:17PM    11           THE COURT:  Mr. Parisi, who is the next three or four

04:17PM    12   witnesses you're calling?

04:17PM    13           MR. PARISI:  Your Honor, I think we're going to call

04:17PM    14   State Police and Buffalo Police officers related to this Joel

04:17PM    15   Catuzza, Lauren Nash from the District Attorney's office,

04:17PM    16   Kaitlin Drollette from the Central Police Services Laboratory.

04:17PM    17   I think that's the next few witnesses.

04:17PM    18           THE COURT:  All right.  All right.  We'll see you

04:17PM    19   tomorrow morning.  Court will be in recess.

04:17PM    20           THE CLERK:  All rise.

          21   (Proceedings concluded at 4:17 p.m.)

          22

          23

          24

          25

1              *     *     *     *     *     *     *

2

3              I certify that the foregoing is a

4      correct transcription of the proceedings

5      recorded by me in this matter.

6

7

8

9                           s/ Megan E. Pelka, RPR

10                          Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25